KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD
JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE. and
ALDO CASCIO

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>            Plaintiffs,<br><br>        vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>            Defendants. | CASE NO.<br><br>**COMPLAINT**<br><br>1.    **Sex Trafficking of Children by Force, Fraud, or Coercion (18 U.S.C. §§ 1591, 2255)**<br>2.    **Negligence**<br>3.    **Negligent Hiring, Supervision, or Retention of Employee**<br>4.    **Intentional Infliction of Emotional Distress**<br>5.    **Breach of Contract**<br>6.    **Fraud**<br>7.    **Breach of Fiduciary Duty**<br>8.    **Rescission**<br>9.    **Declaratory Judgment**<br><br>**DEMAND FOR JURY TRIAL** |

6187.060/3192176.11

Plaintiffs Edward Joseph Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio (collectively, "Plaintiffs") hereby allege as follows:

## INTRODUCTION

1.     Michael Jackson ("Jackson") was a serial child predator who, over the course of more than a decade, drugged, raped, and sexually assaulted each of the Plaintiffs, beginning when some of them were as young as seven or eight.  Jackson's attacks on these siblings went on for extended periods, including in locations around the world and when Jackson and his children were guests in Plaintiffs' family home.

2.     Jackson groomed and brainwashed each Plaintiff, without the knowledge of the others or their parents, throughout their childhood years.  Jackson used methods typical of child predators, but his wealth and fame, and the apparatus of professional advisors and employees who aided and abetted, and actively concealed, the abuse, gave him far more power over his many victims than other child predators.

3.     Jackson insinuated himself into the lives of Plaintiffs and their parents with obsessive attention, lavish gifts, access to his celebrity lifestyle, and declarations that he loved and needed each of them.  After the abuse started, he isolated them emotionally, and sometimes physically, from responsible adults and from each other.  He plied them with drugs and alcohol.  He showed them pornography, including pictures of unclothed children, to normalize the abuse and desensitize them.  He made them fear and distrust others by convincing them that not only his life, but also their lives and the lives of their family members, would be destroyed if anyone found out what he was doing to them.

4.     Defendants and their employees provided the drugs, alcohol, and pornography, facilitated Jackson's being left alone during the sexual assaults, and covered the abuse up afterwards.

5.     Fifteen years after Jackson's death, and after the well-publicized release of the HBO documentary *Leaving Neverland* detailing Jackson's abuse of

other children, that apparatus continues to use its enormous wealth and power to try to silence Plaintiffs and prevent them from seeking justice.  After the documentary's release, Defendants fraudulently induced the Plaintiffs to sign a deceptive and unconscionable document that the Jackson Estate created to attempt to prohibit Plaintiffs from talking about the years of abuse they endured.  More recently, Defendants responded to detailed, admissible evidence of Jackson's crimes against Plaintiffs with defamatory false accusations, threats, and public disclosure of highly private information.  Defendants have explicitly threatened to drive Plaintiffs into bankruptcy if they make their claims publicly.

6.    Plaintiffs reject the Jackson Estate's morally bankrupt efforts to control and silence them.  Plaintiffs bring this action to hold the Michael Jackson Estate, its affiliates, and the persons who control or work on their behalf, accountable for Jackson's conduct and their own wrongdoing.

## THE PARTIES

7.    Plaintiff Edward Joseph Cascio ("Edward") is an individual residing in South Carolina.

8.    Plaintiff Dominic Savini Cascio ("Dominic") is an individual residing in South Carolina.

9.    Plaintiff Marie-Nicole Porte ("Marie-Nicole") is an individual residing in South Carolina.

10.    Plaintiff Aldo Cascio ("Aldo") is an individual residing in the County of San Bernardino, California.

11.    Defendant John Branca ("Branca") is and at all times material herein has been co-administrator of the Estate of Michael Jackson (the "Estate") and co-trustee of the Michael Jackson Family Trust (the "Trust") (references hereinafter to the "Jackson Estate" or the "Estate" include the Trust); is named herein individually and in those capacities; and, on information and belief, is and at all times material herein has been a resident of this District.

12.    Defendant John McClain ("McClain") is and at all times material herein has been co-administrator of the Estate and a co-trustee of the Trust; is named herein individually and in those capacities; and, on information and belief, is and at all times material herein has been a resident of this District.

13.    Defendant The Michael Jackson Company, LLC ("MJC") is and at all times material herein has been a Delaware limited liability company with its principal place of business in this District.  On information and belief, the Estate wholly owns and controls MJC directly or indirectly through one or more other entities.

