**MARTIN D. SINGER (BAR NO. 78166)**
**ALLISON S. HART (BAR NO. 190409)**
**SINGER WEINSTEN WOLF & JONELIS LLP**
2049 Century Park East, Suite 2400
Los Angeles, California 90067-2906
Telephone:  (310) 556-3501
Facsimile:   (310) 556-3615
Email:  mdsinger@singerlaw.com
         ahart@singerlaw.com

**JONATHAN P. STEINSAPIR (SBN 226281)**
**KATHERINE T. KLEINDIENST (SBN 274423)**
**KINSELLA HOLLEY ISER KUMP STEINSAPIR LLP**
11766 Wilshire Blvd., Suite 750
Los Angeles, CA 90025
Telephone: (310) 566-9834
Facsimile: (310) 556-3615
Email:  jsteinsapir@khiks.com
         kkleindienst@khiks.com

Attorneys for Defendants THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; and MJJ VENTURES, LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF | CASE NO. 2:26-cv-02129-HDV-AGR<br><br>Hon. Hernan D. Vera<br><br>**DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION FOR AN ORDER COMPELLING ARBITRATION**<br><br>Date:         June 4, 2026<br>Time:         10:00 a.m.<br>Courtroom: 5B<br><br>Complaint filed:  February 27, 2026 |

1

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN WEISBERG, an individual; and DOES 1 through 20, inclusive,

Defendants.

## DECLARATION OF MARTIN D. SINGER

I, Martin D. Singer, hereby declare:

1. I am an attorney at law licensed to practice before all of the Courts of the State of California and the Central District of California. I am a partner of Singer Weinsten Wolf & Jonelis LLP, counsel of record for Defendants The Michael Jackson Company, John Branca, individually and as Co-Administrator of The Estate of Michael Jackson and Co-Trustee of the Michael Jackson Family Trust, John McClain, individually and as Co-Administrator of The Estate Of Michael Jackson and Co-Trustee of the Michael Jackson Family Trust, MJJ Productions, LLC, and MJJ Ventures, LLC (collectively "Defendants" or the "MJC Parties"). I make this Declaration in support of Defendants' Motion for an Order Compelling Arbitration. I have personal and first-hand knowledge of the matters set forth in this declaration and, if called upon to testify, could and would provide testimony thereto under oath.

### The 2020 Agreement Providing for Mandatory Arbitration

2. The Motion to Compel Arbitration is brought pursuant to the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) and the California Arbitration Act (Cal. Civ. Proc. Code § 1281), seeking to compel Plaintiffs and all other parties to the

2

Agreement to submit to binding Arbitration any and all alleged claims against the Defendants and/or other agents, attorneys or third-party beneficiaries of a Confidential Acquisition and Consulting Agreement dated on or about January 10, 2020 that Defendant The Michael Jackson Company, LLC ("MJC") entered into with Plaintiffs and others, including without limitation Plaintiffs' brother, Frank Cascio[1] (herein the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit 1.

3.  Subsequently, in January of 2020, at the Cascio Parties' request, a Letter of Direction was entered into substantially modifying the initial payments due under the Agreement. Attached hereto as Exhibit 2 is a true and correct copy of the Letter of Direction.  Defendant Herman Weisberg, who I do not represent and who I am informed has not yet been served, is also a signatory to the Letter of Direction, pursuant to which Mr. Weisberg specifically agreed to arbitrate future disputes with the Cascio Parties and the MJC Parties under the Agreement.

4.  I am informed and believe that MJC's officer (Defendant John Branca who is also one of the Executors of the Estate of Michael J. Jackson and one of the Trustees of the Michael Jackson Family Trust), entered into the Agreement under recommendation of counsel with respect to their responsibility as fiduciaries, in order to protect the beneficiaries of the Estate from having to deal with specious future claims, and to protect future projects important to Michael Jackson's legacy. Pursuant to the Agreement, the Cascio Parties and the other parties to the Agreement were paid significant financial consideration over a period of five (5) years.

5.  Prior to entering into the Agreement, none of the Cascio Parties nor any of the other parties to the Agreement ever filed any civil action against any of the MJC Parties.

---

[1]  Plaintiffs and Frank Cascio, who is not a party to this action, but is a Respondent in an underlying arbitration proceeding with MJC, shall hereinafter be collectively referred to as the "Cascio Parties."

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

6. In communications with the Cascio Parties' attorney, Howard King, in October 2024, Mr. King admitted in writing that the amount of consideration initially offered to the Cascio Parties by MJC in connection with the Agreement was significantly less than the amount they were ultimately paid since the Cascio Parties were able to obtain from MJC substantially more consideration than was initially offered.

7. Among other provisions, as further set forth below, the Agreement contains an arbitration provision requiring mandatory arbitration of future claims, strict confidentiality and non-disparagement terms, and comprehensive waivers and releases of any and all past claims against MJC, the Estate of Michael Jackson, all companies owned in whole or in part by the Estate of Michael Jackson, all companies owned in whole or in part by Michael Jackson at the time of his death, and their officers, executors, attorneys and other representatives.

8. The Agreement contains a mandatory arbitration clause that expressly provides that all future disputes arising out of or related to the Agreement must be resolved in arbitration, as follows:

> "20. <u>Governing Law, Mandatory Arbitration, Venue, And Jurisdiction</u>. This Agreement shall be governed under the laws of the State of California without reference to choice of law rules. ***Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof,*** **including any allegations that either Party has violated any state or federal statutory or common law right**, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, ***shall be determined by binding arbitration in Los Angeles County, California***, before a retired judge or justice of a California or federal court. Without limiting the foregoing, ***the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court***. Any such arbitration shall be filed with and administered by JAMS or Signature Resolution, at the claimant's choice, pursuant to their then current general arbitration rules. With respect to conflicts between the California Arbitration Act and the Federal Arbitration Act, the Federal Arbitration Act shall govern. If neither JAMS nor Signature Resolution (or successor entities) shall exist at the time of a demand for arbitration, the arbitration shall be filed with and administered by ADR Services pursuant to its applicable arbitration rules at

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

the time of filing. If ADR Services does not exist at the time of the demand for arbitration, the arbitration shall be filed with AAA or any other arbitration service. ***The filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement, and the confidentiality provisions thereof, and shall entitle the non-breaching Party to all damages, including attorneys' fees expended in compelling arbitration, resulting therefrom***. Each Party irrevocably submits to the exclusive jurisdiction and exclusive venue of the state and federal courts for the County of Los Angeles, State of California for any necessary court proceedings, such as petitions to confirm or vacate an arbitral award." (Emphasis added).

9.     In addition, Paragraph 6.a. of the Agreement provides: "Any action to enforce this Agreement must be brought pursuant to Paragraph 20 below."

### **The Agreement's Confidentiality and Release Provisions**

10.     The Agreement includes strong confidentiality provisions, as follows:

"6.     <u>Confidentiality and Non-Disparagement</u>.

a.     Each Party shall forever maintain the confidentiality of and shall not disclose this Agreement or anything relating thereto, including but not limited to the Agreement's existence, terms, subject matter, etc., along with information relating to the Cascio Life Story Rights, other than information relating thereto that is already publicly known at the time of execution of this Agreement (the 'Confidential Information') to any third-party except insofar as disclosure is necessary to be made to the Party's respective accountants and attorneys (who will similarly keep the terms and conditions of this Agreement confidential and shall sign appropriate non-disclosure agreements). Should any Party be served with legal process that may be interpreted to require disclosure of this Agreement, that Party shall advise the other Parties reasonably in advance of any such disclosure in order to allow any of the other Parties to bring an appropriate motion for a protective order or other motion or action. Any action to enforce this Agreement must be brought pursuant to Paragraph 20 below.

b.     The Parties agree to refrain from making any statements or taking any action, directly or indirectly, orally or in writing, that may defame, disparage, embarrass, or in any way harm or impair the reputation, goodwill, business interests or financial interests of any of the other Parties, including the Cascio Releasing Parties and the Estate Released Parties, except as required by law or in connection with a legal or administrative proceeding."

11.    The Agreement also contains comprehensive waivers and releases of any and all past claims against the MJC Parties as follows:

"4.    Releases. The Parties recognize that they have had potential disputes in the past and, as part of this Agreement and in order to start on a 'clean slate,' the Parties agree it is in their mutual best interests to fully release each other from any and all claims that they may have against the other relating to any subject matter, known or unknown, from the beginning of time until the date of execution of this Agreement. Accordingly, the Parties hereby exchange the following releases:

a.    Except with respect to the obligations created by or arising out of this Agreement, the **Cascio Parties**, on behalf of themselves, and any of their companies, and each of the Cascio Parties' respective heirs, successors, assigns, licensees, subsidiaries, affiliates, representatives, beneficiaries, spouse, agents, employees, officers, members, managers and attorneys ('the Cascio Releasing Parties'), **hereby fully and forever release and discharge MJC, Michael Jackson, the Estate of Michael J. Jackson, its Co-Executors**, its individual beneficiaries (Michael Jackson's three children and Michael Jackson's mother), **all companies owned in-whole or in-part by the Estate of Michael Jackson (including but not limited to all companies owned in-whole or in-part by Michael Jackson at the time of his death**), personal representatives, **and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers, members, managers, attorneys, insurers, sureties and agents ('the Estate Released Parties'**), from any and all claims, causes of action, damages and any other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date that this Agreement is fully executed by the Parties, relating in any way to their individual and collective association with, interactions with, knowledge of, or experiences through Michael J. Jackson.

b.    Except with respect to the obligations created by or arising out of this Agreement, MJC and the Estate of Michael J. Jackson, on behalf of themselves, and any of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, representatives, beneficiaries, spouse, agents, employees, officers, members, managers and attorneys ('the MJC Releasing Parties'), hereby fully and forever release and discharge the Cascio Parties, and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers,

6

members, managers, attorneys, insurers, sureties and agents ('the Cascio Released Parties'), from any and all claims, causes of action, damages and any other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date that this Agreement is fully executed by the Parties, relating in any way to their individual and collective association with, interactions with, knowledge of, or experiences through Michael J. Jackson.

c.      Nothing herein shall be construed to release any claims for breach of this Agreement.

d.      Nothing herein shall be construed as an admission of liability by any Party, and each Party expressly acknowledges and agrees that the other Party hereto has not admitted, and by execution or performance of this Agreement does not admit, any liability or obligation to the other Party, except for the obligations created by this Agreement.

5.      Waiver of Civil Code Section 1542 and Similar Laws. The Parties acknowledge that they may hereafter discover facts different from, or in addition to, those now known or believed to be true relating to the Action. Notwithstanding the existence of any such different to additional facts, the Parties hereby agree that this Agreement shall remain in full force and effect. The Parties hereby waive any and all rights which they have or may have under the provisions of Section 1542 of the California Civil Code as no worded and as thereafter amended, along with any similar principles of law in other jurisdictions. Section 1542 of the California Civil Code reads as follows:

'SECTION 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THA, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.'

The Parties hereby waive and relinquish any right and benefit which either Party or any other party may have under Section 1542 to the extent that such party may lawfully do so in connection with the subject matter hereof." (Emphasis added.)

7

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

12.     Mr. Branca and Mr. McClain are Officers of MJC, Co-Executors of the Estate of Michael Jackson, and Co-Trustees of the Michael Jackson Family Trust. MJJ Ventures, LLC and MJJ Productions, LLC are single-member LLC's whose sole member is a corporation owned by the Estate of Michael Jackson. Therefore, pursuant to Paragraph 4(a) of the Agreement, Defendants MJC, MJJ Ventures, LLC, MJC Productions, LLC, John Branca, individually and as Co-Executor of the Estate of Michael Jackson and Co-Trustee of the Michael Jackson Family Trust and John McClain, individually as Co-Executor of the Estate of Michael Jackson and Co-Trustee of the Michael Jackson Family Trust, and the attorneys involved in representing MJC in connection with the Agreement, are each intended and named third-party beneficiaries of the Agreement and its terms, including but not limited to its releases, arbitration provisions, confidentiality and non-disparagement obligations.

### The $213 Million Demand

13.     Commencing in 2024, during a series of telephone conversations that I had with the Cascio Parties' lawyer, Howard King, he communicated a series of extortionate threats and demands on behalf of his clients. On behalf of the Cascio Parties, Mr. King demanded payment of a staggering *$213 Million*. Those demands were coupled with threats to repudiate the Agreement's mandatory arbitration and confidentiality obligations, that unless MJC agreed to the Cascio Parties' demand for hundreds of millions of dollars, they would make public accusations in the guise of an impermissible lawsuit, notwithstanding that pursuant to the Agreement, they had agreed to mandatory arbitration of all future disputes, had released all claims, had agreed to confidentiality, and had been paid substantial monies in consideration for those obligations.

### The Pending Arbitration and Continuing Shakedown Demands

14.     Accordingly, on or about September 17, 2024, MJC initiated an Arbitration against Frank Cascio before Signature Resolution, asserting claims for

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

Civil Extortion, Anticipatory Breach of Contract, and Declaratory Relief, Signature Resolution Case ID NLKXB.