14.    Defendant MJJ Productions, LLC ("MJJP") is and at all times material herein has been a limited liability company organized and existing under the laws of the State of California, with its principal place of business in this District.  On information and belief, the Estate wholly owns and controls MJJP directly or indirectly through one or more other entities.

15.    Defendant MJJ Ventures, LLC ("MJJV") is and at all times material herein has been a limited liability company organized and existing under the laws of the State of California with its principal place of business in this District.  On information and belief, the Estate wholly owns and controls MJJV directly or indirectly through one or more other entities.

16.    Defendant Herman Weisberg ("Weisberg") is and at all times material herein has been an individual residing in the State of New York.

17.    Plaintiffs sue Does 1 through 20, inclusive, herein under fictitious names.  Plaintiffs do not know their true names and capacities.  When Plaintiffs ascertain the Doe defendants' true names and capacities, Plaintiffs will amend this complaint by inserting their true names and capacities herein.  On information and belief, each defendant named herein as a Doe acted with the other defendants and is responsible for the damages to Plaintiff herein alleged.  Each reference in this complaint to Defendants, or to any of them, also refers to all defendants sued under

fictitious names.

18.    On information and belief, at all times material herein, each of the Defendants was the agent and employee of the other Defendants, and in doing the things hereinafter alleged, was acting within the course and scope of such agency and employment.

## JURISDICTION

19.    This Court has subject matter jurisdiction over the federal question claim alleged herein under 15 U.S.C. § 1121(a) and 28 U.S.C. §§ 1331 and 1338.

20.    Plaintiffs' state law claims and federal question claim are related and arise from the same case or controversy, such that this Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1338(b) and § 1367(a).

## VENUE

21.    Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

22.    Should this Court decide that venue is not proper under 28 U.S.C. § 1391(b)(1) and (b)(2), venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to this Court's personal jurisdiction in this judicial district.

## GENERAL ALLEGATIONS

### A. Summary

23.    Plaintiffs met Jackson through their father, who met Jackson while working at a luxury hotel where Jackson frequently stayed.  After gaining Plaintiffs' and their family's trust, Jackson sexually abused each of the Plaintiffs for years, starting when some of them were as young as seven or eight years old and continuing into their adolescence.  The abuse included the following:

24.    Jackson raped and molested Edward on interstate and international trips, including, among others, during stops on the *Dangerous World Tour*, at

Elizabeth Taylor's house in Switzerland, at Elton John's home in the United Kingdom, and at Jackson's Santa Barbara County, California estate, Neverland Ranch.

25.    Jackson raped and molested Dominic on interstate and international trips, including in Florida, New Jersey, New York, France, and South Africa, and during the *HIStory World Tour*, at Neverland Ranch, and at the Cascio family's New Jersey home.

26.    Jackson raped and molested Aldo on interstate and international trips, including at Neverland Ranch, in New York, at the Cascio family's home, on video shoot locations, and at recording sessions.

27.    Jackson sexually assaulted Marie-Nicole on interstate and international trips, including at Neverland Ranch, New York, Las Vegas, Florida, and the Cascio family's home. He unsuccessfully attempted to sexually abuse Marie-Nicole in Bahrain.

**B. Jackson's Grooming and Manipulation of Plaintiffs**

28.    Jackson's years of brainwashing prevented Plaintiffs from seeking help when he was alive and for years afterward, or even comprehending the despicable behavior they endured.  After *Leaving Neverland* was released, the Jackson Estate and its lawyers and investigator used fraudulent misrepresentations, undue influence, and false promises to prevent Plaintiffs from revealing their abuse and seeking justice, until now.

29.    Jackson insinuated himself into Plaintiffs' family life.  He spent holidays and special occasions, including Thanksgiving, Christmas, and his own birthday, with Plaintiffs and their family, often during lengthy stays at their New Jersey home with his own children.  Jackson gained Plaintiffs' sympathy by complaining about his own childhood and telling them repeatedly that he lacked a bond with his own family and that they were his true family.

/ / /

30.    Jackson secured Plaintiffs' loyalty and acceptance of the abuse with rewards, including unique access to his celebrity lifestyle and increasingly extravagant presents. These included suitcases full of videogames and electronics, private shopping trips to toy stores, exclusive visits to theme parks, introductions to other celebrities, and interstate and international travel.  The travel included extended concert tours during which Jackson's organization assured Jackson the privacy he needed for his sexual assaults.

31.    Jackson normalized his abuse to condition Plaintiffs to it.  He told them that pornography and pictures of unclothed children were "sweet" and normal.  He bathed with some of the Plaintiffs.  He made two young boys under his "care" watch him abuse Marie-Nicole and told her that the abuse he inflicted on her was a "normal thing between a man and a woman."