15. Shortly thereafter, the Cascio Parties' lawyer, Howard King, threatened that his clients intended to assert tort claims against Branca as a result of statements attributed to Mr. Branca acting as an officer of MJC and Co-Executor of the Estate of Michael Jackson contained in two media reports regarding the reasons that MJC had entered into the Agreement, the extortion alleged, and the resulting Arbitration. The Cascio Parties were not named in the media reports, but their attorney, Howard King, sent a letter to Mr. Branca demanding that he issue a public statement refuting certain information that the media had published. That demand contained an implicit threat that rather than abiding by the Agreement's mandatory arbitration provision, Frank Cascio intended to repudiate the Agreement's obligation to arbitrate disputes.

16. Accordingly, on September 24, 2024, MJC and Mr. Branca filed a Supplemental Demand for Arbitration against Frank Cascio before Signature Resolution.

17. Soon thereafter, on October 11, 2024, Mr. King threatened to file public lawsuits on behalf of the Cascio Parties against Mr. Branca for defamation, and against MJC and the Estate of Michael Jackson based on outlandish scurrilous allegations that were completely inconsistent with what Frank Cascio had insisted for years in his unwavering defense of Michael Jackson unless the Cascio Parties' demand for hundreds of millions of dollars was satisfied.

18. After the Arbitrator was appointed in the pending arbitration, the Cascio Parties' lawyer, Howard King, sent an email dated January 3, 2025 in which he identified John Branca and other third parties as Cross-defendants to be included *in the Arbitration.* He also identified as Cross-defendants the Estate's co-executor, a lawyer for the Estate who was involved in negotiating and/or preparing the Agreement, MJJ Ventures, LLC, MJJ Productions, LLC, and others. Mr. King also

9

identified Frank Cascio, Edward Cascio, Dominic Cascio, Aldo Cascio and Marie-Nicole Porte as Cross-Complainants who would be asserting claims against those Cross-defendants *in the arbitration*. This was an acknowledgement that any claims against MJC, Branca, and/or other third-party beneficiaries of the Agreement are required to be adjudicated in mandatory Arbitration, and not in court. A true and correct copy of the January 3, 2025 email is attached hereto as Exhibit 3.

### Statements by the Cascio Parties Defending Michael Jackson

19.     Among the many past public statements that the Cascio Parties have made defending Michael Jackson's innocence, in a 2005 interview on *ABC Primetime Live*, Frank Cascio (under the name "Frank Tyson") stated, ***"Let me tell you something. If Michael ever laid a finger on me, I would not be in this chair right now."*** That interview may be viewed on YouTube at the following link: https://www.youtube.com/watch?v=Zma1mTfXJis&list=PPSV (12:45-48).

20.     In 2010, Frank Cascio, Edward Cascio, Marie-Nicole Porte and their parents and others were interviewed by Oprah Winfrey, reminiscing about Michael after his death. That interview, which aired December 6, 2010, can be viewed on YouTube at the following link: https://www.youtube.com/watch?v=Zma1mTfXJis&list=PPSV (12:45-48). When Oprah directly asked the Cascios, "were there ever any improprieties with you and Michael Jackson?" Frank Cascio resoundingly responded in unison with the others, "***Never***." In fact, Edward Cascio also explained to Oprah and her audience that "***Michael was a target. And, unfortunately, he was targeted.***" Their father, Dominic, Sr., stated unequivocally to Oprah that he never believed his children were unsafe in Michael's presence.

21.     In 2011, a major publishing house released a 300+ page book that Frank Cascio authored defending Michael Jackson entitled, "*My Friend Michael: An Ordinary Friendship with an Extraordinary Man*" (the "Book"). Collectively

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

attached as Exhibit 4 are excerpts from the Kindle edition of Frank Cascio's Book referenced herein.

22.     Frank Cascio dedicated the Book "*To Michael, my teacher—thank you for being a father, a brother, a mentor, and a friend, and for the greatest adventure I could ever have imagined. I love you, and I miss you every day. With all my love, Frank.*"

23.     In his Book, Frank Cascio stated unequivocally, *"I want to be precise and clear, on the record, so that everyone can read and understand: Michael's love for children was innocent, and it was profoundly misunderstood."* Book, Kindle edition, p. 49.

24.     Frank Cascio also wrote in his Book that Michael *"was being attacked by liars"* and that *"The allegations were all bullshit. There was nothing ambiguous about the whole thing. These people were after Michael's money. But he was innocent...."* Book, Kindle edition, pp. 276-277.

### MJC'S Petition to Compel Arbitration in the LA Superior Court and Plaintiffs' Forum Shopping

25.     Based on discussions I had with counsel representing the Cascio Parties[2] in early July 2025 in which the MJC Parties and I were deeply concerned that Frank Cascio and/or other of the Cascio Parties intended to imminently file a public lawsuit asserting tort claims against one or more of the MJC Parties in breach of the obligation under the Agreement to arbitrate disputes, on July 9, 2025, the MJC Parties filed a Petition to Compel Arbitration in the Los Angeles Superior Court against Frank Cascio and Does 1-10 (meant to include the other Cascio Parties), in

---

[2]     Between March 2025 and February 2026, the Cascio Parties replaced Howard King as their attorney with Mark Geragos of Geragos & Geragos.  However, after the Los Angeles Superior Court announced its tentative ruling to grant MJC's Petition to Compel Arbitration in January 2025, the MJC Parties re-engaged Mr. King and his firm replaced Mr. Geragos as the MJC Parties' attorneys in this matter.

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

the proceeding entitled *The Michael Jackson Company, LLC vs. Frank Cascio, et al.*, LASC Case No. 25SMCP00385.

26.     The hearing on MJC's Petition to Compel Arbitration took place on January 14, 2026, at which time the Los Angeles Superior Court announced its tentative ruling in favor of granting MJC's Petition to Compel Arbitration.  A true and correct copy of the Los Angeles Superior Court's tentative ruling dated January 14, 2026 is attached hereto as Exhibit 5.

27.     After hearing argument from both sides, and delivering the tentative ruling to grant the Petition to Compel Arbitration, the Judge presiding over MJC's Petition to Compel Arbitration in the Los Angeles Superior Court action took the matter under submission, and scheduled a follow-up hearing to take place on March 5, 2026.  Although he was not counsel of record for the Cascio Parties at the January 14, 2026 hearing, the Cascio Parties' current attorney, Howard King, along with Frank Cascio, Eddie Cascio, Aldo Cascio and Marie-Nicole Porte were present at the January 14, 2026 hearing and aware that the Los Angeles Superior Court had tentatively ruled in favor of granting the Petition to Compel Arbitration.

28.     In a flagrant display of forum shopping, on February 27, 2026, less than one week prior to the scheduled March 5, 2026 hearing before the Los Angeles Superior Court at which time the parties anticipated that the Court's decision to grant the Petition to Compel Arbitration would become final, on behalf of Edward Cascio, Dominic Cascio, Aldo Cascio and Marie-Nicole Porte, Howard King filed the instant action in violation of the mandatory arbitration provisions in the Agreement and asserting specious tort claims that were previously released under the Agreement.

29.     On March 4, 2026, the Los Angeles Superior Court issued its final ruling granting the Petition to Compel Arbitration filed by MJC.  A true and correct copy of the Los Angeles Superior Court's March 4, 2026 ruling granting MJC's Petition to Compel Arbitration is attached hereto as Exhibit 6.

12

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

30.    On March 18, 2026, MJC filed a Motion for Leave to File a Second Supplemental Demand for Arbitration against Frank Cascio, Edward Cascio, Dominic Cascio, Jr., Aldo Cascio, Marie-Nicole Porte and James Porte (Marie-Nicole Porte's husband), asserting claims against them for civil extortion, breach of the Agreement and declaratory relief in the arbitration pending before Signature Resolution. Although the Arbitrator presiding over the arbitration, the Hon. Terry A. Green (Ret.), ordered that the Cascio Parties file any opposition to the Motion for Leave to File Second Supplemental Demand for Arbitration by April 8, 2026, no opposition was filed to the Motion for Leave to file Second Supplemental Demand for Arbitration.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 17th day of April, 2026, at Los Angeles, California.

_____
MARTIN D. SINGER

13

DECLARATION OF MARTIN D. SINGER IN SUPPORT OF MOTION TO FOR AN ORDER COMPELLING ARBITRATION

# EXHIBIT 1

Confidential

## <u>ACQUISITION AND CONSULTING AGREEMENT</u>

This Agreement (the "Agreement") is made and entered into as of the date this Agreement is fully executed by the Parties (as defined below) (the "Effective Date") by and between The Michael Jackson Company, LLC ("MJC"), on the other hand, and Frank Cascio, Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, James Porte, Dominic Cascio, Sr., and Connie Cascio (individually and collectively, the "Cascio Parties"), on the other hand. MJC and the Cascio Parties are sometimes referred to collectively herein as the "Parties" and individually as a "Party."

In consideration of the mutual promises and covenants contained in this Agreement, the Parties agree as follows:

1.      <u>Life Story Rights</u>. The Cascios and MJC recognize that the Cascio family had a unique and close relationship to Michael Jackson such that Michael Jackson referred to them as a second family. As a result of this unique and close relationship, the Cascio family has unique stories to tell about Michael Jackson that are not publicly known and that could be of great value if exploited. As consideration in addition to their other obligations, promises, and services that the Cascio Parties agree to undertake incident to the terms and conditions of this Agreement, the Cascio Parties, and each of them, agree to grant to MJC the exclusive and irrevocable rights to the life story of each of the Cascio Parties as that life story relates to Michael Jackson, and their interactions and relationships with Michael Jackson, or their knowledge of other Cascio Parties' interations and relationships with Michael Jackson, from birth to the present (the "Cascio Life Story Rights"). The Cascio Life Story Rights include, but are not limited to, all pictures, videos, audio recordings, or any other audio, visual or audiovisual works of the Cascios with Michael Jackson, Michael Jackson's family (including Michael Jackson's three children), and of the Cascios, along with all stories about the Cascio Parties' interactions with Michael Jackson that are not publicly known at the time of execution of this Agreement. The Cascio Parties agree not to disclose anything relating to the Cascio Life Story Rights to any other person or entity without the prior written authorization of MJC, except for matters already publicly known by virtue of their disclosure, prior to the Effective Date, by the press, by Michael Jackson or those acting under his control, by MJC or those acting under its control, or by one or more of the Cascio Parties. Without limiting the foregoing, the Cascio Parties agree not to disparage Michael Jackson by portraying him in a negative light to any other person or entity. The Cascio Parties recognize that the Cascio Life Story Rights are valuable, and their disclosure in violation of this Agreement, would constitute irreparable hard to MJC. For the avoidance of doubt, the Cascio Parties agree not to sell, license, or authorize anyone else to use or exploit the Cascio Life Story Rights and agree to use or exploit the Cascio Life Story Rights to anyone else.

2.      <u>Consulting Obligations</u>. As consideration in addition to their other obligations, promises, and services that the Cascio Parties agree to undertake incident to the terms and conditions of this Agreement, the Cascio Parties agree to consult with MJC at reasonable times upon MJC's request in order to cooperate in efforts to exploit the Cascio Life Story Rights and also to help MJC exploit other unique information the Cascio Parties have about Michael Jackson. The Cascio Parties, and each of them agree to make themselves available, so long as

Page **1** of **10**

Confidential

they are given reasonable advance notice, to consult with MJC when MJC needs such consulting services.

        3.      <u>Payment</u>. As financial consideration for all of the obligations, promises, and services that the Cascio Parties agree to undertake incident to the terms and conditions of this Agreement, MJC shall make the following payments to certain of the Cascio Parties as follows (the "Payments"):

        a.      Beginning on January 1, 2020 and continuing for a term of five (5) consecutive calendar years ending on January 1, 2024, MJC shall cause to be paid to Frank Cascio the annual sum of Six Hundred and Ninety Thousand Dollars (USD $690,000), less six percent which shall be paid to Herman Weisberg and Ken Katz.

        b.      Beginning on January 1, 2020 and continuing for a term of five (5) consecutive calendar years ending on January 1, 2024, MJC shall cause to be paid jointly to Edward Cascio and Valeria Lissette Cascio the annual sum of Six Hundred and Ninety Thousand Dollars (USD $690,000), less six percent which shall be paid to Herman Weisberg and Ken Katz.

        c.      Beginning on January 1, 2020 and continuing for a term of five (5) consecutive calendar years ending on January 1, 2024, MJC shall cause to be paid jointly to Dominic Cascio, Jr. and Cindy Cascio the annual sum of Six Hundred and Ninety Thousand Dollars (USD $690,000), less six percent which shall be paid to Herman Weisberg and Ken Katz.

        d.      Beginning on January 1, 2020 and continuing for a term of five (5) consecutive calendar years ending on January 1, 2024, MJC shall cause to be paid to Aldo Cascio the annual sum of Six Hundred and Ninety Thousand Dollars (USD $690,000), less six percent which shall be paid to Herman Weisberg and Ken Katz.

        e.      Beginning on January 1, 2020 and continuing for a term of five (5) consecutive calendar years ending on January 1, 2024, MJC shall cause to be jointly paid to Marie-Nicole Porte and James Porte the annual sum of Six Hundred and Ninety Thousand Dollars (USD $690,000), less six percent which shall be paid to Herman Weisberg and Ken Katz.

        f.      On or before fourteen (14) calendar days after this Agreement is fully executed by the Parties, MJC shall cause to be paid jointly to Dominic Cascio, Sr. and Connie Cascio the sum of Ten Thousand Dollars (USD $10,000).MJC shall cause the Payments to be paid to the Cascio parties via wire transfer as directed (the "Payment Direction"). The Cascio Parties shall notify MJC in writing signed by each of the Cascio Parties if there is any change to the Payment Direction.

        g.      If the date by which any of the Payments are to be delivered falls on a Saturday, Sunday or legal holiday in the State of California or the United States, then the date said payment shall be delivered shall be the next following day which is not a Saturday, Sunday or legal holiday in the State of California or the United States.