32.    Jackson, himself constantly under the influence of drugs and frequently intoxicated, plied Plaintiffs with alcohol, marijuana, illegal hard drugs, and with prescription drugs, including Xanax, Vicodin, and Viagra, making them more vulnerable to his abuse than they already were as young children.  His advisors and employees made sure the substances were always available to him, including when he was alone with children.

33.    Jackson used child-friendly language to appeal to Plaintiffs and conceal the assaults and drug and alcohol use from others.  "Can I have a meeting," "Yogi Tea," "Neverland," and "Go to Disneyland" were his code words for encouraging the children to engage in extreme sex acts with him.  Those acts were as bad as, if not worse than, anything that can be described or imagined.  He called wine "Jesus Juice" and hard liquor "Disney Juice."  He associated alcohol with playing, including by encouraging Plaintiffs to drink with him while they were in the basement of his Neverland Ranch game room, which he called the "Wine Cellar".

34.    Jackson also made Plaintiffs fear and distrust others so that they would hide the abuse.  He repeatedly stressed that all of their lives, and Plaintiffs' family

members' lives, would be destroyed if his sexual activity with them were discovered.  He told them to hide if someone entered the room during a molestation. He drilled them on what to  say if a police officer or other adult asked whether he was molesting them.  He told them to stay away from therapists and to avoid women, who he told them were "evil," "sneaky," "liars," and could "smell" if something sexual had happened.

35.     To prevent disclosure of the abuse and gain more access to them, Jackson twice convinced Plaintiffs' parents to withdraw Aldo and Marie-Nicole from school so that they could be homeschooled.  The second time was immediately after authorities raided Neverland Ranch in November 2003.

36.     Jackson's manipulation and psychological and emotional abuse continued until days before Jackson's death.

**C. Jackson's Enablers**

37.     Jackson's employees, advisors, lawyers, and doctors were aware of Jackson's abuse and aided and abetted it, both by facilitating it and concealing it.

38.     For decades, Branca, McClain, and other Jackson advisors, representatives, and employees, acting for the Estate and its entities, along with lawyers, doctors, managers, security personnel, house managers, publicists, maids, chauffeurs, and pilots working for Jackson and his entities (all of the foregoing, collectively, the "Jackson Organization"), knew of and facilitated Jackson's sexual abuse of children.  A number of Jackson's victims have now been identified publicly, and there are others who have not been identified publicly.

39.     The Jackson Organization arranged for interstate and international trips during which Jackson sexually assaulted Plaintiffs. Members of the Jackson Organization purposefully booked Plaintiffs' hotel rooms near Jackson's rooms so that he had immediate access to Plaintiffs. When a Cascio parent accompanied one of the children on a trip with Jackson, members of the Jackson Organization intentionally booked the parent a room far from Jackson and the child so that the

1  parent would not see them spending long periods alone in Jackson's rooms.

2  40.    The Jackson Organization procured expensive gifts and arranged

3  shopping trips that Jackson orchestrated as part of his grooming of Plaintiffs.

4  41.    Jackson Organization members providing those services knew that

5  Jackson was sexually abusing Plaintiffs and many other children.  Jackson

6  Organization members constantly encountered evidence of Jackson's sexual

7  activities with Plaintiffs.  They saw Jackson bringing victims, including Plaintiffs, to

8  spend nights in his private bedrooms. They did the children's bedding and laundry.

9  They brought pornography and photographs of unclothed children to Jackson. They

10  procured drugs and alcohol that they knew Jackson was going to give to Plaintiffs to

11  make them comply with his demands.  They saw Plaintiffs and other children

12  inebriated and in alcohol induced stupors. They regularly witnessed Jackson's

13  inappropriate displays of affection to Plaintiffs, including Jackson fondling his

14  victims in public spaces at Neverland Ranch and elsewhere. They followed

15  Jackson's orders not to disturb him when he was alone with Plaintiffs, knowing that

16  he was sexually violating them. They installed security systems at Neverland

17  designed to prevent outsiders from discovering Jackson's crimes.

18  **D. *Leaving Neverland***

19  42.    In 2019, HBO released the documentary *Leaving Neverland*, in which

20  Jackson victims Wade Robson and James Safechuck described Jackson's sexual

21  abuse of them when they were children.  *Leaving Neverland* deprogrammed

22  Plaintiffs and forced them, for the first time, to become conscious of the reality:

23  Jackson's abuse was wrong and had severely damaged them.  It was not love, it was

24  not normal, and it was not exclusive, as Jackson had spent years making them

25  believe.