Confidential

4.      Releases. The Parties recognize that they have had potential disputes in the past and, as part of this Agreement and in order to start on a "clean slate," the Parties agree it is in their mutual best interests to fully release each other from any and all claims that they may have against the other relating to any subject matter, known or unknown, from the beginning of time until the date of execution of this Agreement. Accordingly, the Parties hereby exchange the following releases:

a.      Except with respect to the obligations created by or arising out of this Agreement, the Cascio Parties, on behalf of themselves, and any of their companies, and each of the Cascio Parties' respective heirs, successors, assigns, licensees, subsidiaries, affiliates, representatives, beneficiaries, spouse, agents, employees, officers, members, managers and attorneys ("the Cascio Releasing Parties"), hereby fully and forever release and discharge MJC, Michael Jackson, the Estate of Michael J. Jackson, its Co-Executors, its individual beneficiaries (Michael Jackson's three children and Michael Jackson's mother), all companies owned in-whole or in-part by the Estate of Michael Jackson (including but not limited to all companies owned in-whole or in-part by Michael Jackson at the time of his death), personal representatives, and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers, members, managers, attorneys, insurers, sureties and agents ("the Estate Released Parties"), from any and all claims, causes of action, damages and any other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date that this Agreement is fully executed by the Parties, relating in any way to their individual and collective association with, interactions with, knowledge of, or experiences through Michael J. Jackson.

b.      Except with respect to the obligations created by or arising out of this Agreement, MJC and the Estate of Michael J. Jackson, on behalf of themselves, and any of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, representatives, beneficiaries, spouse, agents, employees, officers, members, managers and attorneys ("the MJC Releasing Parties"), hereby fully and forever release and discharge the Cascio Parties, and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers, members, managers, attorneys, insurers, sureties and agents ("the Cascio Released Parties"), from any and all claims, causes of action, damages and any other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date that this Agreement is fully executed by the Parties, relating in any way to their individual and collective association with, interactions with, knowledge of, or experiences through Michael J. Jackson.

c.      Nothing herein shall be construed to release any claims for breach of this Agreement.

d.      Nothing herein shall be construed as an admission of liability by any Party, and each Party expressly acknowledges and agrees that the other Party hereto has not admitted, and by execution or performance of this Agreement does not admit, any liability or obligation to the other Party, except for the obligations created by this Agreement.

17

Confidential

5.      Waiver of Civil Code Section 1542 and Similar Laws. The Parties acknowledge that they may hereafter discover facts different from, or in addition to, those now known or believed to be true relating to the Action. Notwithstanding the existence of any such different or additional facts, the Parties hereby agree that this Agreement shall remain in full force and effect. The Parties hereby waive any and all rights which they have or may have under the provisions of Section 1542 of the California Civil Code as now worded and as thereafter amended, along with any other similar principles of law in other jurisdictions. Section 1542 of the California Civil Code reads as follows:

> "SECTION 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

The Parties hereby waive and relinquish any right and benefit which either Party or any other party may have under Section 1542 to the extent that such party may lawfully do so in connection with the subject matter hereof.

6.      Confidentiality and Non-Disparagement.

        a.      Each Party shall forever maintain the confidentiality of and shall not disclose this Agreement or anything relating thereto, including but not limited to the Agreement's existence, terms, subject matter, etc., along with information relating to the Cascio Life Story Rights, other than information relating thereto that is already publicly known at the time of execution of this Agreement (the "Confidential Information") to any third-party except insofar as disclosure is necessary to be made to the Party's respective accountants and attorneys (who will similarly keep the terms and conditions of this Agreement confidential and shall sign appropriate non-disclosure agreements).  Should any Party be served with legal process that may be interpreted to require disclosure of this Agreement, that Party shall advise the other Parties reasonably in advance of any such disclosure in order to allow any of the other Parties to bring an appropriate motion for a protective order or other motion or action.  Any action to enforce this Agreement must be brought pursuant to Paragraph 20 below.

        b.      The Parties agree to refrain from making any statement or taking any action, directly or indirectly, orally or in writing, that may defame, disparage, embarrass, or in any way harm or impair the reputation, goodwill, business interests or financial interests of any of the other Parties, including the Cascio Releasing Parties and the Estate Released Parties, except as required by law or in connection with a legal or administrative proceeding.

7.      Representations And Warranties.

        a.      The Cascio Parties, and each of them, hereby represent and warrant that they have not defamed, disparaged, embarrassed, or in any way harmed or impaired the

Page **4** of **10**

18

Confidential

reputation, goodwill, business interests or financial interests of Michael Jackson, his Estate, his companies (including MJC) and/or that they have not shared the Confidential Information except to the following individuals and/or entities: Each of the Cascio Parties shall provide MJC with a written list of persons or entities that they have disclosed Confidential Information at the time of execution of this Agreement or within seven days theradter and each of the Cascio Parties shall sign his or her respective list (or a joint list by more than one person).

b.      The Cascio Parties, and each of them, hereby represent and warrant that none of the Life Story Rights granted to MJC in Paragraph 1 above have heretofore been granted, sold, assigned, licensed, or otherwise transferred to any person or entity other than a Party to this Agreement, nor have said rights been in any way encumbered, limited, or diminished by any of the Cascio Parties.

It is understood by the Parties that these representations and warranties are essential to this Agreement, and if they are breached and/or turn out to be false in any material way, MJC shall have the right to cancel all future Payments and seek the return of all Payments made to the Cascio Parties, along with interest at the legal rate against the Cascio Parties.

8.      <u>Cross-Default; A Breach by One Is a Breach by All</u>.

a.      If any of the Cascio Parties: (i) discloses information relating to the Cascio Life Story Rights (except for information publicly known at the time of execution of this Agreement) to any person other than MJC and the Estate Released Parties as set out in Paragraph 1 without the express written consent of MJC or the Estate Released Parties; or (ii) breaches or causes the breach of the Confidentiality or Non-Disparagement provisions in Paragraph 6, then any outstanding obligation of MJC to make the Payments shall be void, and MJC shall be entitled to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below.  Each Party understands the significance of the Confidential Information remaining confidential, and that this Paragraph is a material term of this Agreement.  The Cascio Parties hereby agree that if any of the Confidential Information becomes public, then MJC shall have no further financial obligation to any of the Cascio Parties, including but not limited to the Payments, and that MJC shall no longer be bound by this Paragraph 20. Without limiting the foregoing, the Cascio Parties understand that a breach by one of them is a breach by all of them and a breach by one of them shall relieve MJC of any obligation to make further Payments and shall entitle MJC to to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below.

b.      If any of the Cascio Parties' Representations and Warranties, as set out above in Paragraph 7, turn out to be false then any outstanding obligation of MJC to make the Payments shall be void, and MJC shall be entitled to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below. Without limiting the foregoing, the Cascio Parties understand that a breach by one of them is a breach by all of them and a breach by one of them shall relieve MJC of any obligation to make further Payments and shall entitle MJC to to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below.

Page **5 of 10**

Confidential

9.    Indemnification. The Cascio Parties, jointly and severally, hereby agree to indemnify and hold harmless MJC from and against any and all claims, demands, causes of action, costs, expenses, losses, damages, judgments, and reasonable outside attorneys' fees ("Claims") arising out of or resulting in any way from any breach by any of the Cascio Parties of the representations and warranties set forth in Paragraph 7 above.

10.    No Fiduciary Relationship. The Parties agree that this Agreement does not create any sort of joint venture or fiduciary relationship between the Cascio Parties and MJC.

11.    Representation By Counsel. All Parties expressly acknowledge that they either have been represented by counsel of their choosing or have had the opportunity to consult with independent counsel in connection with this Agreement. Accordingly, any principle requiring that ambiguities in a writing be construed against its drafter shall have no application to this Agreement.

12.    Authority to Bind. The undersigned signors for each of the Parties represent and warrant that they are duly authorized to execute this Agreement on behalf of their respective Parties and have full authority to act for their respective Parties in making all promises, representations, releases, and covenants set forth in this Agreement.

13.    Further Documents. The Parties agree to execute any further documents that may be reasonably necessary to effectuate the Parties' intent hereunder.

14.    No Waiver. No waiver of any breach of a covenant, condition or promise of this Agreement shall be deemed to be a waiver of any other or subsequent breach of a covenant, condition or promise, whether of like or different nature.

15.    Integration. This Agreement expresses the entire agreement of the Parties hereto. No recitals, promises, agreements, representations or warranties of any kind whatsoever have been made or have been relied upon by any Party hereto, except as specifically set forth in this Agreement. All prior discussions and negotiations regarding the subject matter of this Agreement have been and are merged and integrated into, and are superseded by, this Agreement.

16.    Written Modifications Only. This Agreement may not be modified in any way whatsoever, except in a writing signed by all Parties.

17.    Construction of Agreement. This Agreement shall be construed as a whole according to its fair meaning. The headings used in this Agreement are for reference only and shall not affect the construction of the Agreement.

18.    Jointly Drafted. This Agreement shall be deemed negotiated and drafted jointly by the Parties hereto, and shall not be strictly construed for or against any of the Parties hereto, and none of the Parties shall be deemed to be the sole drafter.

19.    Severability. The Parties agree that in the event that any provision of this Agreement should be held by a court of competent jurisdiction to be void, voidable, illegal or unenforceable in any respect, the remaining provisions shall still remain in full force and effect.

Confidential

20.     <u>Governing Law, Mandatory Arbitration, Venue, And Jurisdiction</u>. This Agreement shall be governed and interpreted under the laws of the State of California without reference to choice of law rules. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Los Angeles County, California, before a retired judge or justice of a California or federal court. Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court. Any such arbitration shall be filed with and administered by JAMS or Signature Resolution, at the claimant's choice, pursuant to their then current general arbitration rules. With respect to conflicts between the California Arbitration Act and the Federal Arbitration Act, the Federal Arbitration Act shall govern. If neither JAMS nor Signature Resolution (or successor entities) shall exist at the time of a demand for arbitration, the arbitration shall be filed with and administered by ADR Services pursuant to its applicable arbitration rules at the time of filing. If ADR Services does not exist at the time of the demand for arbitration, the arbitration shall be filed with AAA or any other arbitration service. The filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement, and the confidentiality provisions thereof, and shall entitle the non-breaching Party to all damages, including attorneys' fees expended in compelling arbitration, resulting therefrom. Each Party irrevocably submits to the exclusive jurisdiction and exclusive venue of the state and federal courts for the County of Los Angeles, State of California for any necessary court proceedings, such as petitions to confirm or vacate an arbitral award.

21.     <u>Attorneys' Fees</u>. The Parties agree that they shall bear their own costs, expenses and attorneys' fees relating to the negotiation of this Agreement. In any subsequent legal proceeding between the Parties that may arise out of or relate to this Agreement, the prevailing party shall be entitled to recover its costs, expenses, and reasonable attorneys' fees.

22.     <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Parties, along with their respective successors and assigns.

23.     <u>Communications</u>. All written communications that are required or otherwise may be given under this Agreement shall be deemed delivered and given upon personal delivery, facsimile transmittal or e-mail transmission thereof to the people and addresses shown below:

| As to the Cascio Parties, address to: | As to MJC, address to: |
|---|---|
| Frank Cascio | Howard Weitzman, Esq. |
| Tel: (917) 816-6400 | Kinsella Weitzman Iser Kump & Aldisert LLP |
| Email: fdcascio@gmail.com | 808 Wilshire Blvd, Third Floor |
| | Santa Monica, CA 90401 |
| | Office: (310) 566-9800 |
| | Fax: (310) 566-9850 |
| | Email: hweitzman@kwikalaw.com |

Confidential

From time to time, either Party may substitute a different representative than the representatives or attorneys listed above to receive any notice, request, instruction, or document to be provided under this Agreement. The Party shall advise the other Party in writing of a change in that Party's representative.