26  **E. The 2019 "Acquisition and Consulting Agreement"**

27  43.    In 2019, Plaintiffs were introduced to Weisberg.  Weisberg told them

28  he was a private investigator and former New York Police Department officer.  He

KING, HOLMES, PATERNO & SORIANO, LLP

6187.060/3192176.11

9

promised to help Plaintiffs' family obtain fair compensation from the Jackson Estate. Weisberg convinced the family, including Plaintiffs, that he would be working for them, not for Jackson's Estate.  Among other things, Weisberg said the Jackson Estate was the "evil empire," that he would never work for the Estate or its representatives, and that he was happy to be on the "right side" because he usually worked for the "bad guys."

44.     Shortly after the Weisberg introduction, prominent Jackson Estate attorney Bryan Freedman told the family, including Plaintiffs, that the Estate would compensate them for Jackson's crimes. Plaintiffs' understanding, based on what Weisberg told them (and on what he failed to disclose), was that Weisberg had contacted Freedman on their behalf.  Although Plaintiffs understood that Freedman represented the Jackson Estate, Freedman convinced Plaintiffs that he was working in their interests.  He expressed sympathy for them and acknowledged Jackson's crimes.  He told the Cascio family that he represented the "situation" to obscure his real role.

45.     Freedman and Weisberg were even more dishonest about Weisberg's role.  Unknown to Plaintiffs, Weisberg's job was to neutralize the threat that *Leaving Neverland* would trigger public disclosures from other Jackson victims, including Plaintiffs.  Freedman had a history of paying Weisberg for services and hired Weisberg on behalf of the Jackson Estate to convince Plaintiffs to cooperate with the Estate.

46.     Freedman and Weisberg concealed from Plaintiffs that Weisberg was working for Freedman and, through Freedman, the Jackson Estate.

47.     Freedman and Weisberg concealed from Plaintiffs that their goal was to buy Plaintiffs' silence for as little as possible.

48.     Freedman and Weisberg failed to advise Plaintiffs that they needed or should retain their own counsel to help them negotiate compensation and affirmatively dissuaded them from consulting independent counsel.

49.    After their early conversations, Weisberg arranged for Plaintiffs and other members of the Cascio family to meet with Freedman and the late Howard Weitzman, another Jackson Estate attorney.

50.    In or about June 2019, Plaintiffs told Freedman and Weitzman explicit details about Jackson's abuse. Freedman interviewed each Cascio sibling individually, again without advising them that they should have their own counsel. Freedman and Weitzman told Plaintiffs they knew they were telling the truth. Weitzman told the family he wanted to help them.  Weitzman also said "there were others—a girl."

51.    Freedman and Weitzman promised to send the family a settlement agreement that would properly compensate them for their "pain and suffering."

52.    Throughout this process, Weitzman, like Freedman and Weisberg, convinced Plaintiffs he was on their side.  He repeatedly told the Cascio family that he was advocating on their behalf to Branca so that the Estate would pay a fair settlement. Weitzman established a personal relationship with Plaintiffs to make them trust him, including by visiting the siblings' parents.

53.    At no time did Weitzman tell Plaintiffs they needed their own lawyer or that their conversations with him were not privileged and would be relayed to the Estate, including its decision maker, Branca, with or without their consent.  When Plaintiffs asked if they should hire their own counsel, Weitzman told them it would complicate matters and could prevent them from reaching an agreement with the Jackson Estate.

54.    The Jackson Estate eventually offered Plaintiffs only $100,000 each for the many years of abuse Jackson inflicted on them.  Weitzman told Plaintiffs that amount was inadequate to compensate Plaintiffs for the harm they had suffered and promised to try to negotiate a higher amount, still without making it clear that he was working to protect the Jackson Estate's interests, not theirs.

55.    Weitzman told Plaintiffs that the next sum that the Estate would

1    propose would be fair and the best he could achieve from Branca. Weitzman also

2    advised Plaintiffs that they risked losing any reasonable settlement if they rejected

3    whatever the Estate offered next.

4        56.    On or about December 22, 2019, Weisberg told Plaintiffs that he was

5    traveling to New Jersey to talk with them.  Weisberg then met with Plaintiffs, their

6    spouses, and their parents at the Cascio family restaurant in New Jersey.  Weitzman,

7    who was on the phone with Weisberg, told Weisberg what to say.  Weisberg told the

8    family that the Estate believed them and was prepared to compensate them fairly for

9    the suffering Jackson had caused.  Weisberg then showed Plaintiffs a legal

10   document deceptively titled "Acquisition and Consulting Agreement" (the

11   "Document").  That was the first time they saw the Document.  On information and

12   belief, Defendants used that harmless sounding title to obscure the unfair and

13   unconscionable nature of the Document so that Plaintiffs would accept and sign the

14   Document without protest.

15       57.    Weisberg did not let Plaintiffs read the Document and did not give

16   them a copy.  Instead, he allowed a family member—not one of the Plaintiffs—to

17   read the convoluted legalese aloud.