24.    Counterparts. This Agreement may be executed by way of one or more counterparts, each of which shall be deemed an original, but all of which together constitute one agreement among the parties hereto. Each of the Parties hereto agrees that a fax or email transmission of a signature on this document shall constitute a valid execution of this document, and shall be sufficient to formally bind, at the time of transmission, the party whose signature was transmitted by fax or email.

IN WITNESS WHEREOF, the Parties have approved and executed this Agreement on the dates set forth opposite his, her or its respective signatures.

EXECUTED by the Parties as follows:

By the Michael Jackson Company

_____            Dated: _____

By_____, an Authorized Signatory

By Frank Cascio

_____            Dated: _____
Frank Cascio

By Edward Cascio

_____            Dated: _____
Edward Cascio

Page **8** of **10**

Confidential

From time to time, either Party may substitute a different representative than the representatives or attorneys listed above to receive any notice, request, instruction, or document to be provided under this Agreement. The Party shall advise the other Party in writing of a change in that Party's representative.

24.    Counterparts. This Agreement may be executed by way of one or more counterparts, each of which shall be deemed an original, but all of which together constitute one agreement among the parties hereto. Each of the Parties hereto agrees that a fax or email transmission of a signature on this document shall constitute a valid execution of this document, and shall be sufficient to formally bind, at the time of transmission, the party whose signature was transmitted by fax or email.

IN WITNESS WHEREOF, the Parties have approved and executed this Agreement on the dates set forth opposite his, her or its respective signatures.

EXECUTED by the Parties as follows:


By the Michael Jackson Company

_____          Dated: _____

By _____, an Authorized Signatory



By Frank Cascio

_____          Dated: 01/10/2020
Frank Cascio



By Edward Cascio

_____          Dated: 12-22-19
Edward Cascio

12/22/19

MICHAEL McMAHON
NOTARY PUBLIC OF NEW JERSEY
Comm. # 2457313
My Commission Expires 12/8/2022

Page **8** of **10**

**CALIFORNIA ACKNOWLEDGMENT**                                        CIVIL CODE § 1189

┌─────────────────────────────────────────────────────────────────────────────┐
│ A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document │
│ to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. │
└─────────────────────────────────────────────────────────────────────────────┘

State of California

County of _Los ANGELES_                    }

On _JANUARY 10, 2020_ before me, _JENTRY COLLINS, NOTARY PUBLIC_,
      *Date*                           *Here Insert Name and Title of the Officer*

personally appeared _____ _FRANK CASCIO_ _____
                                    *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the
laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

JENTRY COLLINS
Notary Public – California
Los Angeles County
Commission # 2215223
My Comm. Expires Sep 22, 2021

*Place Notary Seal and/or Stamp Above*

Signature _____
                    *Signature of Notary Public*

──────────────────── OPTIONAL ────────────────────

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____      Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____      Signer's Name: _____
☐ Corporate Officer – Title(s): _____      ☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General         ☐ Partner – ☐ Limited ☐ General
☐ Individual         ☐ Attorney in Fact      ☐ Individual         ☐ Attorney in Fact
☐ Trustee        ☑ Guardian or Conservator    ☐ Trustee        ☐ Guardian or Conservator
☐ Other: _____      ☐ Other: _____
Signer is Representing: _____      Signer is Representing: _____

©2018 National Notary Association

24

Confidential

By Valeria Lissette Cascio

_____     Dated: _12/22/19_
Valeria Lissette Cascio


By Dominic Cascio, Jr.

_____     Dated: _12/22/19_
Dominic Cascio, Jr.


By Cindy Cascio

_____     Dated: _12·22·19_
Cindy Cascio


By Aldo Cascio

_____     Dated: _12/22/19_
Aldo Cascio


By Marie-Nicole Porte

_____     Dated: _12/22/19_
Marie-Nicole Porte

MICHAEL McMAHON
NOTARY PUBLIC OF NEW JERSEY
Comm. # 2457313
My Commission Expires 12/8/2022

12-22-19

Page **9** of **10**

25

Confidential

By James Porte

_____
James Porte

Dated: 12/22/19

By Dominic Cascio, Sr.

_____
Dominic Cascio, Sr.

Dated: 12/22/19

By Connie Cascio

_____
Connie Cascio

Dated: 12/22/2019

MICHAEL McMAHON
NOTARY PUBLIC OF NEW JERSEY
Comm. # 2457313
My Commission Expires 12/8/2022

12/22/19

Page **10** of **10**

26

# EXHIBIT 2

**LETTER OF DIRECTION**

January 28, 2020

To The Michael Jackson Company, LLC:

Reference is made to the Agreement (the "Agreement") entered into in January 2020 by and between The Michael Jackson Company, LLC ("MJC"), on the other hand, and myself (Frank Cascio), Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, James Porte, Dominic Cascio, Sr., and Connie Cascio.

On behalf of myself, and Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte, I request and irrevocably authorize MJC to make the following payments to Ken Katz and Herman Weisberg on our behalf:

    (a) Three percent (3%) of all payments set out in Sections 3(a) through 3(e) of the Agreement shall be made at the direction of Ken Katz; and

    (b) Three percent (3%) of all payments set out in Sections 3(a) through 3(e) of the Agreement shall be made at the direction of Herman Weisberg.

These payments shall be deducted from all amounts to be paid directly to myself, and to Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte, such that each of us shall receive ninety-four percent (94%) of the amounts set out in Sections 3(a) through 3(e) of the Agreement, with Mr. Katz and Mr. Weisberg splitting the remaining six percent (6%). By way of example, the first payment of $800,000 Section 3(a) shall be made as follows: $752,000 to me, $24,000 at the direction of Mr. Katz, and $24,000 at the direction of Mr. Weisberg. The remaining annual payments of $530,000 set out in Section 3(a) shall be made as follows: $498,200 to me, and $15,900 at the direction of Mr. Katz, and $15,900 at the direction of Mr. Weisberg. The same shall apply to the payments to Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte set out in Sections 3(a) through 3(e) of the Agreement. These payments to Katz and Weisberg are the complete agreement between the parties to this Letter of Direction.

In the event that the remedies under Section 8 of the Agreement are invoked by MJC, no further payments to Mr. Katz or Weisberg shall be made.

Any disputes arising out of or relating to this Letter of Direction shall be finally resolved by confidential and binding arbitration as set out in Section 19 of the Agreement, which is incorporated herein by this reference and made a part of this Letter. Without limiting the generality of the foregoing, I acknowledge, on behalf of myself and on behalf of Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née

1 of 2

28

Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte, that any potential dispute arising out of or relating to this Letter also arises out of and relates to the Agreement and must be arbitrated pursuant to Section 19 of the Agreement. Ken Katz and Herman Weisberg acknowledge the same and consent to and agree to confidential and binding arbitration, as set out in Section 19 of the Agreement, as the sole and final mechanism for resolution of any and all disputes arising out of or relating to this Letter of Direction or the Agreement, including any and all disputes regarding the scope and validity of the agreement to arbitrate.

I represent and warrant that I have the permission and consent of Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte to execute this Letter of Direction and make this direction on their behalf. I will hold MJC harmless for any damages, including attorneys' fees, caused by the actual or alleged failure to obtain their permission and consent to execute this document and make this direction on their behalf.

SO DIRECTED AND AGREED TO:

_____

By Frank Cascio, on behalf of himself, and Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte

CONSENTED TO:

_____
Ken Katz

_____
Herman Weisberg

2 of 2

29

Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte, that any potential dispute arising out of or relating to this Letter also arises out of and relates to the Agreement and must be arbitrated pursuant to Section 19 of the Agreement. Ken Katz and Herman Weisberg acknowledge the same and consent to and agree to confidential and binding arbitration, as set out in Section 19 of the Agreement, as the sole and final mechanism for resolution of any and all disputes arising out of or relating to this Letter of Direction or the Agreement, including any and all disputes regarding the scope and validity of the agreement to arbitrate.

I represent and warrant that I have the permission and consent of Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, and James Porte to execute this Letter of Direction and make this direction on their behalf. I will hold MJC harmless for any damages, including attorneys' fees, caused by the actual or alleged failure to obtain their permission and consent to execute this document and make this direction on their behalf.

SO DIRECTED AND AGREED TO:

_____
By Frank Cascio, on behalf of himself,
and Edward Cascio, Valeria Lissette
Cascio (née Valeria Lissette Manchego),
Dominic Cascio, Jr., Cindy Cascio (née
Cindy Betancur), Aldo Cascio, Marie-
Nicole Porte, and James Porte

CONSENTED TO:

_____
Ken Katz

_____
Herman Weisberg

2 of 2

30

# EXHIBIT 3

| | |
|---|---|
| **Subject:** | RE: Case ID: NLKXB The Michael Jackson Company, LLC v. Cascio - Notice of Proposed Appointment |
| **Attachments:** | The Michael Jackson Company, LLC v. Cascio - Notice of Proposed Appointment.pdf |

**From:** Howard King
**Sent:** Friday, January 3, 2025 2:38 PM
**To:** Jasmine Lu ; jsteinsapir@kwikalaw.com; Lynda Goldman ; Martin Singer ; Stephen Rothschild
**Cc:** Lisa Carpenter ; Mari Ventura ; Jesse Centeno ; Heather Pickerell ; Jackson Trugman ; Karen Sloane
**Subject:** RE: Case ID: NLKXB The Michael Jackson Company, LLC v. Cascio - Notice of Proposed Appointment

Per your request, we provide the following list of parties and known witnesses:

Cross-Complainants:

Dominic Casio Jr
Edward Casio
Aldo Casio
Marie Nicole Porte
Francesco Casio

Cross-defendants:

John Branca
Bryan Freedman
Herman Weissberg
John McClain
MJJ Productions Holding Company
MJJ Ventures Holding Company
MJJ Productions, LLC
MJJ Ventures, LLC
The Michael Jackson Company
Michael Jackson Family Trust

Nonparty witnesses:

Dominic Casio Sr
Connie Casio
James Porte
Omer Bhatti
Paris Jackson
Cindy Casio
Valeria Lissette Cascio
James Safechuck
Wade Robson

Elijah Jackson
Levon Jackson
Anthony Jackson


**Howard E. King, Esq.**
**King, Holmes, Paterno & Soriano, LLP**
direct: 310.282.8999

---

**From:** Jasmine Lu <jlu@signatureresolution.com>
**Sent:** Monday, December 9, 2024 6:45 PM
**To:** jsteinsapir@kwikalaw.com; lgoldman@lavelysinger.com; mdsinger@lavelysinger.com; Howard King <hking@khpslaw.com>; Stephen Rothschild <srothschild@khpslaw.com>
**Cc:** lcarpenter@lavelysinger.com; Mari Ventura <mventura@signatureresolution.com>; Jesse Centeno <jcenteno@signatureresolution.com>
**Subject:** Case ID: NLKXB The Michael Jackson Company, LLC v. Cascio - Notice of Proposed Appointment

Counsel,

Please see attached Notice of Proposed Appointment for **Bruce Isaacs, Esq.**

Our office will send out disclosure information and proceed with the arbitration process.

I have copied the case administrator, **Mari Ventura.**

Thank you.


**Jasmine Lu**
**Associate - Case Administration**

**P** (213) 433-5769
**W** signatureresolution.com
**E** jlu@signatureresolution.com

## SIGNATURE
### RESOLUTION

---

IMPORTANT: The contents of this email and any attachments are confidential. They are intended for the named recipient(s) only. If you have received this email by mistake, please notify the sender immediately and do not disclose the contents to anyone or make copies thereof.

# EXHIBIT 4

MY FRIEND MICHAEL: AN ORDINARY FRIENDSHIP WITH AN EXTRAORDINARY MAN



Learning reading speed...

Location 1 of 5169 ▪ 0%

My father is fiercely protective of his family. We mean everything to him, and he would never put us in harm's way. In my dad's book, never mind prison, pedophiles should be thrown to the wolves. (He's from Sicily, after all.) If he and my mother had had any doubts about Michael's innocence, no matter how small, believe me, my brother and I would *not* have been there, much less stayed.

I want to be precise and clear, on the record, so that everyone can read and understand: Michael's love for children was innocent, and it was profoundly misunderstood. People seemed to have trouble accepting all the good qualities of this incredible man, and were always asking how it could be that he was the greatest singer on earth, the greatest dancer on earth, and yet enjoy hanging around with children all day? How could he write and perform such explosively sexual, complex songs, and then have nothing but harmless interactions with the kids with whom he surrounded himself? How could he have so many idiosyncrasies that seemed weird to the outside observer—the plastic surgery, the bizarre purchases, the secrecy—and then not be "weird" in other, more offensive ways?

Yes, Michael had different personas. The same way I myself became a different person depending on whether I was home with my family, traveling with Michael, or back in school in New Jersey. The same way we all put on different faces for dealing with different parts of our lives. If Michael's different images seemed extreme, it was only because his life was more extreme than anyone else's.