18       58.    The Estate and its lawyers knew not only that the statements in the

19   Document, that Plaintiffs had an opportunity to consult with counsel, and that the

20   Document was "jointly drafted," were false, but also that the Estate and its lawyers

21   had themselves prevented Plaintiffs from consulting with counsel and negotiating

22   the terms of the Document and that the Estate presented it to Plaintiffs on a "take it

23   or leave it" basis.

24       59.    Weisberg told the family vaguely that the Document was a "life rights"

25   agreement that would give the Jackson Estate the exclusive rights to Plaintiffs'

26   experiences with Jackson.  In fact, buried within the Document's legalese was a

27   purported release of the Estate from liability for Jackson's crimes, and language that

28   prohibited Plaintiffs from reporting Jackson's crimes to law enforcement or anyone

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.060/3192176.11                              12

else, saying anything negative about Jackson, or holding the Estate accountable in court for its and Jackson's wrongdoing.

60.    The Document provided for the Estate to pay each Plaintiff the wholly inadequate sum of five annual payments of approximately $690,000 as compensation for the many years that Jackson abused each of them and that the Jackson Organization enabled and covered up the abuse.

61.    The Document also provided for Weisberg and his agent to receive a "commission" of six percent of the payments to Plaintiffs, thereby reducing payments to Plaintiffs by six percent, as if Weisberg were representing Plaintiffs when, in fact, Weisberg was secretly working for Jackson Estate attorney Freedman on behalf of the Jackson Estate, and against Plaintiffs' interests.

62.    In August 1994, more than thirty years ago, Jackson reportedly paid one of his victims (who, unlike Plaintiffs, was represented by counsel) $25,000,000-the equivalent of approximately $55,000,000 in 2024 dollars-to settle that victim's claim that Jackson had abused him for a reported three month period.

63.    Taking into account inflation and that Jackson's abuse of Plaintiffs continued for many years, Jackson paid his 1993 victim approximately one hundred times the amount the Document allocates for each Plaintiff.

64.    Before signing the Document, Plaintiffs were never given an opportunity to read it carefully or obtain independent legal advice about what it meant and whether it was in their interest to sign it.  After signing the Document, Plaintiffs were never given a copy of what they had signed.

65.    The Document's technical wording included other unconscionable terms which were not explained to Plaintiffs and which Plaintiffs did not understand.  If the Jackson Estate's view is accepted, it included a grossly unfair penalty designed to pit the members of the Cascio family, including Plaintiffs, against each other.  The Jackson Estate interprets the Document to provide that, if any one of the Plaintiffs or another member of their family disclosed Jackson's

crimes to anyone, all of the promised payments would stop and each Plaintiff would have to pay back all payments that the Estate had already made.

66.     The Document contained an arbitration agreement that purportedly denied Plaintiffs the right to make claims against the Estate in court and have them decided by a jury of their peers.  Weitzman, Weisberg, and Freedman never explained that to Plaintiffs, and, even if the Estate had allowed them to read it, the written Document contained nothing to point a reader's attention to it.

67.     Had Plaintiffs understood the full meaning of the Document, they would not have signed it.

68.     The Jackson Estate arranged for Plaintiffs to sign the Document immediately, including arranging for their signatures to be notarized by a notary public who Weisberg brought to the restaurant.  Plaintiffs were not provided with a copy of the Document.

69.     Plaintiffs are informed and believe that neither Branca nor anyone else on behalf of the Estate signed the Document until Plaintiffs raised issues with the Document with the Estate in or around 2024. Unlike Plaintiffs' signatures, Branca's purported signature is not notarized or even dated.

70.     Plaintiffs are informed and believe that Branca delayed signing the Document to leave the Estate the option to avoid it.  Plaintiffs are further informed and believe he did not sign it until years after Plaintiffs signed it, when the Jackson Estate learned that Plaintiffs were considering making claims against the Jackson Estate.

### F.  The Jackson Estate's Publication of Material It Claims Is Subject to the Confidentiality and Non-Disparagement Terms in the Document

71.     Around April 2024, Weisberg contacted the Cascio family again. He indicated that Branca was willing to increase the Estate's compensation and make further arrangements to ensure Plaintiffs' continued silence.