For all the hard work he'd put in during his own childhood, for all the perfectionism that drove his music, Michael craved the simplicity and innocence of the youth he had never fully experienced. He revered it, he treasured it, and, especially through Neverland, he tried to offer it to others. People had trouble understanding all this, and many assumed the worst. This misunderstanding was the greatest sorrow of Michael's life. He carried it with him to the end. I am here to say that I knew the real Michael Jackson. I knew him throughout my childhood. In all that time, he never showed himself to be anything but a perfect friend. Never did he make a questionable advance or a sexual remark. My parents were older and wiser than my brother or I. If anything, their perspective was broader and more encompassing than ours. And they trusted Michael implicitly.

When my father talked to Bill Bray about the possibility of Eddie and me remaining on the tour, Bill said, "Yeah, Michael's been down. Those kids, they keep him going." My parents knew that we would be a great source of comfort to Michael. They checked with our school to see if we could make up our classwork with a tutor. Then, at last, my father said the magic words: "You can stay."

I called in my parents, and we tried to reach Michael but failed. All our phones were ringing—a mix of concerned friends wondering what was going on and colleagues filling us in. Someone confirmed that the accusers were the Arvizos. Of course; who else could it have been?

We'd been here before. I was young at the time, but I'd seen the years of damage those first accusations had inflicted on Michael's heart as well as his public image. Again, he was being attacked by liars. We had never trusted the Arvizos, and now the worst had come to pass. Why hadn't Michael severed ties with the family back in 2000? Why had he invited them back into his life for the Bashir video? Why had we taken them in to help them deal with the aftermath? I was angry with Gavin's mother, of course, but I was also angry at Michael for foolishly allowing her to get away with her manipulations of her kids and angry at myself for failing to act more aggressively. After all, we had ample reason to doubt Janet's intentions from the start, yet we had stood by while she set up this situation.

The allegations were all bullshit. There was nothing ambiguous about the whole thing. These people were after Michael's money. But he was innocent, and we were going to destroy them in court. I felt confident of that. What I didn't realize at the time was how great a battle we would end up having to fight, and how heavy a toll it would exact. I had no idea it would drive a wedge between me and Michael that most friendships couldn't hope to survive. Ours just barely would.

Michael, Aldo, and Marie Nicole were spending their last day in Las Vegas when they received the news that the ranch was being raided again, and immediately they went to their hotel. But the hotel wouldn't admit them for fear of the impending media onslaught. They drove to another hotel but were turned away there as well. Hotel after hotel turned them down for fear of the media storm. The three of them circled Vegas, with no refuge, while Michael grew increasingly agitated. Finally, Karen was able to secure them a hotel room.

From what my brother and sister told me, once he got to the room, Michael lost it. He could not believe this was happening. Again. He went ballistic, overturning tables, throwing chairs, destroying everything in sight. If Aldo and Marie Nicole hadn't been there, I would have been concerned for his safety. The trip abroad was canceled, the video shoot for "One More Chance" was never rescheduled, and Aldo and Marie Nicole went home to New Jersey.

Michael didn't want to return to Neverland, which he felt had once again been violated by a police raid. Instead, he rented a house up Coldwater Canyon in L.A. A week or so later, I went to visit him, but because the DA was looking to subpoena me and there was speculation about a warrant for my arrest, I wanted to stay under the radar. So I flew into Las Vegas. Michael's driver picked me up and brought me to L.A.

When I arrived, Michael's brother Randy was in and out of the house. In all my years with Michael, I'd never really spent any time with Randy, and I was a

MY FRIEND MICHAEL: AN ORDINARY FRIENDSHIP WITH AN EXTRAORDINARY MAN

*To Michael, my teacher—thank you for being a father, a brother,
a mentor, and a friend, and for the greatest adventure I could
ever have imagined. I love you, and I miss you every day.*

*With all my love,
Frank*

*To Paris, Prince, and Blanket—I love and adore all three of you. When
you came into this world, one by one, you brought new light, energy, and
purpose to your father. You made him the happiest person in the world.
Nothing was more important to him than you. You have always been as
smart, beautiful, and well-mannered as he wanted you to be. I see him
in each of you, and watching you grow makes me happy on his behalf.
I hope that reading this book brings back good memories of your father
and his love for you. Please know that I will always be there for you.*

*To Frank "Tookie" DiLeo—first and foremost I want to thank you for
loving and protecting Michael for all those years. He loved you very
much. I miss our lunches by the pool at the Beverly Hilton Hotel and
hearing your crazy stories and life experiences. Thank you for being a
mentor and father figure to me. I miss you and I love you so much.*

*To the fans of Michael Jackson—I wrote this book to show you a
personal side of Michael that you may or may not know. I hope you
can appreciate the human being that he was behind his enormous gifts
and talents. For over twenty-five years, my family and I were blessed
to experience the world from his perspective. Through Michael's eyes,
the world was a very different place. He was the innocent.*

*We were all very fortunate to have been blessed by his presence in this
world. He wasn't only my friend Michael; he was our friend Michael.*

# EXHIBIT 5

| DEPARTMENT | 207 |
|---|---|
| HEARING DATE | November 6, 2025, continued to January 14, 2026 |
| CASE NUMBER | 25SMCP00385 |
| MOTION | Petition to Compel Arbitration |
| MOVING PARTIES | Petitioners The Michael Jackson Company, LLC; John G. Branca and John McClain, individually and as Officers of The Michael Jackson Company, LLC and Co-Executors of the Estate of Michael Jackson |
| OPPOSING PARTY | Respondent Frank Cascio |

**MOTION**

This case arises from a dispute concerning the obligations owed pursuant to a written agreement.

On July 9, 2025, Petitioners The Michael Jackson Company, LLC ("MJC"); John G. Branca and John McClain, individually and as Officers of The Michael Jackson Company, LLC and Co-Executors of the Estate of Michael Jackson ("Petitioners") filed a petition to compel Respondent Frank Cascio ("Respondent") to arbitration.

Respondent opposes the petition and requests the Court issue an order staying the currently-pending arbitration proceedings. Petitioners oppose Respondent's request for a stay and reply in support of the petition to compel arbitration.

**EVIDENTIARY OBJECTIONS**

The Court rules as follows with respect to Respondent's objections to the Declaration of Martin D. Singer:

40

1. Overruled

2. Overruled

3. Overruled

4. Overruled

5. Overruled

6. Sustained

7. Sustained

8. Overruled

9. Overruled

10. Overruled

11. Overruled

12. Overruled

13. Overruled

14. Overruled

15. Overruled

16. Overruled

17. Overruled

18. Overruled

19. Overruled

20. Overruled

21. Overruled

22. Overruled

23. Overruled

24. Overruled

25. Overruled

26. Overruled

27. Overruled

28. Overruled

29. Overruled

30. Overruled

31. Overruled

32. Overruled

33. Sustained

34. Sustained

35. Overruled

36. Overruled

37. Overruled

The Court rules as follows with respect to Petitioners' Evidentiary Objections:

1. Sustained

2. Sustained

3. Sustained

4. Overruled

5. Overruled

6. Overruled

7. Overruled

8. Overruled

9. Sustained

10. Sustained

11. Overruled

12. Overruled

13. Overruled

14. Overruled

15. Sustained

16. Overruled

17. Sustained

18. Sustained


**ANALYSIS**


**1.    MOTION TO COMPEL ARBITRATION – LEGAL STANDARDS**


"[T]he advantages of arbitration include a presumptively less costly, more expeditious manner of resolving disputes.  It follows a party to a valid arbitration agreement has a contractual right to have its dispute with another party to the contract resolved quickly and inexpensively."  (*Henry v. Alcove Investment, Inc*. (1991) 233 Cal.App.3d 94, 99–100 [cleaned up].)  Thus, "on petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists."  (Code Civ. Proc., § 1281.2; see also

*EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320 [the language in section 1281.2 compelling arbitration is mandatory].) The right to compel arbitration exists unless the court finds that the right has been waived by a party's conduct, other grounds exist for revocation of the agreement, or where a pending court action arising out of the same transaction creates the possibility of conflicting rulings on a common issue of law or fact.  (Code Civ. Proc., § 1281.2, subds. (a)-(c).)


"On a petition to compel arbitration, the trial court must first determine whether an agreement to arbitrate the controversy exists.  Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its

43

existence by a preponderance of the evidence.  The party seeking arbitration can meet its initial burden by attaching to the petition a copy of the arbitration agreement purporting to bear the respondent's signature."  (*Bannister v. Marinidence Opco, LLC* (2021) 64 Cal.App.5th 541, 543-544 [cleaned up].)  The party seeking to compel arbitration must also "plead and prove a prior demand for arbitration and a refusal to arbitrate under the agreement."  (*Mansouri v. Superior Court* (2010) 181 Cal.App.4th 633, 640-641.)

And while the moving party on a motion to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, [a] party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense.  The trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence, and any oral testimony the court may receive at its discretion, to reach a final determination."  (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 842 [cleaned up]; see also *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 ["The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability"].)

## 2.    ENFORCEABLE ARBITRATION AGREEMENTS

In 2020, MJC and Respondent entered into an Acquisition and Consulting Agreement ("Agreement"), which provides in pertinent part as follows:

20. Governing Law, Mandatory Arbitration, Venue, And Jurisdiction. This Agreement shall be governed under the laws of the State of California without reference to choice of law rules. **Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Los Angeles County, California, before a retired judge or justice of a California or federal court.** Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court. Any such arbitration shall be filed with

and administered by JAMS or Signature Resolution, at the claimant's choice, pursuant to their then current general arbitration rules. With respect to conflicts between the California Arbitration Act and the Federal Arbitration Act, the Federal Arbitration Act shall govern. If neither JAMS nor Signature Resolution (or successor entities) shall exist at the time of a demand for arbitration, the arbitration shall be filed with and administered by ADR Services pursuant to its applicable arbitration rules at the time of filing. If ADR Services does not exist at the time of the demand for arbitration, the arbitration shall be filed with AAA or any other arbitration service. The filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement, and the confidentiality provisions thereof, and shall entitle the non-breaching Party to all damages, including attorneys' fees expended in compelling arbitration, resulting therefrom. Each Party irrevocably submits to the exclusive jurisdiction and exclusive venue of the state and federal courts for the County of Los Angeles, State of California for any necessary court proceedings, such as petitions to confirm or vacate an arbitral award.

(Singer Decl. ¶ 6 and Ex. A, emphasis added; see also Petition at ¶¶ 31-32.)  The Agreement also contains a non-disparagement clause and a release of all claims.  (Ex. A at ¶¶ 4, 6.)

A dispute has now arisen over the payments owed under the Agreement and whether the non-disparagement clause has been breached.  (Singer Decl. ¶ 12.)

On  September 17, 2024, MJC initiated arbitration proceedings to resolve the dispute, followed by a supplemental demand for arbitration on September 24, 2024.  (Singer Decl. ¶¶ 13, 15.)

In opposition, Respondent argues (1) that the Agreement is void because its purpose is to silence victims of sexual assault, in violation of Code of Civil Procedure sections 1001 and 1002; (2) the Agreement is unconscionable; (3) the Agreement is rescindable because it was signed under duress; and (4) Petitioners waived the right to compel arbitration.  The Court analyzes each issue in turn.

a.    **CODE OF CIVIL PROCEDURE SECTIONS 1001 AND 1002**

45

Code of Civil Procedure section 1001 provides:  "a provision within a settlement agreement that prevents or restricts the disclosure of factual information related to a claim filed in a civil action or a complaint filed in an administrative action, regarding any of the following is prohibited: (1) An act of sexual assault that is not governed by subdivision (a) of Section 1002."

Section 1002 provides:

a provision within a settlement agreement that prevents the disclosure of factual information related to the action is prohibited in any civil action the factual foundation for which establishes a cause of action for civil damages in any of the following:

(1) An act that may be prosecuted as a felony sex offense.

(2) An act of childhood sexual assault, as defined in Section 340.1.

(3) An act of sexual exploitation of a minor, as defined in Section 11165.1 of the Penal Code, or conduct prohibited with respect to a minor pursuant to Section 311.1, 311.5, or 311.6 of the Penal Code.

(4) An act of sexual assault, as defined in paragraphs (1) to (8), inclusive, of subdivision (e) of Section 15610.63 of the Welfare and Institutions Code, against an elder or dependent adult, as defined in Sections 15610.23 and 15610.27 of the Welfare and Institutions Code.

"A **provision** within a settlement agreement that prevents the disclosure of factual information related to the action described in subdivision (a) that is entered into on or after January 1, 2017 is void as a matter of law and against public policy."  (Code Civ. Proc., § 1002, subd. (d), emphasis added; see also Code Civ. Proc., § 1001, subd. (d).)  Here, the provision at issue is a confidentiality clause within the Acquisition and Consulting Agreement.