72.     Freedman also contacted Plaintiffs, told them that they needed a

1  lawyer, and tried to induce them to hire him as their lawyer to negotiate with his

2  client, the Estate.  By then the conflict was obvious.

3      73.    Plaintiffs retained independent counsel, and learned for the first time

4  that Weisberg worked for the Estate and that Weitzman also represented the Jackson

5  Estate *against* them when he pretended to advance their interests and negotiate the

6  amounts that the Estate agreed to pay Plaintiffs in the Document.

7      74.    When Plaintiffs demanded compensation proportional to Jackson's

8  crimes and the harm they caused, Branca and McClain instructed Weisberg to try to

9  convince Plaintiffs to fire their independent counsel.  Plaintiffs refused.

10     75.    Branca and the Jackson Estate then engaged in a public "blame the

11 victim" campaign to intimidate Plaintiffs and their counsel.  In September 2024,

12 Branca and the Estate published false and defamatory statements concerning

13 Plaintiffs, their brother, and their attorney, and false statements concerning the

14 Document, to reporters.  Branca and the Jackson Estate made the false statements

15 with the intent and knowledge that they would be published for maximum

16 circulation to the Public, and they were published, including in the *Financial Times*,

17 *The Washington Informer*, and YouTube.com.  The false and defamatory statements

18 included that Plaintiffs and their counsel were "shak[ing] down"—i.e.,

19 blackmailing—the Jackson Estate by threatening to release "false" claims that

20 Jackson molested Plaintiffs. Without naming them, Branca intentionally described

21 Plaintiffs with enough detail that any reader could immediately discern their identity

22 with a quick Google search.

23     76.    Branca's statements materially breached the "Confidentiality and

24 Non-Disparagement" terms in the Document by disclosing the existence of the

25 Document and disparaging Plaintiffs.

26     77.    On July 9, 2025, Branca, McClain, the Estate and MJC filed a Petition

27 to Compel Arbitration (the "Petition") in the Superior Court for the County of Los

28 Angeles.  The Petition repeated much of what Branca had published in the press,

extensively quoted the Document, and made detailed allegations about the circumstances surrounding its creation.  The Petition accused Plaintiffs of extortion and lying about Jackson's abuse, and contained many other defamatory statements. Although the Petition did not identify Plaintiffs by name, the Petition provided ample information from which Plaintiffs' names could be deduced easily.

78.    The Petition was in direct violation of the terms of the Document, which expressly prohibited Defendants from defaming Plaintiffs and from making any court filing relating to the Document.

79.    MJC, Branca, McClain and the Estate filed the Petition to intimidate and defame Plaintiffs, and to position themselves to claim that the litigation privilege immunized them from liability for their evasion of the Document's confidentiality, disparagement, and mandatory arbitration provisions, and for defaming Plaintiffs.

## **FIRST CLAIM FOR RELIEF**

### **Sex Trafficking of Children by Force, Fraud, or Coercion**
### **(18 U.S.C. §§ 1591, 2255)**

*All Plaintiffs against all Defendants except Weisberg*

80.    Plaintiffs incorporate the foregoing allegations as though fully set forth.

81.    Defendants knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained Plaintiffs when they were children who had not attained the age of 18 years.

82.    Defendants knew Plaintiffs had not attained the age of 18 years.

83.    Defendants knew or acted with reckless disregard of the fact that Plaintiffs would be caused to engage in commercial sex acts with Jackson, who (directly and through the Jackson Organization) gave Plaintiffs valuable items, took Plaintiffs on trips, and gave Plaintiffs other items of value on account of the sexual abuse he inflicted on them.

/ / /

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.060/3192176.11

16

84.    Defendants' acts were in or affecting interstate or foreign commerce or within the special maritime and territorial jurisdiction of the United States.

85.    As a result of the foregoing conduct, Plaintiffs have been damaged in an amount subject to proof, plus interest at the legal rate.

86.    Defendants acted with fraud, malice, or oppression in connection with the foregoing conduct, such that Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish Defendants for their wrongful conduct and to deter future malfeasance.

## SECOND CLAIM FOR RELIEF

### Negligence

*Dominic, Marie-Nicole, and Aldo against all Defendants except Weisberg*

87.    Plaintiffs incorporate the foregoing allegations as though fully set forth.

88.    Defendants owed Dominic, Marie-Nicole, and Aldo a legal duty of care to take reasonable care to prevent Jackson from raping, sexually assaulting and psychologically abusing them and to inform their parents of Jackson's criminal activities.

89.    As a result of Defendants' breach of that duty, Dominic, Marie-Nicole, and Aldo have been damaged in an amount subject to proof, plus interest at the legal rate.