46

There are two primary reasons why the confidentiality clause does not void the agreement.  As a threshold matter, there was no action pending when the Agreement was executed.  (Singer Decl. ¶ 4.)  Moreover, the confidentiality clause provides:

The Parties agree to refrain from making any statement or taking any action, directly or indirectly, orally or in writing, that may defame, disparage, embarrass, or in any way harm or impair the reputation, goodwill, business interests or financial interests of any of the other Parties, including the Cascio Releasing Parties and the Estate Released Parties, **except as required by law or in connection with a legal or administrative proceeding.**

(Ex. A at ¶ 6.b., emphasis added.)  Thus, on its face, the Court finds that the confidentiality clause appears to comply with Code of Civil Procedure sections 1001 and 1002.

**b.  UNCONSCIONABILITY**

"Unconscionability is ultimately a question of law for the court."  (*Flores v. Transamerica Homefirst, Inc.* (2001) 93 Cal.App.4th 846, 851.)  "However, numerous factual issues may bear on that question." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89.)  As such, Respondent must show two elements to establish the unconscionability defense: (1) procedural unconscionability, which focuses on the manner in which the contract was negotiated, and (2) substantive unconscionability, which concerns whether the contract's terms are unreasonably one-sided. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113-115 (hereafter *Armendariz*).)

"The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.  In other words, the more substantively oppressive the contract term, the less evidence of

procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra*, 24 Cal.4th at p. 114 [cleaned up].)

### i.  PROCEDURAL UNCONSCIONABILITY

Procedural unconscionability examines the "oppression that arises from unequal bargaining power and the surprise to the weaker party that results from hidden terms or the lack of informed choice." (*Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, 795.) Preprinted forms buried within a volume of documents offered on a "take or leave it basis" evidence a high degree of procedural unconscionability. (See *Dougherty v. Roseville Heritage Partners* (2020) 47 Cal.App.5th 93, 102-104 (hereafter *Dougherty*).) Most consumer contracts are adhesive and therefore present some procedural unconscionability. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 915 (hereafter *Sanchez*).) "[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided." (*Ibid.*)

Respondent argues that the Arbitration provision is procedurally unconscionable because it is a contract of adhesion that was presented to Respondent on a "take it or leave it" basis.

The Agreement itself appears to be personalized to the parties, and not a form contract.  In support of Respondent's claim that it was presented on a "take it or leave it" basis, Respondent provides the Declaration of Frank Cascio, which provides as follows:

3. In late December 2019, I learned that nine members of my family had already signed a settlement agreement with the Estate but that the agreement would not become effective absent my signature. At the time, my family was in severe turmoil, and the agreement appeared to offer them a sense of closure. Knowing that, I felt immense pressure to sign as well, to avoid causing more conflict within the family during this unbelievably difficult chapter.

48

4. I was diagnosed with dyslexia in the fifth grade and have struggled with reading comprehension throughout my life. When I was presented with the agreement, I had difficulty understanding many of its terms, particularly the legal concepts. The Estate's attorneys and representatives assured me that the agreement was merely a technicality and that I should not attach much significance to it. They told me that nothing would get done if we had our own counsel and that the only way to reach resolution was "to do it the way we are doing it." They further explained that calling the settlement a "life rights agreement" would keep it private, avoid probate, and prevent the beneficiaries from finding out—even though we were very uncomfortable with this being hidden from them and pressed this issue with the Estate. Despite my family's persistence, the Estate would not budge and said this was non-negotiable.

5. The attorneys and representatives for the Estate led me to believe they had my best interests at heart. They spoke to me in a reassuring and supportive manner, which caused me to trust them completely. The Estate convinced me that my family would find peace and comfort in moving on with their lives, and that signing the agreement would mean our family's private information would not be exposed.

[...]

7. Acting under that pressure, and with misplaced trust in the Estate's representatives, I signed the agreement in January 2020 without my own lawyer and without fully understanding its implications. I signed the agreement while I was alone in attorney Howard Weitzman's office with a notary present. Mr. Weitzman had long represented Michael and the Estate, and I had known him since childhood. He did not read or explain the agreement to me. He simply pointed where I needed to sign. He then gave me a hug and said he was so sorry for what my family had been through and to please reach out if we ever needed anything. When I asked for a copy of the agreement, he identified which one of the Estate's representatives would have a copy. When we later asked this representative for a copy of the signed agreement, he said he did not have it. We never received a signed copy of the agreement from the Estate.

(Frank Cascio Decl. ¶¶ 3-7.)

Respondent's declaration does not support his characterization that he was forced to sign the Agreement on a take-it-or-leave-it basis, and only if he signed it, without counsel. Rather, the reasonable inference from paragraph 3 of Respondent's declaration, that nine members of his family had already signed the agreement, but they could not get closure absent Respondent's signature, is that the "immense pressure" to sign the Agreement came from his own family, not from Petitioners or their attorneys.

Nor does the fact that Petitioners' counsel expressed their concerns that "nothing would get done" if additional attorneys got involved demonstrate that Respondent was precluded from seeking advice from counsel. Respondent's declaration does not indicate, for example, that in the three or four weeks between "late December 2019," when he first became aware of the agreement, and January 10, 2020 when he ultimately signed the Agreement, that he had requested additional time from Petitioners to have an attorney of his own choice to review the Agreement but Petitioners refused. Further, Respondent's declaration does not indicate that he wanted his own counsel to review the Agreement and advise him about it, and when expressed his wish to Petitioners or their attorneys, he was rebuffed.

Even further, the fact that the payments to be made under the Agreement subsequently increased as evidenced by the Letter of Direction, modifying the payments under the Agreement, suggests Respondent was able to negotiate a larger payment, calling to question Respondent's contention that the Agreement is procedurally unconscionable. (See Singer Decl. ¶ 2.)

Thus, Respondent has not demonstrated that the Agreement was a procedurally unconscionable contract of adhesion offered to Respondent on a take-it-or-leave-it basis and only if he signed it without his own counsel. In short, the Agreement is not the same as preprinted form buried within a volume of documents offered on a "take or leave it basis."

Because the Court does not find the Agreement to be procedurally unconscionable, it does not analyze substantive unconscionability.

c.    **WAIVER**

50

"[A] court should apply the same principles that apply to other contracts to determine whether the party seeking to enforce an arbitration agreement has waived its right to do so." (*Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 569 (hereafter *Quach*).) "To establish waiver under generally applicable contract law, the party opposing enforcement of a contractual agreement must prove by clear and convincing evidence that the waiving party knew of the contractual right and intentionally relinquished or abandoned it." (*Id.* at p. 584.) "Under the clear and convincing evidence standard, the proponent of a fact must show that it is 'highly probable' the fact is true." (*Ibid.*)

"The waiving party's knowledge of the right may be "actual or constructive." (*Quach*, *supra*, 16 Cal.5th at p. 584.) "Its intentional relinquishment or abandonment of the right may be proved by evidence of words expressing an intent to relinquish the right or of conduct that is so inconsistent with an intent to enforce the contractual right as to lead a reasonable factfinder to conclude that the party had abandoned it." (*Ibid.*)

"To establish waiver, there is no requirement that the party opposing enforcement of the contractual right demonstrate prejudice or otherwise show harm resulting from the waiving party's conduct." (*Quach*, *supra*, 16 Cal.5th at p. 585.)

In the arbitration context, "[i]f a party to an arbitration agreement files a complaint in court raising a claim covered by the agreement, the defendant can file a motion asking the court to stay the lawsuit and send the dispute to arbitration. A defendant who instead litigates the case risks losing the contractual right to compel arbitration." (*Quach*, *supra*, 16 Cal.5th at p. 569.)

Participation in litigation that has been deemed to constitute a waiver includes answering the complaint, propounding discovery requests, and actively engaging in discovery for thirteen months instead of moving to compel arbitration at the outset of the case. (*Quach*, *supra*, 16 Cal.5th at pp. 586-587.)

Engaging in discovery is "markedly inconsistent with an intent to arbitrate." (*Hofer v. Boladian* (2025) 111 Cal.App.5th 1, 15.) In *Hofer*, the plaintiffs were found to have waived their right to arbitration by vigorously litigating in court for six months, including

51

propounding comprehensive discovery requests.  (*Ibid.*)  In particular, raising the issue of arbitration, but doing nothing to bring it about for six months generally constitutes a waiver.  (*Id.* at p. 16; *Quach*, *supra*, 16 Cal.5th at pp. 586-587.)  This is because courts disfavor "blow[ing] hot and cold by pursuing a strategy of courtroom litigation only to turn towards the arbitral forum at the last minute."  (*Hofer*, 111 Cal.App.5th at p. 17.)  "The courtroom may not be used as a convenient vestibule to the arbitration hall so as to allow a party to create his own unique structure combining litigation and arbitration."  (*Christensen v. Dewor Developments* (1983) 33 Cal.3d 778, 784.)

Here, Respondent argues that Petitioners have waived the right to compel arbitration by filing the instant Petition to Compel Arbitration in the Superior Court while the arbitration proceeding was pending.

Without more, the Court does not find that filing a Petition to Compel Arbitration in the Superior Court in any way constitutes a relinquishment of Petitioners' right to compel arbitration amounting to a waiver.

### d.   RESCINDABLE AGREEMENT & BREACH

Respondent argues that the Agreement is rescindable because it was procured under duress and that the Petitioners breached the Agreement's Confidentiality Provision by filing the instant action.  But having determined the parties entered into an Agreement to Arbitrate, whether and to what extent the Agreement is revocable or the parties breached the Agreement are questions for the arbitrator to decide.

To wit, "Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration [...] Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court."  (Agreement at ¶ 20.)

**CONCLUSION**

For the foregoing reasons, finding a valid and binding arbitration provision within the Acquisition and Consulting Agreement exists with respect to the dispute in question, the Court grants the Petition to Compel Arbitration and stays this matter pending the completion of arbitration proceedings, except for the continued hearing on the concurrent motion to seal documents filed in support of this motion, which shall still go forward as scheduled.

Petitioners shall file and serve a proposed Order in conformity with the Court's ruling on or before January 23, 2026.

Petitioners shall provide notice of the Court's ruling and file the notice with a proof of service forthwith.

DATED:  January 14, 2026                          ____/s/_____

                                                  Michael E. Whitaker

                                                  Judge of the Superior Court

# EXHIBIT 6

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**25SMCP00385**
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**
**FRANK CASCIO**

March 4, 2026
12:19 PM

Judge: Honorable Michael E. Whitaker       CSR: None
Judicial Assistant: J. Young               ERM: None
Courtroom Assistant: P. Booker             Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): No Appearances

For Defendant(s):  No Appearances

**NATURE OF PROCEEDINGS:** Court Order Re: Ruling on Submitted Matter

The Court, having taken the matter under submission on 01/14/2026 for Hearing on Motion to Compel Arbitration submitted by Petitioner, now rules as follows:

## MOTION

This case arises from a dispute concerning the obligations owed pursuant to a written agreement.

On July 9, 2025, Petitioners The Michael Jackson Company, LLC ("MJC"); John G. Branca and John McClain, individually and as Officers of The Michael Jackson Company, LLC and Co-Executors of the Estate of Michael Jackson ("Petitioners") filed a petition to compel Respondent Frank Cascio ("Respondent") to arbitration.

Respondent opposes the petition and requests the Court issue an order staying the currently-pending arbitration proceedings.  Petitioners oppose Respondent's request for a stay and reply in support of the petition to compel arbitration.

## EVIDENTIARY OBJECTIONS

The Court rules as follows with respect to Respondent's objections to the Declaration of Martin D. Singer:

1.    Overruled
2.    Overruled
3.    Overruled
4.    Overruled
5.    Overruled

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

West District, Beverly Hills Courthouse, Department 207

**25SMCP00385**                                                    March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                    12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

6.  Sustained
7.  Sustained
8.  Overruled
9.  Overruled
10. Overruled
11. Overruled
12. Overruled
13. Overruled
14. Overruled
15. Overruled
16. Overruled
17. Overruled
18. Overruled
19. Overruled
20. Overruled
21. Overruled
22. Overruled
23. Overruled
24. Overruled
25. Overruled
26. Overruled
27. Overruled
28. Overruled
29. Overruled
30. Overruled
31. Overruled
32. Overruled
33. Sustained
34. Sustained
35. Overruled
36. Overruled
37. Overruled

The Court rules as follows with respect to Petitioners' Evidentiary Objections:

1.  Sustained
2.  Sustained

| Minute Order | Page 2 of 15 |
| --- | --- |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**25SMCP00385**                                                           March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                           12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker            CSR: None
Judicial Assistant: J. Young                    ERM: None
Courtroom Assistant: P. Booker                  Deputy Sheriff: None

3.   Sustained
4.   Overruled
5.   Overruled
6.   Overruled
7.   Overruled
8.   Overruled
9.   Sustained
10.  Sustained
11.  Overruled
12.  Overruled
13.  Overruled
14.  Overruled
15.  Sustained
16.  Overruled
17.  Sustained
18.  Sustained

## ANALYSIS

### 1.   MOTION TO COMPEL ARBITRATION – LEGAL STANDARDS

"[T]he advantages of arbitration include a presumptively less costly, more expeditious manner of resolving disputes.  It follows a party to a valid arbitration agreement has a contractual right to have its dispute with another party to the contract resolved quickly and inexpensively." (*Henry v. Alcove Investment, Inc*. (1991) 233 Cal.App.3d 94, 99–100 [cleaned up].)  Thus, "on petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party to the agreement refuses to arbitrate that controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists." (Code Civ. Proc., § 1281.2; see also *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311, 1320 [the language in section 1281.2 compelling arbitration is mandatory].) The right to compel arbitration exists unless the court finds that the right has been waived by a party's conduct, other grounds exist for revocation of the agreement, or where a pending court action arising out of the same transaction creates the possibility of conflicting rulings on a common issue of law or fact.  (Code Civ. Proc., § 1281.2, subds. (a)-(c).)