90.    Because Defendants covered up Dominic's, Marie-Nicole's, and Aldo's childhood sexual abuse, Plaintiffs are entitled to recover up to treble damages under California Code of Civil Procedure section 340.1(b).

## THIRD CLAIM FOR RELIEF

### Negligent Hiring, Supervision, or Retention of Employee

*Dominic, Marie-Nicole, and Aldo against all Defendants except Weisberg.*

91.    Plaintiffs incorporate the foregoing allegations as though fully set forth.

92.    Defendants hired members of the Jackson Organization who facilitated Jackson's sexual abuse of children, various of whom have been identified publicly.

93.     Defendants knew or should have known that those members of the Jackson Organization facilitated and would continue to facilitate Jackson's sexual abuse of children and that this created a particular risk to other children in Jackson's proximity.

94.     Members of the Jackson Organization facilitated the singer's abuse of Dominic, Marie-Nicole, and Aldo.

95.     Defendants' negligence in retaining those members of the Jackson Organization was a substantial factor in causing Dominic's, Marie-Nicole's, and Aldo's harm. Dominic, Marie-Nicole, and Aldo have been damaged in an amount subject to proof, plus interest at the legal rate.

96.     Because Defendants covered up Dominic's, Marie-Nicole's, and Aldo's childhood sexual abuse, they are entitled to recover up to treble damages under California Code of Civil Procedure section 340.1(b).

## FOURTH CLAIM FOR RELIEF

### Intentional Infliction of Emotional Distress

*All Plaintiffs against all Defendants Except Weisberg*

97.     Plaintiffs incorporate the foregoing allegations as though fully set forth.

98.     Defendants' conduct was outrageous.

99.     Defendants intended to cause Dominic, Marie-Nicole, and Aldo to suffer emotional distress or acted with reckless disregard of the probability that Dominic, Marie-Nicole, and Aldo would suffer emotional distress.

100.   Dominic, Marie-Nicole, and Aldo suffered emotional distress.

101.   Defendants' conduct was a substantial factor in causing Dominic's, Marie-Nicole's, and Aldo's severe emotional distress.

102.   As a direct and proximate result of Defendants' infliction of emotional distress, Dominic, Marie-Nicole, and Aldo have been damaged in an amount to be proved at trial, plus interest.

/ / /

KING, HOLMES,
PATERNO &
SORIANO, LLP

103.   Because Defendants covered up Dominic's, Marie-Nicole's, and Aldo's childhood sexual abuse, they are entitled to recover up to treble damages under California Code of Civil Procedure section 340.1(b).

104.   Defendants acted with fraud, malice, or oppression in connection with the foregoing conduct, such that Dominic, Marie-Nicole, and Aldo are entitled to an award of punitive damages in an amount sufficient to punish Defendants for their wrongful conduct and to deter future malfeasance.

## FIFTH CLAIM FOR RELIEF

### Breach of Contract

*All Plaintiffs against MJC*

105.   Plaintiffs incorporate the foregoing allegations as though fully set forth.

106.   Plaintiffs have performed all obligations required of them under the Document, except those that Defendants have waived or of which performance has been excused.

107.   Plaintiffs dispute that the Document is or ever was an enforceable contract.  If the Document was an enforceable agreement, Branca's September 2024 statements and MJC's filing of the Petition materially and substantially breached its express prohibitions against disparaging Plaintiffs, disclosing the information that Branca published in September 2024, and including confidential information in court documents.

108.   Defendants' acts in contravention of the express terms of the Document have caused Plaintiffs to suffer damages in an amount to be proved at trial, plus interest at the legal rate.

## SIXTH CLAIM FOR RELIEF

### Fraud

*All Plaintiffs against all Defendants*

109.   Plaintiffs incorporate the foregoing allegations as if fully set forth.

/ / /

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.060/3192176.11

19

110.   To convince Plaintiffs to enter into the Document, Freedman, Weitzman, and Weisberg, acting on behalf and at the direction of the Jackson Estate, including Branca, falsely and fraudulently represented to Plaintiffs that they were protecting Plaintiffs' interests and negotiating the Document on their behalf.

111.   Freedman and Weisberg intentionally and fraudulently concealed from Plaintiffs that Weisberg was working for the Jackson Estate and that Freedman and Weisberg were adverse to Plaintiffs.

112.   Plaintiffs reasonably relied on Freedman, Weitzman and Weisberg's fraudulent misrepresentations on behalf and at the instruction of the Jackson Estate. Plaintiffs were not attorneys and the Jackson Estate, Freedman, Weitzman and Weisberg knew that Plaintiffs were unsophisticated, did not understand legal documents (especially when they were not allowed to read them), and did not have counsel.