"On a petition to compel arbitration, the trial court must first determine whether an

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

25SMCP00385                                                                   March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                                        12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

---

agreement to arbitrate the controversy exists.  Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence.  The party seeking arbitration can meet its initial burden by attaching to the petition a copy of the arbitration agreement purporting to bear the respondent's signature." (*Bannister v. Marinidence Opco, LLC* (2021) 64 Cal.App.5th 541, 543-544 [cleaned up].)  The party seeking to compel arbitration must also "plead and prove a prior demand for arbitration and a refusal to arbitrate under the agreement." (*Mansouri v. Superior Court* (2010) 181 Cal.App.4th 633, 640-641.)

And while the moving party on a motion to compel arbitration "bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence, [a] party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense.  The trial court sits as the trier of fact, weighing all the affidavits, declarations, and other documentary evidence, and any oral testimony the court may receive at its discretion, to reach a final determination." (*Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, 842 [cleaned up]; see also *Pinnacle Museum Tower Assn. v. Pinnacle Market Development (US), LLC* (2012) 55 Cal.4th 223, 236 ["The party seeking arbitration bears the burden of proving the existence of an arbitration agreement, and the party opposing arbitration bears the burden of proving any defense, such as unconscionability"].)

## 2.    ENFORCEABLE ARBITRATION AGREEMENTS

In 2020, MJC and Respondent entered into an Acquisition and Consulting Agreement ("Agreement"), which provides in pertinent part as follows:

> 20. <u>Governing Law, Mandatory Arbitration, Venue, And Jurisdiction</u>. This Agreement shall be governed under the laws of the State of California without reference to choice of law rules. **Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Los Angeles County, California, before a retired judge or justice of a California or federal court.** Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**25SMCP00385**                                                  March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                  12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

not by a court. Any such arbitration shall be filed with and administered by JAMS or Signature Resolution, at the claimant's choice, pursuant to their then current general arbitration rules. With respect to conflicts between the California Arbitration Act and the Federal Arbitration Act, the Federal Arbitration Act shall govern. If neither JAMS nor Signature Resolution (or successor entities) shall exist at the time of a demand for arbitration, the arbitration shall be filed with and administered by ADR Services pursuant to its applicable arbitration rules at the time of filing. If ADR Services does not exist at the time of the demand for arbitration, the arbitration shall be filed with AAA or any other arbitration service. The filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement, and the confidentiality provisions thereof, and shall entitle the non-breaching Party to all damages, including attorneys' fees expended in compelling arbitration, resulting therefrom. Each Party irrevocably submits to the exclusive jurisdiction and exclusive venue of the state and federal courts for the County of Los Angeles, State of California for any necessary court proceedings, such as petitions to confirm or vacate an arbitral award.

(Singer Decl. ¶ 6 and Ex. A, emphasis added; see also Petition at ¶¶ 31-32.)  The Agreement also contains a non-disparagement clause and a release of all claims.  (Ex. A at ¶¶ 4, 6.)

A dispute has now arisen over the payments owed under the Agreement and whether the non-disparagement clause has been breached.  (Singer Decl. ¶ 12.)

On  September 17, 2024, MJC initiated arbitration proceedings to resolve the dispute, followed by a supplemental demand for arbitration on September 24, 2024.  (Singer Decl. ¶¶ 13, 15.)

In opposition, Respondent argues (1) that the Agreement is void because its purpose is to silence victims of sexual assault, in violation of Code of Civil Procedure sections 1001 and 1002; (2) the Agreement is unconscionable; (3) the Agreement is rescindable because it was signed under duress; and (4) Petitioners waived the right to compel arbitration.  The Court analyzes each issue in turn.

### a.    DELEGATION

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

| | |
|---|---|
| **25SMCP00385** | March 4, 2026 |
| **THE MICHAEL JACKSON COMPANY, LLC, et al. vs** | 12:19 PM |
| **FRANK CASCIO** | |

| | |
|---|---|
| Judge: Honorable Michael E. Whitaker | CSR: None |
| Judicial Assistant: J. Young | ERM: None |
| Courtroom Assistant: P. Booker | Deputy Sheriff: None |

Petitioners argue that because the arbitration agreement, by its own terms is governed by the Federal Arbitration Act ("FAA") and contains a delegation clause, all of the above challenges to the validity of the contract as a whole are for the arbitrator, and not the Court to decide. In support, Petitioners cite to *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440 (hereafter *Buckeye*), which held: "regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." (*Id.* at p. 449.)

In *Buckeye*, the U.S. Supreme Court explained that as a matter of substantive federal arbitration law, arbitration provisions are generally severable from the remainder of the contract, and unless the challenge is to the arbitration clause itself, the issue of the contract's validity is a question for the arbitrator, not the court, to decide. (*Buckeye*, *supra*, 546 U.S. at pp. 445-446.) Specifically at issue in *Buckeye* was whether the overarching contract containing the arbitration provision was void for illegality as usurious. Because the agreement to arbitrate was severable from the issue of whether the other provisions were void as usurious, whether the contract was usurious was a question for the arbitrator to decide, not the court. (*Id.* at p. 449.)

Similarly, in *Nielsen Contracting, Inc. v. Applied Underwriters, Inc.* (2018) 22 Cal.App.5th 1096, 1107-1108, the California Court of Appeal explained:

> It has long been settled that when parties have agreed to arbitration, challenges to the validity of the underlying contract, including contract defenses such as fraud in the inducement or illegality, are for the arbitrator to decide. This is because the arbitration clause is viewed as separate from the underlying contract. Thus, allegations that the main contract is unlawful or unconscionable does not affect the enforceability of the arbitration clause.

> However, challenges to the validity of the arbitration clause itself are generally resolved by the court in the first instance. An exception to this rule applies when the parties have clearly and unmistakably agreed to delegate questions regarding the validity of the arbitration clause to the arbitrator. Such delegation clauses are generally enforceable according to their terms.

By contrast, here, when reading the entire agreement in context, the primary purpose of the arbitration provision contained within the agreement is clearly to maintain the confidentiality

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
West District, Beverly Hills Courthouse, Department 207

| | |
|---|---|
| **25SMCP00385** | March 4, 2026 |
| **THE MICHAEL JACKSON COMPANY, LLC, et al. vs** | 12:19 PM |
| **FRANK CASCIO** | |

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                          ERM: None
Courtroom Assistant: P. Booker                   Deputy Sheriff: None

of Respondent's childhood sexual assault claims.  Thus, if the contract's confidentiality requirements run afoul of the law, they would void both the agreement to arbitrate and the overall contract.  Thus, unlike *Buckeye*, where the usurious nature of the overarching contract had no bearing on whether the agreement to arbitrate contained within it was valid, here, the same purportedly illegal confidentiality provisions infecting the overall contract would also specifically affect the arbitration clause.

Thus, because the contentions impact whether the *arbitration agreement* contained within the overall contract is valid or void, they are generally issues for the Court to adjudicate. Further, the delegation clause does not pass on the question of whether the arbitration agreement is void to the arbitrator, as the delegation clause only delegates to the arbitrator "the scope, enforceability, or applicability" of the agreement to arbitrate and "the question of arbitrability," not the arbitration agreement's validity or voidness.  (Ex. A to Singer Decl. at ¶ 20.)

Thus, the Court analyzes each contention in turn.

### b.    CODE OF CIVIL PROCEDURE SECTIONS 1001 AND 1002

Code of Civil Procedure section 1001 provides:  "a provision within a settlement agreement that prevents or restricts the disclosure of factual information **related to a claim filed in a civil action** or a complaint filed in an administrative action, regarding any of the following is prohibited: (1) An act of sexual assault that is **not** governed by subdivision (a) of Section 1002."  Section 1002 provides:

> a provision within a settlement agreement that prevents the disclosure of factual information **related to the action** is prohibited **in any civil action** the factual foundation for which establishes a cause of action for civil damages in any of the following:
>
> (1) An act that may be prosecuted as a felony sex offense.
>
> (2) **An act of childhood sexual assault**, as defined in Section 340.1.
>
> (3) An act of sexual exploitation of a minor, as defined in Section 11165.1 of the Penal Code, or conduct prohibited with respect to a minor pursuant to Section 311.1, 311.5, or 311.6 of the Penal Code.

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**25SMCP00385**                                                                March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                               12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

---

(4) An act of sexual assault, as defined in paragraphs (1) to (8), inclusive, of subdivision (e) of Section 15610.63 of the Welfare and Institutions Code, against an elder or dependent adult, as defined in Sections 15610.23 and 15610.27 of the Welfare and Institutions Code.

"A **provision** within a settlement agreement that prevents the disclosure of factual information **related to the action** described in subdivision (a) that is entered into on or after January 1, 2017 is void as a matter of law and against public policy."  (Code Civ. Proc., § 1002, subd. (d), emphasis added; see also Code Civ. Proc., § 1001, subd. (d) [re: agreements entered into on or after January 1, 2019].)  Here, the provision at issue is a confidentiality clause within the Acquisition and Consulting Agreement.

Because the underlying allegations at issue involve alleged childhood sexual assault, the confidentiality provisions are governed by Section 1002, not Section 1001.

There are two primary reasons why the confidentiality clause at issue does not void the agreement under Section 1002.  As a threshold matter, there was no action pending when the Agreement was executed.  (Singer Decl. ¶ 4.)  Nor is there any civil action pending now concerning the underlying allegations.  As such, there is no factual information "related to the action," nor is there a "civil action" in which Respondent is being prevented from disclosing such factual information.  Moreover, the "confidentiality" clause provides:

> The Parties agree to refrain from making any statement or taking any action, directly or indirectly, orally or in writing, that may defame, disparage, embarrass, or in any way harm or impair the reputation, goodwill, business interests or financial interests of any of the other Parties, including the Cascio Releasing Parties and the Estate Released Parties, **except as required by law or in connection with a legal or administrative proceeding.**

(Ex. A at ¶ 6.b., emphasis added.)  Thus, on its face, the Court finds that the "confidentiality clause" is actually a general non-disparagement clause specifically designed to carve out disclosures required by Code of Civil Procedure sections 1001 and 1002.

In supplemental briefing, Respondent requests the Court to take judicial notice of Assembly Bill No. 250, as evidence of the legislature's intent to wholly void agreements containing such non-disparagement clauses.  Assembly Bill No. 250 amends Code of Civil

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
West District, Beverly Hills Courthouse, Department 207

25SMCP00385                                                    March 4, 2026
THE MICHAEL JACKSON COMPANY, LLC, et al. vs                    12:19 PM
FRANK CASCIO


Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

Procedure section 340.16 (pertaining to the statute of limitations for sexual assault committed against a person **on or after** their 18th birthday) to revive claims that would otherwise be time barred where an entity was involved in a "cover up" of a <u>previous</u> instance or allegations of sexual assault.

First, the Court notes that the Legislature specifically developed separate statutory schemes for childhood sexual assault (see Code Civ. Proc., § 340.10, as referenced in Code Civ. Proc., § 1002) and sexual assault against a person aged 18 or older (Code Civ. Proc., § 340.16).

In particular, there is no statute of limitations for a claim for childhood sexual assault, unless it occurred before January 1, 2024, in which case the statute of limitations is 22 years after plaintiff attains the age of majority or within five years of the date plaintiff discovers or should have discovered injury caused by the sexual assault, whichever is later. (See Code Civ. Proc., §§ 340.10-340.11.) Whereas the statute of limitations for an action for damages arising from adult sexual assault is generally 10 years from the date of the last act or three years from the date the plaintiff discovers or should have discovered an injury resulting from such act or attempted act of sexual assault, whichever is later. (Code Civ. Proc., § 340.16.)

Moreover, a "cover up" in the context of *childhood* sexual assault is defined as "a concerted effort to hide evidence relating to childhood sexual assault" and permits any plaintiff who was sexually assaulted as the result of a cover up to recover treble damages. (See Code Civ. Proc., § 340.1, subd. (b)(1)-(2). But "cover up" in the context of *adulthood* sexual assault is defined as "a concerted effort to hide evidence relating to a sexual assault that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public or being disclosed to the plaintiff, including, but not limited to, the use of nondisclosure agreements or confidentiality agreements" and permits a plaintiff to revive time-barred claims against an entity that participated in, or attempted a, cover up. (Code Civ. Proc., § 340.16, subds. (e)(1) & (e)(5)(A).)