113.   Due to Defendants' fraudulent representations and concealments, Plaintiffs were denied the opportunity to negotiate full and fair compensation for their injuries alleged herein, and have been damaged in an amount to be proved at trial, plus interest.

114.   Defendants acted with fraud, malice, or oppression in connection with the foregoing conduct, such that Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish Defendants for their wrongful conduct and to deter future malfeasance.

## SEVENTH CLAIM FOR RELIEF

### Breach of Fiduciary Duty

*All Plaintiffs against Weisberg*

115.   Plaintiffs incorporate the foregoing allegations as though fully set forth.

116.   As Plaintiffs' paid advocate in negotiating the Document, Weisberg owed Plaintiffs a fiduciary duty of loyalty to Plaintiffs to provide them complete, truthful and accurate information and to act in their best interests.

117.  Weisberg breached his fiduciary duty by concealing from Plaintiffs that he was employed by Freedman and, through Freedman, by the Jackson Estate, to represent the Estate's interests against Plaintiffs and to convince Plaintiffs to accept far less than the reasonable value of their claims for Jackson's abuse and the Jackson Organization's facilitation and concealment of the abuse; and by encouraging and convincing Plaintiffs to sign the Document, which contained the unconscionable terms described herein.

118.  As a result of Weisberg's breach of fiduciary duty Plaintiffs have suffered damages in an amount to be proved at trial, plus interest at the legal rate.

119.  Weisberg acted with fraud, malice, or oppression in connection with the foregoing conduct, such that Plaintiffs are entitled to an award of punitive damages in an amount sufficient to punish Weisberg for his wrongful conduct and to deter future malfeasance.

## EIGHTH CLAIM FOR RELIEF

### Rescission

*All Plaintiffs against MJC*

120.  Plaintiffs incorporate the foregoing allegations as though fully set forth.

121.  The Document in its entirety, and the arbitration agreement therein, are procedurally and substantively unconscionable.  MJC procured Plaintiffs' signatures on the Document by fraud, undue influence, and duress.

122.  Plaintiffs are entitled to rescission of the Document on those grounds.

## NINTH CLAIM FOR RELIEF

### Declaratory Judgment

*All Plaintiffs against all Defendants except Weisberg*

123.  Plaintiffs incorporate the foregoing allegations as though fully set forth.

124.  Plaintiffs contend that the Document, including its arbitration agreement, is void because it violates public policy, and voidable due to its unconscionability and Defendants' fraud, undue influence, and duress, and that

Defendants, by their public disclosures alleged herein, have waived or are estopped to enforce, the Document's confidentiality and non-disparagement terms.

125. Defendants contend that the Document, including its arbitration agreement and confidentiality and non-disparagement terms, is enforceable. An actual, present controversy exists concerning whether the Document is void or voidable, and whether Defendants have waived or estopped to enforce its confidentiality and non-disparagement terms.

126. Plaintiffs request that the Court issue a declaration as to the Parties' rights and obligations under the Document.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment, as follows:

1. As to each Plaintiff, damages in an amount to be proved at trial, plus interest at the legal rate;

2. As to Dominic, Marie-Nicole, and Aldo, an award of treble damages pursuant to Code of Civil Procedure section 340.1(b);

3. For rescission of the Document;

4. For a declaration that (1) the Document is void or voidable, (2) Plaintiffs are excused from performing any obligation for which the Document provides, (3) the arbitration agreement in the Document is void or voidable, (4) Defendants have waived any right they may have had to enforce the arbitration agreement in the Document, and (5) Defendants have waived any right they may have had to enforce the confidentiality and non-disparagement terms in the Document.

5. For punitive damages;

6. For Plaintiffs' costs and attorney fees; and

7. For such other and further relief as the Court deems just and proper.

/ / /

KING, HOLMES,
PATERNO &
SORIANO, LLP

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs demand a trial by jury on all issues so triable under Federal Rule of

3

Civil Procedure 38.

4

5

DATED:  February 27, 2026          KING, HOLMES, PATERNO &
                                                              SORIANO, LLP

6

7

8

9          By:    _____/s/ Howard E. King_____

10                                       HOWARD E. KING
                                            STEPHEN D. ROTHSCHILD
                                            JACKSON S. TRUGMAN
11                                       HEATHER L. PICKERELL
                                       Attorneys for Plaintiffs EDWARD JOSEPH
12                                    CASCIO, DOMINIC SAVINI CASCIO,
                                       MARIE-NICOLE PORTE and ALDO CASCIO
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28