Thus, legislative intent behind extending the statute of limitations for a cause of action alleging *adulthood* sexual assault does not necessarily apply with equal force to claims of *childhood* sexual assault, as the two types of sexual assault have separate statutory schemes, statutes of limitations, and definitions of "cover up."

Second, the plain language of AB 250 is to revive claims against entities who covered up <u>previous</u> instances or allegations of sexual assault. Thus, in context, it is clear that the rationale is to prevent the cover up of sexual assault information that enabled the perpetrator to continue to

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

**25SMCP00385**                                                March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**              12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

---

commit additional, future acts of sexual assault.  It is victims of those additional, future acts of sexual assault made possible by virtue of the cover-up who may have their otherwise time-barred claims revived.  Those same concerns do not apply here, where the alleged perpetrator had been deceased for about a decade when the parties entered into the agreement containing the confidentiality/non-disparagement clause, and thus was incapable of committing any future acts of sexual assault.

Thus, the Court finds no basis to find the agreement void, either in the language of the statutory scheme or based on legislative history.

### c.    UNCONSCIONABILITY

"Unconscionability is ultimately a question of law for the court."  (*Flores v. Transamerica Homefirst, Inc.* (2001) 93 Cal.App.4th 846, 851.)  "However, numerous factual issues may bear on that question." (*Gutierrez v. Autowest, Inc.* (2003) 114 Cal.App.4th 77, 89.)  As such, Respondent must show two elements to establish the unconscionability defense: (1) procedural unconscionability, which focuses on the manner in which the contract was negotiated, and (2) substantive unconscionability, which concerns whether the contract's terms are unreasonably one-sided. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113-115 (hereafter *Armendariz*).)

"The prevailing view is that procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.  In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa." (*Armendariz, supra*, 24 Cal.4th at p. 114 [cleaned up].)

### i.    PROCEDURAL UNCONSCIONABILITY

Procedural unconscionability examines the "oppression that arises from unequal bargaining power and the surprise to the weaker party that results from hidden terms or the lack of informed choice." (*Ajamian v. CantorCO2e, L.P.* (2012) 203 Cal.App.4th 771, 795.) Preprinted forms buried within a volume of documents offered on a "take or leave it basis"

---

Minute Order                                                Page 10 of 15

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**Civil Division**

West District, Beverly Hills Courthouse, Department 207

| | |
|---|---|
| **25SMCP00385** | March 4, 2026 |
| **THE MICHAEL JACKSON COMPANY, LLC, et al. vs** | 12:19 PM |
| **FRANK CASCIO** | |

| | |
|---|---|
| Judge: Honorable Michael E. Whitaker | CSR: None |
| Judicial Assistant: J. Young | ERM: None |
| Courtroom Assistant: P. Booker | Deputy Sheriff: None |

evidence a high degree of procedural unconscionability. (See *Dougherty v. Roseville Heritage Partners* (2020) 47 Cal.App.5th 93, 102-104 (hereafter *Dougherty*).) Most consumer contracts are adhesive and therefore present some procedural unconscionability. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 915 (hereafter *Sanchez*).) "[A] finding of procedural unconscionability does not mean that a contract will not be enforced, but rather that courts will scrutinize the substantive terms of the contract to ensure they are not manifestly unfair or one-sided." (*Ibid.*)

Respondent argues that the Arbitration provision is procedurally unconscionable because it is a contract of adhesion that was presented to Respondent on a "take it or leave it" basis.

The Agreement itself appears to be personalized to the parties, and not a form contract. In support of Respondent's claim that it was presented on a "take it or leave it" basis, Respondent provides the Declaration of Frank Cascio, which provides as follows:

> 3. In late December 2019, I learned that nine members of my family had already signed a settlement agreement with the Estate but that the agreement would not become effective absent my signature. At the time, my family was in severe turmoil, and the agreement appeared to offer them a sense of closure. Knowing that, I felt immense pressure to sign as well, to avoid causing more conflict within the family during this unbelievably difficult chapter.

> 4. I was diagnosed with dyslexia in the fifth grade and have struggled with reading comprehension throughout my life. When I was presented with the agreement, I had difficulty understanding many of its terms, particularly the legal concepts. The Estate's attorneys and representatives assured me that the agreement was merely a technicality and that I should not attach much significance to it. They told me that nothing would get done if we had our own counsel and that the only way to reach resolution was "to do it the way we are doing it." They further explained that calling the settlement a "life rights agreement" would keep it private, avoid probate, and prevent the beneficiaries from finding out—even though we were very uncomfortable with this being hidden from them and pressed this issue with the Estate. Despite my family's persistence, the Estate would not budge and said this was non-negotiable.

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
## Civil Division
West District, Beverly Hills Courthouse, Department 207

25SMCP00385                                                      March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                  12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

5. The attorneys and representatives for the Estate led me to believe they had my best interests at heart. They spoke to me in a reassuring and supportive manner, which caused me to trust them completely. The Estate convinced me that my family would find peace and comfort in moving on with their lives, and that signing the agreement would mean our family's private information would not be exposed.

[…]

7. Acting under that pressure, and with misplaced trust in the Estate's representatives, I signed the agreement in January 2020 without my own lawyer and without fully understanding its implications. I signed the agreement while I was alone in attorney Howard Weitzman's office with a notary present. Mr. Weitzman had long represented Michael and the Estate, and I had known him since childhood. He did not read or explain the agreement to me. He simply pointed where I needed to sign. He then gave me a hug and said he was so sorry for what my family had been through and to please reach out if we ever needed anything. When I asked for a copy of the agreement, he identified which one of the Estate's representatives would have a copy. When we later asked this representative for a copy of the signed agreement, he said he did not have it. We never received a signed copy of the agreement from the Estate.

(Frank Cascio Decl. ¶¶ 3-7.)

Respondent's declaration does not support his characterization that he was forced to sign the Agreement on a take-it-or-leave-it basis, and only if he signed it, without counsel. Rather, the reasonable inference from paragraph 3 of Respondent's declaration, that nine members of his family had already signed the agreement, but they could not get closure absent Respondent's signature, is that the "immense pressure" to sign the Agreement came from his own family, not from Petitioners or their attorneys.

Nor does the fact that Petitioners' counsel expressed their concerns that "nothing would get done" if additional attorneys got involved demonstrate that Respondent was precluded from seeking advice from counsel. Respondent's declaration does not indicate, for example, that in the three or four weeks between "late December 2019," when he first became aware of the

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

25SMCP00385                                                                March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                             12:19 PM
**FRANK CASCIO**

Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

agreement, and January 10, 2020 when he ultimately signed the Agreement, that he had requested additional time from Petitioners to have an attorney of his own choice to review the Agreement but Petitioners refused.  Further, Respondent's declaration does not indicate that he wanted his own counsel to review the Agreement and advise him about it, and when expressed his wish to Petitioners or their attorneys, he was rebuffed.

Even further, the fact that the payments to be made under the Agreement subsequently increased as evidenced by the Letter of Direction, modifying the payments under the Agreement, suggests Respondent was able to negotiate a larger payment, calling to question Respondent's contention that the Agreement is procedurally unconscionable.  (See Singer Decl. ¶ 2.)

Thus, Respondent has not demonstrated that the Agreement was a procedurally unconscionable contract of adhesion offered to Respondent on a take-it-or-leave-it basis and only if he signed it without his own counsel.  In short, the Agreement is not the same as preprinted form buried within a volume of documents offered on a "take or leave it basis."

Because the Court does not find the Agreement to be procedurally unconscionable, it does not analyze substantive unconscionability.

### d.    WAIVER

"[A] court should apply the same principles that apply to other contracts to determine whether the party seeking to enforce an arbitration agreement has waived its right to do so." (*Quach v. California Commerce Club, Inc.* (2024) 16 Cal.5th 562, 569 (hereafter *Quach*).)  "To establish waiver under generally applicable contract law, the party opposing enforcement of a contractual agreement must prove by clear and convincing evidence that the waiving party knew of the contractual right and intentionally relinquished or abandoned it."  (*Id.* at p. 584.)  "Under the clear and convincing evidence standard, the proponent of a fact must show that it is 'highly probable' the fact is true."  (*Ibid.*)

"The waiving party's knowledge of the right may be "actual or constructive."  (*Quach*, *supra*, 16 Cal.5th at p. 584.)  "Its intentional relinquishment or abandonment of the right may be proved by evidence of words expressing an intent to relinquish the right or of conduct that is so inconsistent with an intent to enforce the contractual right as to lead a reasonable factfinder to conclude that the party had abandoned it."  (*Ibid.*)

"To establish waiver, there is no requirement that the party opposing enforcement of the

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

25SMCP00385                                                       March 4, 2026
**THE MICHAEL JACKSON COMPANY, LLC, et al. vs**                   12:19 PM
**FRANK CASCIO**


Judge: Honorable Michael E. Whitaker          CSR: None
Judicial Assistant: J. Young                  ERM: None
Courtroom Assistant: P. Booker                Deputy Sheriff: None

---

contractual right demonstrate prejudice or otherwise show harm resulting from the waiving party's conduct." (*Quach*, *supra*, 16 Cal.5th at p. 585.)

In the arbitration context, "[i]f a party to an arbitration agreement files a complaint in court raising a claim covered by the agreement, the defendant can file a motion asking the court to stay the lawsuit and send the dispute to arbitration. A defendant who instead litigates the case risks losing the contractual right to compel arbitration." (*Quach*, *supra*, 16 Cal.5th at p. 569.)

Participation in litigation that has been deemed to constitute a waiver includes answering the complaint, propounding discovery requests, and actively engaging in discovery for thirteen months instead of moving to compel arbitration at the outset of the case. (*Quach*, *supra*, 16 Cal.5th at pp. 586-587.)

Engaging in discovery is "markedly inconsistent with an intent to arbitrate." (*Hofer v. Boladian* (2025) 111 Cal.App.5th 1, 15.) In *Hofer*, the plaintiffs were found to have waived their right to arbitration by vigorously litigating in court for six months, including propounding comprehensive discovery requests. (*Ibid.*) In particular, raising the issue of arbitration, but doing nothing to bring it about for six months generally constitutes a waiver. (*Id.* at p. 16; *Quach*, *supra*, 16 Cal.5th at pp. 586-587.) This is because courts disfavor "blow[ing] hot and cold by pursuing a strategy of courtroom litigation only to turn towards the arbitral forum at the last minute." (*Hofer*, 111 Cal.App.5th at p. 17.) "The courtroom may not be used as a convenient vestibule to the arbitration hall so as to allow a party to create his own unique structure combining litigation and arbitration." (*Christensen v. Dewor Developments* (1983) 33 Cal.3d 778, 784.)

Here, Respondent argues that Petitioners have waived the right to compel arbitration by filing the instant Petition to Compel Arbitration in the Superior Court while the arbitration proceeding was pending.

Without more, the Court does not find that filing a Petition to Compel Arbitration in the Superior Court in any way constitutes a relinquishment of Petitioners' right to compel arbitration amounting to a waiver.

### e.    RESCINDABLE AGREEMENT & BREACH

Respondent argues that the Agreement is rescindable because it was procured under duress and that the Petitioners breached the Agreement's Confidentiality Provision by filing the

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
**Civil Division**
West District, Beverly Hills Courthouse, Department 207

| | |
|---|---|
| **25SMCP00385** | March 4, 2026 |
| **THE MICHAEL JACKSON COMPANY, LLC, et al. vs** | 12:19 PM |
| **FRANK CASCIO** | |

| | |
|---|---|
| Judge: Honorable Michael E. Whitaker | CSR: None |
| Judicial Assistant: J. Young | ERM: None |
| Courtroom Assistant: P. Booker | Deputy Sheriff: None |

instant action.  But having determined the parties entered into an Agreement to Arbitrate, whether and to what extent the Agreement is revocable or the parties breached the Agreement are questions for the arbitrator to decide.

To wit, "Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration […] Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court." (Agreement at ¶ 20.)

## CONCLUSION

For the foregoing reasons, finding a valid and binding arbitration provision within the Acquisition and Consulting Agreement exists with respect to the dispute in question, the Court grants the Petition to Compel Arbitration and orders Petitioners to lodge a proposed Order in conformity with the Court's ruling on or before March 18, 2026.  Any objections to the proposed Order shall be lodged on or before April 1, 2026.

Upon entry of the Order, the Court will deem the action disposed of as no further action by the Court is contemplated or needed.  Notwithstanding, to ensure that the Order is entered, the Courts set a non-appearance review hearing on April 15, 2026.  If the Order is entered before April 15, 2026, the Court will vacate the review hearing.

Petitioners shall provide notice of the Court's ruling and file the notice with a proof of service forthwith.

 Certificate of Service is attached.

| | |
|---|---|
| Minute Order | Page 15 of 15 |