# EXHIBIT 1

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE and ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx)<br><br>Honorable Hernán D. Vera<br><br>**PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR AN ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS**<br><br>*Filed Concurrently with Declarations of Howard E. King, Frank Cascio, Edward Joseph Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio and Plaintiffs' Memorandum of Evidentiary Objections*<br><br>Date:          June 4, 2026<br>Time:          10:00 a.m.<br>Courtroom:   5B<br><br>Action Commenced:  February 27, 2026 |

6187.061/3247406.3

Case No. 2:26-cv-02129 HDV (AGRx)

PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER COMPELLING ARBITRATION

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ......................................................................................... 1

II. FACTS ........................................................................................................ 2

III. ARGUMENT .............................................................................................. 7

    A. The EFAA's Text ............................................................................... 8

    B. The EFAA's plain text and ordinary meaning controls. ................... 9

    C. Plaintiffs are "alleging conduct constituting" a "sexual assault dispute" because their claims "involv[e]" Jackson's sexual assaults. ............................................................................................. 9

        1. A "dispute involving sexual assault" is a dispute that in some way includes or concerns sexual assault. ........................... 9

        2. Plaintiffs allege a dispute that includes or concerns sexual assault ........................................................................................ 11

    D. Plaintiffs have satisfied the EFAA's two timing clauses ................... 14

        1. The Parties' dispute arose no earlier than 2024, after the EFAA's 2022 effective date. ...................................................... 15

        2. Alternatively, three of Plaintiffs' claims accrued after the EFAA's effective date. ............................................................. 17

    E. The Parties' 2019 Agreement is a "predispute arbitration agreement" under 9 U.S.C. § 402(a). ................................................. 18

    F. The arbitration agreement is unenforceable as to Plaintiffs' entire "case." ............................................................................................... 19

IV. CONCLUSION ........................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Companies, Inc. v. Dobson*,
  513 U.S. 265 (1995)............................................................................................10

Boyd v. City of Oakland,
  458 F. Supp. 2d 1015 (N.D. Cal. 2006).................................................................17

*Bray v. Rhythm Mgmt. Grp., LLC*,
  2024 WL 4278989 (D. Md. Sept. 24, 2024)..........................................................20

*Bruce v. Adams & Reese, LLP*,
  168 F.4th 367 (6th Cir. 2026) .....................................................................9, 19, 21

*Bulic v. Celebrity Cruises, Inc.*,
  2025 WL 1783865 (S.D. Fla. June 27, 2025)..........................................11, 14, 21

*Clay v. FGO Logistics, Inc.*,
  751 F. Supp. 3d 3 (D. Conn. 2024)..........................................................18, 19, 22

*Cornelius v. CVS Pharmacy Inc.*,
  133 F.4th 240 (3d Cir. 2025) ................................................................................15

*CVS Health Corp. v. Vividus, LLC*,
  878 F.3d 703 (9th Cir. 2017) ..................................................................................9

*D.C. v. Greater Washington Bd. of Trade*,
  506 U.S. 125 (1992)..............................................................................................19

*Diaz-Roa v. Hermes L., P.C.*,
  757 F. Supp. 3d 498 (S.D.N.Y. 2024) .......................................................2, 11, 14

*Doe (J.K.) v. Celebrity Cruises, Inc.*,
  792 F. Supp. 3d 1371 (S.D. Fla. 2025).........................................................passim

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006)..............................................................................................10

*Famuyide v. Chipotle Mexican Grill, Inc.*,
  111 F.4th 895 (8th Cir. 2024) ...............................................................................15

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.061/3247406.3                                    ii                Case No. 2:26-cv-02129 HDV (AGRx)

PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER COMPELLING ARBITRATION

*Gill v. US Data Mgmt., LLC*,
2024 WL 5402494 (C.D. Cal. Dec. 2, 2024)........................................................14

*Goldman, Sachs & Co. v. Golden Empire Schools Financing Auth.*,
764 F.3d 210 (2d Cir. 2014) ...................................................................................2

*Johnson v. Everyrealm, Inc.*,
657 F. Supp. 3d 535, 559 (S.D.N.Y. 2023) ....................................................19, 22

*Kelly v. Rosenberg & Estis, P.C.*,
804 F. Supp. 3d 461 (S.D.N.Y. 2025) ..................................................................20

*Memmer v. United Wholesale Mortg., LLC*,
135 F.4th 398 (6th Cir. 2025) ........................................................................14, 15

*Miranda v. Anchondo*,
684 F.3d 844 (9th Cir. 2012) ................................................................................10

*Molchanoff v. SOLV Energy, LLC*,
2024 WL 899384 (S.D. Cal. Mar. 1, 2024)....................................................18, 22

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)..............................................................................................19

*Morgan Stanley & Co., LLC v. Couch*,
134 F. Supp. 3d 1215 (E.D. Cal. 2015) ..................................................................2

*Mulugu v. Duke Univ. Sch. of Med.*,
2024 WL 3695220 (M.D.N.C. Aug. 7, 2024) ................................................18, 22

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)................................................................................................9

*Olivieri v. Stifel, Nicolaus & Co., Inc.*,
112 F.4th 74 (2d Cir. 2024) .........................................................................2, 8, 17

*Orr v. Bank of Am., NT & SA*,
285 F.3d 764 (9th Cir. 2002) ................................................................................16

*Pacheco-Camacho v. Hood*,
272 F.3d 1266 (9th Cir. 2001) ..............................................................................10

*Pfingston v. Ronan Eng'g Co.*,
284 F.3d 999 (9th Cir. 2002) ................................................................................17

*Polen v. API Grp. Life Safety USA, LLC*,
2025 WL 3251349 (D. Or. Nov. 21, 2025) ....................................................passim

*Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*,
111 F.3d 658 (9th Cir. 1997) ......................................................................21

*Rix v. Polsinelli PC*,
2025 WL 2674767 (D.D.C. Sept. 18, 2025)................................................19

*Sheehan v. Everstory Partners*,
804 F. Supp. 3d 498 (E.D. Pa. 2025)..........................................................19

*Shumway v. Space Expl. Techs. Corp.*,
2025 WL 4035293 (C.D. Cal. Dec. 3, 2025)...............................................20

*Singh v. Meetup LLC*,
750 F. Supp. 3d 250 (S.D.N.Y. 2024) ........................................................14

*Solis v. Prime Comms Retail, LLC*,
2025 WL 1255143 (C.D. Cal. Apr. 7, 2025)...............................................14

*Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*,
627 F.3d 1268 (9th Cir. 2010) ......................................................................9

*Turner v. Tesla, Inc.*,
686 F. Supp. 3d 917 (N.D. Cal. 2023)...................................................20, 22

*United States v. Flores*,
729 F.3d 910 (9th Cir. 2013) ........................................................................9

*United States v. Franklin*,
904 F.3d 793 (9th Cir. 2018) ......................................................................20

*United States v. Owens-El*,
889 F.2d 913 (9th Cir. 1989) ......................................................................16

*United States v. St. Luke's Subacute Care Hosp., Inc.*,
178 F. App'x 711 (9th Cir. 2006)................................................................17

*United States v. Wells*,
156 F.4th 907 (9th Cir. 2025) .......................................................................9

*Walters v. Starbucks Corp.*,
623 F. Supp. 3d 333 (S.D.N.Y. 2022)........................................................16

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.061/3247406.3    iv    Case No. 2:26-cv-02129 HDV (AGRx)

PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER COMPELLING ARBITRATION

*Yost v. Everyrealm, Inc.*,
   657 F. Supp. 3d 563 (S.D.N.Y. 2023) ........................................................................ 14

**Statutes**

9 U.S.C. § 401 .................................................................................................... *passim*

9 U.S.C. § 402 ............................................................................................ 7, 8, 19, 21

9 U.S.C. § 7 ...................................................................................................................... 19

9 U.S.C. §§ 1-16 .............................................................................................................. 1

9 U.S.C. §§ 401-02 .......................................................................................................... 1

18 U.S.C. § 2246 ........................................................................................................ 9, 11

28 U.S.C. § 1446 ............................................................................................................ 19

Cal. Pen. Code § 243.4 ................................................................................................ 11

Cal. Pen. Code § 261 .................................................................................................... 11

**Rules**

Fed. R. App. Proc. 3(c)(5) ........................................................................................... 19

Fed. R. civ. Proc. 18 ..................................................................................................... 19

**Other Authorities**

H.R. REP. 117-234 ........................................................................................................... 8

Pub. L. No. 117-90, 136 Stat. 26 ......................................................................... 1, 7, 8, 14

## I.    **INTRODUCTION**

Plaintiffs Edward Joseph Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio oppose the Motion for an Order Compelling Arbitration ("Motion") filed by Defendants The Michael Jackson Company ("MJC"), MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties"). Plaintiffs further oppose the joinder that Defendant Herman Weisberg intends to file to the Motion.[1]

Michael Jackson sexually assaulted Plaintiffs when they were children. Plaintiffs now sue the Jackson Parties and Weisberg (together, "Defendants") to hold them responsible for facilitating Jackson's sexual assaults by trafficking and grooming them, fraudulently inducing them into signing a "hush money" agreement to buy their silence, and spending the past two years falsely accusing Plaintiffs of lying about the abuse.

Defendants request that this Court compel arbitration of Plaintiffs' Complaint and to stay proceedings in this Court until arbitration is complete. The Motion cites the Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), and point to an arbitration provision in the "hush money" agreement.

But Defendants have failed to acknowledge the existence of a recent amendment to the FAA, which forecloses each of their arguments in their Motion: the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), Pub. L. No. 117-90, 136 Stat. 26, *codified at* 9 U.S.C. §§ 401-02.

---

[1] On May 11, 2026, Defendant Herman Weisberg told Plaintiffs' counsel that he intends to file a joinder to the Motion before May 15, 2026—one day before Plaintiff's opposition to the Motion is due on May 14, 2026. (King Decl. ¶ 6.) In this opposition, Plaintiffs argue that the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA") bars all Defendants—including Weisberg—from enforcing the arbitration agreement between MJC and Plaintiffs. Plaintiffs nonetheless reserve the right to amend this opposition to address Weisberg's joinder.

"In broad strokes, the EFAA renders arbitration agreements invalid and unenforceable, at the election of the complainant, in sexual assault and sexual harassment cases." *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 77 (2d Cir. 2024).[2] In other words, Congress passed the EFAA to prohibit defendants from burying sexual assault disputes in arbitration—just as Defendants attempt to do here. Because the EFAA requires Plaintiffs' entire Complaint to proceed in this Court, the Court must (1) deny the Motion and (2) order a stay of any arbitration proceedings that Defendants have initiated against Plaintiffs until the Court decides the Motion. *See Goldman, Sachs & Co. v. Golden Empire Schools Financing Auth.*, 764 F.3d 210, 213 (2d Cir. 2014) ("Federal courts generally have remedial power to stay arbitration."); *Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1234 (E.D. Cal. 2015) ("[Courts have] the authority to enjoin arbitration proceedings where there is no valid, enforceable arbitration agreement between the parties."); *see Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 519 (S.D.N.Y. 2024) (staying arbitration proceeding until Court made decision to motion to compel arbitration because EFAA precluded enforcement of arbitration agreement).

## II.   FACTS

For more than a decade, Michael Jackson repeatedly raped and sexually assaulted Plaintiffs, beginning when some of them were as young as seven or eight. (Compl. ¶¶ 24-27.) Jackson secured Plaintiffs' silence about the sexual abuse through years of brainwashing, grooming, and manipulation. (*Id.* ¶¶ 28-36.) He obtained their loyalty by showering them with extravagant presents and trips, normalized the abuse by showing them pornography and pictures of unclothed children, plied Plaintiffs with alcohol and drugs to lower their inhibitions, and repeatedly impressed on them that all of their lives would be destroyed if they told

---

[2] The formatting of all citations in this document has been modified to omit citations, alterations, and quotation marks, unless stated otherwise.

anyone about the abuse. (*Id.*)

Jackson's representatives and employees ("Jackson Organization")—including each of the Jackson Parties, lawyers, doctors, managers, security personnel, house managers, publicists, maids, chauffeurs, and pilots—knew of, facilitated, and covered up Jackson's sexual abuse of Plaintiffs and other children. (*Id.* ¶¶ 37-41.) Members of the Jackson Organization had personally witnessed evidence of Jackson's abuse of Plaintiffs. Nonetheless, the Jackson Organization arranged for interstate and international trips, during which Jackson sexually assaulted Plaintiffs. The Jackson Organization procured expensive gifts and shopping trips to groom Plaintiffs for Jackson. The Jackson Organization procured the drugs and alcohol that Jackson gave Plaintiffs and the pornography that Jackson showed Plaintiffs. And the Jackson Organization helped Jackson hide and destroy evidence of his sexual abuse of Plaintiffs. (*Id.*)

In 2019, the Estate of Michael Jackson ("Estate") sent an investigator—Defendant Herman Weisberg—and two attorneys—Bryan Freedman and the now-deceased Howard Weitzman—to offer compensation to Plaintiffs and their brother, Frank Cascio (together, "Cascios") for Jackson's sexual abuse. (*Id.*)

During this period, the Cascios' interactions with the Estate were amicable, and no dispute had arisen between the Cascios and the Estate—the disturbing result of decades of grooming and gaslighting. None of the Cascios sent any demand letters, threatened to sue, or assumed any position that was adversarial to the Estate. (*Id.*; Singer Decl. ¶ 5; Pls. Decls. ¶ 5.[3]) Weisberg, Freedman, and Weitzman told the Cascios that they were advocating for the siblings' interests, the Cascios did not need their own attorney, that the amount of money offered by the Estate was fair and non-negotiable, and that entering into a compensation agreement with the Estate

---

[3] "Pls. Decls." refers to the Declarations of Eddie, Dominic, Marie-Nicole, and Aldo.

would allow the Cascio family to move on with their lives in peace, comfort, and privacy. (Compl. ¶¶ 43-55; Frank Decl. ¶¶ 3-4; Pls. Decls. ¶ 5.)

On December 22, 2019, Weisberg met with Plaintiffs. (Compl. ¶ 56; Pls. Decls. ¶ 6.) Weisberg brought a document that was deceptively titled "Acquisition and Consulting Agreement" ("Agreement") and framed as a contract to acquire the Cascio family's "life story" rights and consulting services. (Compl. ¶ 56; Pls. Decls. ¶ 6.) At this point, Plaintiffs still believed that the Estate had the Cascios' best interests at heart and that Weisberg, Freedman, and Weitzman were representing their interests. So, Plaintiffs signed the Agreement. In January 2020, Frank signed the Agreement too. (Frank Decl. ¶ 5.)[4] Defendants claim that Branca signed the Agreement on behalf of MJC (Singer Decl. ¶ 2; Mot. At 4.)  No other Defendant – including Weisberg – signed the Agreement.

Relevant here, the Agreement (1) requires the Estate to pay each Plaintiff five annual payments of $690,000 minus a 6% commission to Weisberg and his agent, Kenny Katz (Singer Decl. Ex. 1 at 16 ¶ 3); (2) contains a "Confidentiality and Non-Disparagement" provision (*id.* at 18 ¶ 6); and (3) includes an arbitration provision, which states:

> This Agreement shall be governed and interpreted under the laws of the State of California without reference to choice of law rules. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration in

---

[4] The circumstances in which the Estate fraudulently induced Plaintiffs and Frank to sign the Agreement render the document unconscionable and void. (Compl. ¶¶ 43-79.) However, the unconscionability and validity of the Agreement does not affect whether the EFAA bars arbitration of the Complaint (which it does), so many facts pertinent to the question of unconscionability and validity are omitted in this opposition and its supporting declarations.

KING, HOLMES, PATERNO & SORIANO, LLP

6187.061/3247406.3                                    4                Case No. 2:26-cv-02129 HDV (AGRx)
PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER COMPELLING ARBITRATION

> Los Angeles County, California, . . . Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court. . . . With respect to conflicts between the California Arbitration Act and the Federal Arbitration Act, the Federal Arbitration Act shall govern. . . . The filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement, and the confidentiality provisions thereof, and shall entitle the non-breaching Party to all damages, including attorneys' fees expended in compelling arbitration, resulting therefrom.

(*Id.* at 21 ¶ 20.)

Also in January 2020, Frank asked Weitzman if the Estate would consider paying $800,000 for the first annual installment and $530,000 for the remaining installments. (Frank Decl. ¶ 7.) The Estate obliged, with no pushback. (*Id.*) Accordingly, Frank, Weisberg, and Katz signed a Letter of Direction ("Letter") with the new payment schedule. (Singer Decl. Ex. 2.) Plaintiffs did not sign the Letter. (*Id.* at 28-30.)

Around April 2024, Weisberg and Freedman contacted the Cascios. (Compl. ¶¶ 71-72; Pls. Decls. ¶ 8) They said that the Estate wanted to continue the annual payments to the Cascios under new terms. (Pls. Decls. ¶ 8.) For the first time, Freedman told the Cascios that they needed an attorney. (*Id.*) He tried to convince them to hire him to negotiate with his client, the Estate. (*Id.* ¶ 72.) Freedman's conflict of interest was now clear to the Cascios. (*Id.*)

So, the Cascios retained independent counsel. (Frank Decl. ¶ 9; Pls. Decls. ¶ 9.) In June and July 2024, the Cascios' attorney had several conversations in person and over the phone with Martin Singer, counsel for the Jackson Parties. (King Decl. ¶ 3.) The Cascios' counsel told Singer that the Agreement was unconscionable and void and that he intended to challenge the Agreement on his clients' behalf. (*Id.*) <u>This is the first time any dispute of any legal nature had arisen between any of the Cascios and any of Defendants</u>. (Frank Decl. ¶ 10; Pls. Decls.

¶ 10.)

In September 2024, the Estate moved to retaliate against Plaintiffs. First, Branca, who is a Co-Administrator of the Estate, defamed the Cascios. (Compl. ¶ 75.) He told reporters that the siblings were blackmailing the Estate by threatening to release "false" claims that Jackson had molested them, breaching the "Confidentiality and Non-Disparagement" provision of the Agreement. (*Id.*) Second, Branca and the Estate filed an arbitration demand against Frank for civil extortion, anticipatory breach of contract, and declaratory relief. (Singer Decl. ¶ 14.) Plaintiffs were not named in the arbitration demand. (*Id.*)

In July 2025, Branca, McClain, and MJC filed a Petition for Order Compelling Arbitration ("Petition") against Frank and "Does 1-10" in the Superior Court for the County of Los Angeles. (King Decl. Ex. 1 at 1.) The Petition does not name Plaintiffs as parties, even though the Jackson Parties now speciously maintain in these proceedings that "Does 1-10" was "meant to include the other Cascio Parties." (Mot. at 17.) The Petition sought an order compelling Frank and "Does 1-10" to "resolve any and all of their specious alleged claims against [Branca, McClain, and MJC] and any attorneys who represented [Branca, McClain, and MJC]" in the arbitration proceedings against Frank. (King Decl. Ex. 1 at 7 ¶ 16.) The Petition accuses the Cascios of lying about Jackson's sexual abuse, extensively quotes the Agreement, and includes detailed allegations about the circumstances surrounding its creation (*Id.* at 2, 10-15.) Thus, by filing the Petition, Branca, McClain, and MJC violated the arbitration provision's clause that "[t]he filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement" as well as the "Confidentiality and Non-Disparagement" provision. (Compl. ¶¶ 105-08.)

On February 27, 2026, Plaintiffs sued Defendants in this Court, bringing nine claims: (1) sex trafficking of children by force, fraud or coercion; (2) negligence; (3) negligent hiring, supervision, or retention of employee; (4) intentional infliction of

emotional distress ("IIED"); (5) breach of contract; (6) fraud; (7) breach of fiduciary duty; (8) rescission; and (9) declaratory judgment that the Agreement, including its arbitration provision, is void and unenforceable. (Compl. ¶¶ 80-126.)

On April 17, 2026, the Jackson Parties filed their Motion, seeking to compel arbitration of the Complaint. They argue that (1) the arbitration provision's delegation clause requires the arbitrator to decide whether the Complaint is arbitrable; (2) the arbitrator must address any arguments that the Agreement as a whole is unenforceable; (3) any tort claims are subject to arbitration; (4) the non-MJC Jackson Parties can enforce the arbitration agreement despite being non-signatories to the Agreement; and (5) Plaintiffs' lawsuit constitutes "improper forum shopping."[5] (Mot. at 19-30.) Weisberg intends to file a joinder to the Motion. (King Decl. ¶ 6.)

Plaintiffs now oppose the Motion.

## III.   <u>ARGUMENT</u>

Even if any of Defendants' arguments had any merit (which Plaintiffs deny and do not concede), the EFAA forecloses each argument. Under the EFAA, this Court—not an arbitrator—must construct the EFAA's plain text and determine four issues. *First*, are Plaintiffs "alleging conduct constituting" a "sexual assault dispute" under 9 U.S.C. § 402(a)? *Second*, did the Parties' "dispute arise" before March 3, 2022 or did Plaintiffs' "claims accrue" before that date? PL 117-90, 136 Stat 26. *Third*, is the Agreement a "predispute arbitration agreement" under 9 U.S.C. § 402(a)? And *fourth*, does the EFAA bar arbitration of Plaintiffs' entire "case" under 9 U.S.C. § 402(a)? The answer to each question is yes, requiring this Court to deny the Motion and bar enforcement of the Agreement's arbitration provision as to

---

[5] To briefly address the Jackson Parties' "improper forum shopping" accusation (Mot. at 18), the Jackson Parties cite no evidence for this conjecture, nor do they point to any caselaw that demonstrates how this purported "forum shopping" supports their Motion or is legally relevant in any way. (*Id.* at 18-19.)

Plaintiffs' entire Complaint.

## A. The EFAA's Text

The EFAA is the first major amendment to the FAA. *See Olivieri*, 112 F.4th at 84. The amendment was driven by Congress' desire to "restore access to justice for millions of victims of sexual assault or harassment"—such as Plaintiffs—"who are currently locked out of the court system and are forced to settle their disputes" in arbitration. H.R. REP. 117-234, 4.

The EFAA states:

> "[A]t the election of the person ***alleging conduct constituting*** *a* sexual harassment dispute or ***sexual assault dispute***, . . . no ***predispute arbitration agreement*** . . . shall be valid or enforceable with respect to a ***case*** which is filed under Federal, Tribal, or State law and ***relates to the sexual assault dispute*** or the sexual harassment dispute.

9 U.S.C. § 402(a). Relevant here are two statutory definitions, a statutory timing provision, and a statutory delegation override provision.

*First*, the EFAA defines "sexual assault dispute" as "a dispute *involving* a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent." 9 U.S.C. § 401(3) (emphasis added).

*Second*, the EFAA's timing provision provides that the statute shall "apply with respect to any dispute or claim that arises *or* accrues on or after the date of enactment of this Act[,]" which was on March 3, 2022. PL 117-90, 136 Stat 26 (emphasis added).

*Third*, the EFAA defines a "predispute arbitration agreement" as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." 9 U.S.C. § 401(1).

*Finally*, the EFAA requires the Court—not an arbitrator—to determine whether the EFAA applies to an arbitration agreement and whether the agreement is valid or enforceable under the FAA, regardless of whether the agreement's

delegation provision accords that responsibility to an arbitrator. 9 U.S.C. § 402(b); *see Doe (J.K.) v. Celebrity Cruises, Inc.*, 792 F. Supp. 3d 1371, 1377 (S.D. Fla. 2025).

**B.    The EFAA's plain text and ordinary meaning controls.**

The construction of any statute—including the EFAA—"must begin with the plain meaning of its language." *United States v. Flores*, 729 F.3d 910, 914 (9th Cir. 2013); *see Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 385 (6th Cir. 2026). "[U]nless defined, words in a statute will be interpreted as taking their ordinary, contemporary, common meaning." *Flores*, 729 F.3d at 914. Courts may consult dictionary definitions to determine a word's "ordinary, common meaning." *Transwestern Pipeline Co., LLC v. 17.19 Acres of Prop. Located in Maricopa Cnty.*, 627 F.3d 1268, 1270 (9th Cir. 2010).

"If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there." *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017); *see Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018). "If the statutory language lacks a plain meaning, we may employ other tools, such as legislative history, to construe the meaning of ambiguous terms." *United States v. Wells*, 156 F.4th 907, 912 (9th Cir. 2025).

**C.    Plaintiffs are "alleging conduct constituting" a "sexual assault dispute" because their claims "involv[e]" Jackson's sexual assaults.**

To allege the existence of a "sexual assault dispute," Plaintiffs need only allege a "dispute *involving* a nonconsensual sexual act or sexual contact" as defined by 18 U.S.C. § 2246 or "similar applicable" state or tribal law. 9 U.S.C. § 401(3) (emphasis added). The plain meaning of the term "involving" is unambiguously broad. *Polen v. API Grp. Life Safety USA, LLC*, 2025 WL 3251349, at *3 (D. Or. Nov. 21, 2025).

1.    <u>A "dispute involving sexual assault" is a dispute that in some way includes or concerns sexual assault.</u>

Helpfully, the Supreme Court has constructed the word "involving" when examining § 2 of the FAA, concluding that "involving" is "broad" and "the functional equivalent of 'affecting'" based on the ordinary meaning of "involving." *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 273-74 (1995). The Supreme Court's construction of "involving" tracks the dictionary definitions of that term. *See id.* (citing Oxford English Dictionary's definition of "involve" as "include or affect in . . . operation"); *see also Involving,* Merriam-Webster (defining "involving" as "to relate closely: CONNECT," "AFFECT," "to have within or as part of itself");[6] *Involve,* Cambridge Dictionary ("If a situation involves someone or something, he, she, or it is affected by it").[7]

Given that the EFAA amends the FAA, the term "involving" as used in the EFAA must be construed the same way as it is used in § 2 of the FAA. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text[.]"); *Miranda v. Anchondo*, 684 F.3d 844, 849 (9th Cir. 2012) ("[U]nder the doctrine of in pari materia, words in different sections of the same statute should be construed similarly."); *Pacheco-Camacho v. Hood*, 272 F.3d 1266, 1271 (9th Cir. 2001) ("[S]tatutory terms should be interpreted, whenever possible, with an eye to intra-statutory consistency.").

Accordingly, "involving" means "affecting," as used in the EFAA's definition of "sexual assault dispute." So, under the EFAA, a "dispute involving sexual assault" is "a dispute that in some way includes *or concerns* sexual assault." *Polen*, 2025 WL 3251349, at *3 (emphasis added); *see Doe*, 792 F. Supp. 3d at 1380 (concluding that a "sexual assault dispute" as used in the EFAA "must *include* or

---

[6] https://www.merriam-webster.com/dictionary/involving (last visited Apr. 22, 2019).

[7] https://dictionary.cambridge.org/us/dictionary/english/involve (last visited Apr. 22, 2019).

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.061/3247406.3                                    10                  Case No. 2:26-cv-02129 HDV (AGRx)
PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER COMPELLING ARBITRATION

*relate to* nonconsensual sexual acts or contact" based on plain meaning of "involve").

Let's be clear about how Congress did *not* define "sexual assault dispute" in the EFAA. Congress wrote the EFAA to apply when a plaintiff alleges a sexual assault *dispute*—not a sexual assault *claim* or a claim that "a violation of a law explicitly prohibiting sexual assault" has occurred. *Doe*, 792 F. Supp. 3d at 1379. Because of Congress' careful definition of "sexual assault dispute," a "sexual assault dispute is formed by facts, not claims." *Id.* at 1380; *see Bulic v. Celebrity Cruises, Inc.*, 2025 WL 1783865, at *3 (S.D. Fla. June 27, 2025). The EFAA does not limit "sexual assault disputes" to only disputes about nonconsensual sexual acts between the parties. *See Polen*, 2025 WL 3251349, at *4. The EFAA does not require Plaintiffs to plead a claim for sexual assault against Defendants. *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 534 (S.D.N.Y. 2024). The EFAA "contains no limitation regarding who committed the sexual assault, where it was committed, or when it was committed." *Polen*, 2025 WL 3251349, at *4. So, in the present case, EFAA does not require Plaintiffs to sue Jackson (who is dead) directly for his sexual assaults or to allege that Defendants sexually assaulted them, that Defendants violated a statute explicitly prohibiting sexual assault, that Defendants' caused or enabled Jackson's sexual assaults, or that any causal link exists between Defendants' conduct and Jackson's sexual assaults. *See id.*; *Doe*, 792 F. Supp. 3d at 1380; *Diaz-Roa*, 757 F. Supp. 3d at 534.

> 2. Plaintiffs allege a dispute that includes or concerns sexual assault.

Here, Plaintiffs have sustained their burden to allege a dispute that includes or concerns sexual assault. Plaintiffs allege that Jackson committed "sexual acts" as defined by 18 U.S.C. § 2246(2) when they were underage and lacked capacity; Jackson raped them, as defined by California Penal Code section 261; and Jackson committed sexual battery against them, as defined by California Penal Code section

243.4. *See* 9 U.S.C.A. § 401(3). And all of Plaintiffs' claims include or concern Jackson's sexual assaults of them when they were children.

To start, Plaintiffs' sex trafficking, negligence, negligent hiring, and IIED claims uncontrovertibly include or concern Jackson's sexual assaults. These claims arise from their allegations of (1) the Jackson Parties' knowledge that Jackson was sexually assaulting Plaintiffs and other children; (2) the Jackson Parties' arrangement of interstate and international trips during which Jackson sexually assaulted Plaintiffs, notwithstanding knowledge of the assaults; (3) the Jackson Parties' gifts of items of value (such as shopping trips and lavish presents) on account of the sexual assaults he inflicted on Plaintiffs; (4) the Jackson Parties' failure to prevent Jackson's sexual assaults per their duty of care towards Plaintiffs; (5) the Jackson Parties' hiring, supervision, and retention of employees who the Jackson Parties knew or should have known facilitated Jackson's sexual assaults of Plaintiffs; and (6) the Jackson Parties' reckless disregard of the emotional distress caused by Jackson's sexual assaults caused Plaintiffs. (Compl. ¶¶ 37-41, 80-102.)

Defendants might portray Plaintiffs' remaining five claims—breach of contract, fraud, and breach of fiduciary duty, rescission, and declaratory judgment—as lacking any connection with Jackson's sexual assaults, given that these claims accrued after Jackson's death in 2009. This Court should disregard any such argument. Jackson's sexual assaults of Plaintiffs are the core of these five claims. All five claims arise from the Agreement, the purpose of which was to compensate Plaintiffs for Jackson's sexual assaults. (*Id.* ¶¶ 80-126.) The breach of contract claim also concerns Branca's breach of the Agreement (which occurred when he published false statements about Jackson's sexual assaults of Plaintiffs) and Branca's, McClain's, and MJC's breach of the Agreement (which occurred when they filed the Petition, which includes similar lies about the sexual assaults). (*Id.* ¶¶ 105-08.) The claims of fraud, breach of fiduciary duty, rescission, and declaratory judgment also arise from the role that each Defendant—including Weisberg—played in

fraudulently inducing Plaintiffs to sign the Agreement. (*Id.* ¶¶ 80-104, 109-26.)

Indeed, the Jackson Parties' filings confirm that Plaintiffs' breach of contract, fraud, and breach of fiduciary duty, rescission, and declaratory judgment arise from Jackson's sexual assaults. In their motion, the Jackson Parties maintain that they entered into the Agreement because they speculated that the Cascio Parties may in the future go public with their sexual assault allegations. (Mot. at 13:5-20.) The Jackson Parties' motion further suggests that they entered into the Agreement because a documentary about Jackson's abuse of other children, *Leaving Neverland*, had aired in 2019, and the Jackson Parties were concerned that the Cascios and Jackson's other victims would participate in future documentaries or release public statements about their abuse. (*See* Mot. at 12:22-13:4.) Notably, the documentary was released shortly before the Jackson Parties' offered to pay the Cascios compensation for Jackson's abuse. (Pls. Decls. ¶ 3.)

There is little caselaw concerning what constitutes a "sexual assault dispute" under the EFAA, given that the statute only recently became effective. But the caselaw so far universally demonstrates that Plaintiffs have sufficiently alleged a "sexual assault dispute."

Consider *Polen*. In that case, the plaintiff repeatedly reported to her then-employer, API, that she was a victim of domestic violence and requested reasonable accommodations for her safety. Her then-partner sexually assaulted her twice. *Polen*, 2025 WL 3251349, at *2. She reported the second assault to API. *Id.* She later reported to API that she had suffered a miscarriage. *Id.* API terminated her, and the plaintiff sued API. *Id.* The *Polen* court concluded that the plaintiff had sufficiently alleged a dispute "involving" sexual assault. *Id.* at *6. Even though it was "undisputed that no API employee sexually assaulted Polen," the plaintiff had "allege[d] that API improperly caused negative employment repercussions because of her sexual assault." *Id.* at *5.

Also consider *Doe*. In that case, an employee of a cruise ship company was

sexually assaulted by a crewmember. *See Doe*, 792 F. Supp. 3d at 1374-75. The employee sued the cruise ship company—not her assaulter. *See id.* at 1378. Yet the *Doe* court still concluded that she had alleged a "sexual assault dispute," reasoning that "under the EFAA, a sexual assault dispute is made up or formed by allegations of behavior or deeds, not the cause of action" and that "[i]t is the conduct that makes the claims subject to the EFAA, not the other way around." *Id.* at 1380. Moreover, in *Bulic*, a case similar to *Doe*, another district court likewise concluded that a victim of sexual assault had alleged a "sexual assault dispute" despite suing the cruise ship and not the person who assaulted her. *Bulic*, 2025 WL 1783865, at \*4.

It bears noting that Courts have disagreed as to the plaintiff's burden to plead a "sexual assault dispute" or "sexual harassment dispute" under the EFAA. Some out-of-district courts have held that a complaint must contain a "well-pleaded allegation" of sexual assault or harassment that satisfies the Rule 12(b)(6) standard. *See, e.g.*, *Yost v. Everyrealm, Inc.*, 657 F. Supp. 3d 563, 577 (S.D.N.Y. 2023); *Singh v. Meetup LLC*, 750 F. Supp. 3d 250, 253 (S.D.N.Y. 2024). But courts in this district have held that a plaintiff need only set forth "nonfrivolous" allegations of sexual assault or harassment—a position that Plaintiffs agree with. *See Solis v. Prime Comms Retail, LLC*, 2025 WL 1255143, at \*2 (C.D. Cal. Apr. 7, 2025); *Gill v. US Data Mgmt., LLC*, 2024 WL 5402494, at \*3 (C.D. Cal. Dec. 2, 2024); *see also Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 533 (S.D.N.Y. 2024). However, this Court need not resolve the correct pleading standard in the present case, because Plaintiffs' allegations satisfy the stricter Rule 12(b)(6) standard.

### D.   Plaintiffs have satisfied the EFAA's two timing clauses.

The EFAA "shall apply with respect to *any dispute or claim that arises or accrues* on or after the date of enactment of this Act[,]" which was on March 3, 2022. PL 117-90, March 3, 2022, 136 Stat 26 (emphasis added). Courts construct this provision as two, distinct clauses with "separate meaning[s]." *Memmer v. United Wholesale Mortg., LLC*, 135 F.4th 398, 407 (6th Cir. 2025).

In other words, the EFAA applies to a Complaint if(1) a "dispute arises" on or after March 3, 2022; *or* (2) a "claim accrues" on or after that date. *See id.*; *Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 246 (3d Cir. 2025). These clauses operate independently. For example, the EFAA applies to a Complaint so long as a dispute arose on or after March 3, 2022, even if the claim arising out of the same facts as the dispute accrues before that date—which is a common scenario. *See Memmer*, 135 F.4th at 409 ("In many cases, the dispute will arise after the claim accrues. For example, a sexual-harassment claim may accrue when one employee makes an inappropriate remark to another, but the dispute may not arise until the employer resists the employee's complaints.").

      1.    <u>The Parties' dispute arose no earlier than 2024, after the EFAA's 2022 effective date.</u>

A dispute arises under the EFAA when the parties become "adverse" to each other, *Memmer*, 135 F.4th at 409, which can occur when an injured party "registers disagreement" by sending a demand letter, files an administrative charge, requests arbitration, or commences lawsuit and the other party "expressly or constructively opposes that position," *Cornelius*, 133 F.4th at 247; *see Famuyide v. Chipotle Mexican Grill, Inc.*, 111 F.4th 895, 898 (8th Cir. 2024) (reasoning that a dispute arises plaintiff "assert[s] any right, claim, or demand" and defendant "register[s] disagreement with any position of" plaintiff's). When a "dispute arises" does *not* turn on when the injury occurred, when the claim accrues, or when a complaint is filed. *See Cornelius*, 133 F.4th at 246; *Famuyide*, 111 F.4th at 898.

Here, the dispute between the Parties did not arise until at least 2024, even taking Defendants' version of events as true. That was the year that Plaintiffs' counsel told Singer that he intended to challenge the Agreement as unconscionable and void. (Compl. ¶ 74; Singer Decl. ¶ 6.) The evidence uncontestably demonstrates that no dispute—as that term is used in this context—had arisen between the Parties before this point. Plaintiffs have alleged and attested that the Estate approached

them in 2019, offering to compensate them for Jackson's sexual abuse. (Compl. ¶¶ 43-44; Frank Decl. ¶ 3; Pls. Decls. ¶¶ 4-5.) There were no demand letters, threats of lawsuits, or requests for arbitration before the Agreement was executed in 2019 or before the letter of direction was entered into in 2020. (Compl. ¶¶ 43-44; Frank Decl. ¶ 3; Pls. Decls. ¶¶ 4-5.) Indeed, *Singer* has sworn under penalty of perjury that "[p]rior to entering into the Agreement, none of the Cascio Parties nor any of the other parties to the Agreement ever filed any civil action against any of the MJC Parties." (Singer Decl. ¶ 5; *see* Mot. at 13:10-11 ("Nor did the Cascio Parties at any time file a lawsuit against Michael, the Estate or MJC alleging any of their supposed tort claims.") Because "the EFAA can apply to arbitration agreements executed before the statute's enactment," *Walters v. Starbucks Corp.*, 623 F. Supp. 3d 333, 338 (S.D.N.Y. 2022), it is irrelevant that Plaintiffs signed the Agreement and Frank signed the Letter before March 3, 2022.

Defendants insist in their motion that "[i]n late-2019, the Cascio Parties threatened to go public with their own purported sexual abuse allegations unless they were each paid significant amounts of money" (Mot. at 13:5-7). So, Defendants might argue that a dispute arose between the Parties in 2019. The Court should disregard any such argument. Plaintiffs have attested that they never engaged in such threats in 2019 (Pls. Decls. ¶ 11), and Defendants have provided no evidence to support their contention. Singer attests only that "I am *informed and believe* that MJC's officer [Branca] entered into the Agreement under recommendation of counsel with respect to their responsibility as fiduciaries, in order to protect the beneficiaries of the Estate from having to deal with specious future claims, and to protect future projects important to Michael Jackson's legacy." (Singer Decl. ¶ 4 (emphasis added).) This assertion is inadmissible because it lacks foundation and personal knowledge, and constitutes hearsay. (*See* Pls. Objections.); *United States v. Owens-El*, 889 F.2d 913, 915 (9th Cir. 1989) ("[T]he witness who testifies must have personal knowledge of the making of the out-of-court statement."); *cf. Orr v.*

*Bank of Am., NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002) (determining that attorney lacked personal knowledge of witness' testimony); *United States v. St. Luke's Subacute Care Hosp., Inc.*, 178 F. App'x 711, 715 (9th Cir. 2006) (concluding that testimony concerning attorney's conversation with defendant was hearsay); *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1003, 1005 (9th Cir. 2002) (determining that affidavit recounting party's conversation with someone else constitutes hearsay); Boyd v. City of Oakland, 458 F. Supp. 2d 1015, 1025 (N.D. Cal. 2006) (excluding witness statements recounted in attorney's affidavit because statements were not based on attorney's personal knowledge).

But even if Singer's testimony could be considered (which it cannot), it merely confirms that the Estate did *not* enter into the Agreement or Letter because a dispute had arisen with Plaintiffs; the Estate did so only to protect against "*future*" disputes.

Although no dispute arose until 2024, should the Court feel that determination requires more evidence, it should hold an evidentiary hearing on the issue and summon, at least, Weisberg, Freedman, Branca, McClain, and all other persons, including attorneys, who were involved in negotiating the Agreement and advising the Estate concerning the Agreement to testify as to when the dispute arose between the Estate and Plaintiffs.

### 2. Alternatively, three of Plaintiffs' claims accrued after the EFAA's effective date.

"The term 'accrue' means the same thing under the EFAA as it does in the statute-of-limitations context," and a claim "accrues" "when the limitations period starts to run." *Olivieri*, 112 F.4th at 78, 85-87. Here, at least three of Plaintiffs' claims undeniably accrued after March 3, 2022: (1) breach of contract, which arises from Branca's statements in September 2024 and the filing of the Petition in 2025; and (2) fraud, as the Cascios discovered the fraud committed by Freedman, Weisberg, and Weitzman in 2024; and (3) breach of fiduciary duty, because the

Cascios discovered said breach in 2024. (Compl. ¶¶ 71-79.)

Plaintiffs assume for the sake of opposing this motion that the other six claims accrued after March 3, 2022. So, if the timeliness of Plaintiffs' Complaint depends on the "claim accrues" clause, the question becomes whether Plaintiffs' other six claims must be severed and subject to arbitration. As explained below, the answer is no, due to the Congress' careful use of the word "case" in EFAA. *See infra* § III.F. (citing *Clay v. FGO Logistics, Inc.*, 751 F. Supp. 3d 3, 19 (D. Conn. 2024); *Molchanoff v. SOLV Energy, LLC*, 2024 WL 899384, at *5 (S.D. Cal. Mar. 1, 2024); *Mulugu v. Duke Univ. Sch. of Med.*, 2024 WL 3695220, at *28 (M.D.N.C. Aug. 7, 2024)).

### E.    The Parties' 2019 Agreement is a "predispute arbitration agreement" under 9 U.S.C. § 402(a).

Under the EFAA, "predispute arbitration agreement" means "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." 9 U.S.C. § 401(1). The Agreement's arbitration provision is a predispute arbitration provision. To start, because the Agreement was executed four years before any dispute arose in 2024, *supra* § III.D.1, it is a *predispute* arbitration agreement. 'Moreover, the Agreement—which purports to be a "life rights" acquisition and consulting agreement—is not titled or framed as a settlement agreement, much less of any specific claim. Nor does the document refer to any past dispute or any settlement of any past dispute. (*See generally* Singer Decl. Ex. 1.) At most, the "Releases" provision refers to "*potential*"—not actual—disputes between the signatories. (*Id.* at 17 ¶ 4 ("Releases. The Parties recognize that they have had *potential* disputes in the past[.] (emphasis added)). Defendants have seemingly confirmed this. (Mot. at 14:14-15 ("[The Agreement] resolved *potential* disputes between the parties."); Singer Decl. ¶ 4 ("I am informed and believe that MJC's officer [Branca] entered into the Agreement . . . in order to protect the beneficiaries of the Estate from having to deal with specious *future* claims, and to protect *future*

18    Case No. 2:26-cv-02129 HDV (AGRx)
PLAINTIFFS' OPPOSITION TO MOTION FOR AN ORDER COMPELLING ARBITRATION

projects important to Michael Jackson's legacy." (emphases added).)

**F.    The arbitration agreement is unenforceable as to Plaintiffs' entire "case."**

The EFAA applies to any "case" that "*relates to* the sexual assault dispute or sexual harassment dispute." 9 U.S.C. § 402(a) (emphases added). So, the terms "case" and "relates to" should be constructed in turn.

Starting with "*case*," the ordinary meaning of that word "encompass[es] a plaintiff's entire suit." *Bruce*, 168 F.4th at 382 (6th Cir. 2026) (citing definitions of "case" from Black's Law Dictionary and Merriam-Webster, use of the word "case" in 9 U.S.C. § 7, 28 U.S.C. § 1446, Federal Rule of Appellate Procedure 3(c)(5), and Federal Rule of Civil Procedure 18); *see Sheehan v. Everstory Partners*, 804 F. Supp. 3d 498, 516 (E.D. Pa. 2025) (collecting cases concluding the same). Accordingly, when "a dispute presents multiple claims—some related to sexual [assault], others not—the EFAA blocks arbitration of the entire case, not just the sexual [assault] claims. *Clay*, 751 F. Supp. 3d at 18; *see Bruce*, 168 F.4th at 382 ("[T]he EFAA's text renders an arbitration agreement unenforceable with respect to a plaintiff's entire case, or action, and not only with respect to certain claims therein."); *see Johnson v. Everyrealm, Inc.,* 657 F. Supp. 3d 535, 559 (S.D.N.Y. 2023) ([T]he text of § 402(a) makes clear that its invalidation of an arbitration agreement extends to the entirety of the case relating to the sexual harassment dispute, not merely the discrete claims in that case that themselves either allege such harassment or relate to a sexual harassment dispute.").

As for whether a case "relates to" the sexual assault dispute, the Supreme Court has made clear that "relates to" is "deliberately expansive" statutory language and that one thing "relates to" another if it has a "connection with or reference to" that other thing. *D.C. v. Greater Washington Bd. of Trade*, 506 U.S. 125, 129 (1992); *see Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992); *Bruce*, 168 F.4th at 383; *see also Rix v. Polsinelli PC*, 2025 WL 2674767, at *8 (D.D.C.

Sept. 18, 2025) ("[T]he test for whether the EFAA applies is not whether claims are 'inexorably intertwined' or 'rise or fall' together; it is whether the claim is or 'relates to' a sexual harassment dispute.") Several district courts have suggested the relevant inquiry is whether the "core" of the case alleges conduct constituting a sexual assault or sexual harassment dispute. *See Turner v. Tesla, Inc.*, 686 F. Supp. 3d 917, 925 (N.D. Cal. 2023); *Shumway v. Space Expl. Techs. Corp.*, 2025 WL 4035293, at *7 (C.D. Cal. Dec. 3, 2025).

So, how does the word "case" interact with the phrase "relates to the sexual assault dispute" in the EFAA? To be clear, the "EFAA demands only that the 'case' relate to a sexual [assault] dispute, not that *each individual claim* within the case must do so," as "the plain text of the statute contains no such additional 'relation' requirement with respect to individual claims." *Kelly v. Rosenberg & Estis, P.C.*, 804 F. Supp. 3d 461, 468 (S.D.N.Y. 2025); *see Bray v. Rhythm Mgmt. Grp., LLC*, 2024 WL 4278989, at *8 (D. Md. Sept. 24, 2024) ("[T]he Court rejects Defendants' claim that the Court must subject the remaining claims to an analysis of whether they are sufficiently related to the sexual [assault] claim, factually or legally, to be covered by the EFAA. The EFAA imposes no such requirement."). To sum up: "the text of the EFAA demands its application to any case where the facts alleged constitute a sexual assault dispute under the EFAA and the sexual assault dispute relates to the case, irrespective of whether a plaintiff labels her claims as sexual assault claims or brings them under a particular statute." *Doe*, 792 F. Supp. 3d at 1383.

Here, there is no question that Plaintiffs' "case" "relates to the sexual assault dispute" because <u>all</u> of Plaintiffs' claims are connected with a sexual assault dispute. As already explained, each of Plaintiffs' claims "involve" Jackson's sexual abuse of Plaintiffs. *See supra* III.C. "Involving" is a narrower statutory term than "relates to." *United States v. Franklin*, 904 F.3d 793, 801 (9th Cir. 2018), *abrogated on other grounds by Shular v. United States*, 589 U.S. 154 (2020). Thus, for the reasons that

Plaintiffs allege a "dispute *involving* a nonconsensual sexual act or sexual contact" under 9 U.S.C. § 401(3), *see supra* III.C., this "case" necessarily "relate[s] to the sexual assault dispute under 9 U.S.C. § 402(a).

The few decisions involving the EFAA's application to sexual assault disputes counsel this Court to conclude that Plaintiffs' "case" "relates to the sexual assault dispute" in the present matter. In both *Doe* and *Bulic* (the aforementioned cruise ship cases), the courts concluded that the EFAA barred arbitration all of the plaintiffs' claims, even though some claims that had questionable connections to the sexual assaults, such as "unseaworthiness" (i.e., that the cruise ship was not reasonably for its intended use). *See Doe*, 792 F. Supp. 3d at 1375; *Bulic*, 2025 WL 1783865, at *1; *see also Ribitzki v. Canmar Reading & Bates, Ltd. P'ship*, 111 F.3d 658, 664 (9th Cir. 1997) (defining unseaworthiness). Likewise in *Polen*, the district court barred arbitration of all of the plaintiff's claims, including three statutory claims that her former employer had discriminated against her based on her pregnancy, even though there was no indication that her pregnancy and miscarriage were related to the sexual assaults she suffered. *Polen*, 2025 WL 3251349, at *2, *6.

Cases involving "sexual harassment disputes" (as opposed to "sexual assault disputes") further confirm that the EFAA bars arbitration of Plaintiffs' entire Complaint. In particular, *Bruce*, *Turner*, and *Johnson* are illustrative.

To start, consider the Sixth Circuit's decision in *Bruce*. In *Bruce*, a paralegal sued her former law firm, alleging that an attorney sexually harassed her. *See Bruce*, 168 F.4th at 372. The Sixth Circuit concluded that the EFAA also required arbitration of all her claims, including her claim that the law firm had violated the Americans with Disabilities Act ("ADA"). *See id.* at 372-73. The paralegal brought an ADA claim based on a completely different set of facts than those that underlay her sexual harassment claim: she claimed that a *different* attorney and the human resources department had "fail[ed] to accommodate" her "need to take sedatives to sleep" due to her post traumatic stress disorder and other mental health issues. *Id.* at

372-73.

Also consider *Turner*. In that case, the plaintiff claimed that her coworkers sexually harassed her "persistently and approximately 100 times." *Turner*, 686 F. Supp. 3d at 921. The plaintiff also alleged that had suffered three workplace injuries: wrist strain, a concussion, and an injury to her right knee and thigh. The district court acknowledged that her two California Labor Code claims related to the workplace injuries —that Tesla fired her in response to her reporting the workplace injuries and willfully failed to pay her post-employment wages—were "not on their face within the scope of the EFAA." *Turner*, 686 F. Supp. 3d at 927. The court still concluded that the entire case was not arbitrable under the EFAA. *Id.*

Further consider *Johnson*. In that case, the plaintiff alleged that his former boss had sexually harassed him. *Johnson*, 657 F. Supp. 3d at 554. The court concluded that EFAA barred arbitration of his claims against two other former colleagues—neither of whom committed any acts of sexual harassment against him—and the company that employed him, including his claims for race discrimination. *See id.* at 540.

Finally, it bears noting that the EFAA bars arbitration of Plaintiffs' entire case, even if this Court determines that the timeliness of the case turns on the "claim accrues" clause instead of the "dispute arises" clause. Due to the EFAA's use of the word "case," the statute still bars arbitration of an entire case even if just one of the claims accrued after the EFAA's enactment date and the rest of the claims accrued before that date. *See Clay*, 751 F. Supp. 3d at 19; *Molchanoff*, 2024 WL 899384, at *5; *Mulugu*, 2024 WL 3695220, at *28 (M.D.N.C. Aug. 7, 2024). Here, at least three claims accrued after the EFAA's effective date. *See supra* § III.D.2. So, Plaintiffs' entire "case" cannot be arbitrated under the EFAA.

/ / /

/ / /

/ / /

## IV.   CONCLUSION

The EFAA compels one outcome: the Court must deny the Motion and order a stay of any arbitration proceedings that the Jackson Parties have initiated against Plaintiffs until the Court decides the Motion.

DATED:  May 14, 2026

KING, HOLMES, PATERNO & SORIANO, LLP

By:   _/s/ Howard E. King_

HOWARD E. KING
STEPHEN D. ROTHSCHILD
JACKSON S. TRUGMAN
HEATHER L. PICKERELL
Attorneys for Plaintiffs EDWARD JOSEPH CASCIO, DOMINIC SAVINI CASCIO, MARIE-NICOLE PORTE and ALDO CASCIO

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Edward Joseph Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio, certifies that this brief contains 7,327 words, which complies with the word limit of L.R. 11-6.1.

DATED:  May 14, 2026

KING, HOLMES, PATERNO & SORIANO, LLP

By: _____/s/ Howard E. King_____
HOWARD E. KING
Attorneys for Plaintiffs EDWARD JOSEPH CASCIO, DOMINIC SAVINI CASCIO, MARIE-NICOLE PORTE and ALDO CASCIO

Docusign Envelope ID: E0BDC184-9A25-8F6A-8278-4A126DD88CE1

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD
JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE and
ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN MR. WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx)<br><br>**DECLARATION OF EDWARD JOSEPH CASCIO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS**<br><br>*Filed Concurrently with Plaintiffs' Opposition to Jackson Parties' Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings; Declarations of Howard E. King, Frank Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio; and Plaintiffs' Memorandum of Evidentiary Objections*<br><br>Date:    June 4, 2026<br>Time:    10:00 a.m.<br>Crtrm.:  5B<br><br>Action Commenced:  February 27, 2026 |

6187.061/3239550.3

DECLARATION OF EDWARD JOSEPH CASCIO

Case No. 2:26-cv-02129 HDV (AGRx)

I, Edward Joseph Cascio, declare as follows:

1.      I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.  This declaration is submitted in support of Plaintiffs' Opposition to the Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings ("Motion") filed by Defendants the Michael Jackson Company, MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties").

2.      I am the brother of the other three Plaintiffs—Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio—and non-party Frank Cascio ("my siblings").

3.      In 2019, the documentary *Leaving Neverland*, was released. The documentary, which I watched, is about Michael Jackson's sexual abuse of Wade Robson and James Safechuck when they were children.

4.      Also in 2019, shortly after *Leaving Neverland* aired, three agents of the Estate of Michael Jackson ("Estate") reached out to my siblings and me: an investigator, Herman Weisberg, and two attorneys, Bryan Freedman and Howard Weitzman (who is now deceased). We were informed that the Estate wanted to meet with us privately at Howard Weitzman's office to discuss our relationship with Michael Jackson and the abuse we had suffered. They flew us out to California and met with us individually to discuss our relationship with Michael Jackson.  They also flew to New Jersey to meet with our parents to apologize for the abuse we had suffered.  They told us that the Estate wanted to compensate us for our trauma and that we were an extraordinary family with an unbelievably powerful story about our time with Michael Jackson.

5.      During this period, the interactions between my siblings and me, on the one hand, and the Estate, Mr. Weisberg, Mr. Freedman, and Mr. Weitzman, on the other hand, were amicable. We trusted them. As far as we were concerned, we were working on the same team.  We never demanded any payment from the Estate—the

Estate offered to pay *us* if we remained silent about our relationship with Michael Jackson. We were asked to provide a list of anyone we had talked to about our experiences since *Leaving Neverland*. We never sent any demand letters, threatened to sue the Estate, or assumed any position that was adversarial to the Estate. We never did so because Mr. Weisberg, Mr. Freedman, and Mr. Weitzman had told us repeatedly that they were advocating for our interests, that we did not need our own attorney, that the amount of money offered by the Estate was fair and non-negotiable, and that entering into a compensation agreement with the Estate would allow us to move on with our lives in peace, comfort, and privacy.

6.    On December 22, 2019, Mr. Weisberg came to my father's restaurant in New Jersey. Dominic, Marie-Nicole, Aldo, and I were there, along with our spouses and parents. Frank was not there, as he was living in California at the time. Mr. Weisberg brought a single copy of a document titled "Acquisition and Consulting Agreement" ("Agreement"). This was the first time I had seen this document which was read out loud to us. A copy of the Agreement is attached as Exhibit 1 to the Declaration of Martin Singer, who is counsel to the Jackson Parties. I signed the Agreement; so did all the other members of my family. When we asked for a copy of the agreement after signing, we were told that only the Estate would hold a copy. We were not represented by independent counsel when we signed the Agreement.

7.    I understand that Frank, Mr. Weisberg, and Kenny Katz signed a Letter of Direction ("Letter") in January or February 2020, which is attached as Exhibit 2 to the Declaration of Mr. Singer. None of us asked the Estate for more compensation than what the Estate had agreed to pay us under the Agreement. I did not assume any position that was adversarial to the Estate when Frank discussed the Letter with the Estate or when he signed the Letter. I did not sign the Letter myself.

8.    Around April 2024, Mr. Weisberg and Mr. Freedman contacted my siblings and me, which was unsolicited. They told us that the Estate wanted to

continue to compensate us for our trauma. For the first time, Mr. Freedman told us that we needed an attorney to represent us. He tried to convince us to hire him to negotiate with the Estate and stated that he would request a conflict waiver from the Estate. At that point, I understood that Mr. Freedman represented the Estate's interests and not ours.

9. So, my siblings and I hired our current attorney, Howard E. King, to represent us as independent counsel.

10. In June or July 2024, Mr. King told Mr. Singer, who is counsel for the Estate, that my siblings and I intended to challenge the Agreement as void and unconscionable. This was the first time that anyone in my family had sent any kind of legal demand to any of Defendants or assumed any kind of adversarial position to any of the Defendants. Prior to that time, neither I nor, to my knowledge, any member of my family had asserted any legal claim against the Jackson Parties, threatened litigation, or communicated any dispute concerning the Agreement.

11. The Jackson Parties' Motion and the supporting declaration of Mr. Singer contain a number of falsehoods.  The Jackson Parties accuse my siblings and me of engaging in an "extortion scheme." (Mot. at 9:17.) They also claim that "[i]n late-2019, the Cascio Parties threatened to go public with their own purported sexual abuse allegations unless they were each paid significant amounts of money." (*Id.* at 13:5-7.) None of this is true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___5/13/2026___, at _Greenville_, South Carolina.

DocuSigned by:

_____
6B98BBEA071544A...
Edward Joseph Cascio

Docusign Envelope ID: E9BDC184-9A25-8F6A-8278-4A126DD88CE1

Docusign Envelope ID: 2371E6D9-A280-8825-8396-CFB2424DAD1A

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD
JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE and
ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN MR. WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>                    Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx)<br><br>**DECLARATION OF DOMINIC SAVINI CASCIO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS**<br><br>*Filed Concurrently with Plaintiffs' Opposition to Jackson Parties' Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings; Declarations of Howard E. King, Frank Cascio, Edward Joseph Cascio, Marie-Nicole Porte, and Aldo Cascio; and Plaintiffs' Memorandum of Evidentiary Objections*<br><br>Date:     June 4, 2026<br>Time:     10:00 a.m.<br>Crtrm.:  5B<br><br>Action Commenced:  February 27, 2026 |

6187.061/3246711.2

Case No. 2:26-cv-02129 HDV (AGRx)

DECLARATION OF DOMINIC SAVINI CASCIO

I, Dominic Savini Cascio, declare as follows:

1.    I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.  This declaration is submitted in support of Plaintiffs' Opposition to the Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings ("Motion") filed by Defendants the Michael Jackson Company, MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties").

2.    I am the brother of the other three Plaintiffs—Edward Joseph Cascio, Marie-Nicole Porte, and Aldo Cascio—and non-party Frank Cascio ("my siblings").

3.    In 2019, the documentary *Leaving Neverland*, was released. The documentary, which I watched, is about Michael Jackson's sexual abuse of Wade Robson and James Safechuck when they were children.

4.    Also in 2019, shortly after *Leaving Neverland* aired, three agents of the Estate of Michael Jackson ("Estate") reached out to my siblings and me: an investigator, Herman Weisberg, and two attorneys, Bryan Freedman and Howard Weitzman (who is now deceased). We were informed that the Estate wanted to meet with us privately at Howard Weitzman's office to discuss our relationship with Michael Jackson and the abuse we had suffered. In 2019, the Estate flew us to California, where they met with each of us individually to discuss our relationship with Michael Jackson.  After interviewing each of us in California and flying to New Jersey to interview our parents, they told us that the Estate wanted to compensate us for our trauma. Howard Weitzman told us that we were an extraordinary family with an unbelievably powerful story about our lives with Michael Jackson.

5.    During this period, the interactions between my siblings and me, on the one hand, and the Estate, Mr. Weisberg, Mr. Freedman, and Mr. Weitzman, on the other hand, were amicable. We trusted them. As far as we were concerned, we were

working on the same team.  We never demanded any payment from the Estate—the Estate offered to pay *us* if we remained silent about our relationship with Michael Jackson. We were asked to provide a list of anyone we had talked to about our experiences since *Leaving Neverland*.  We never sent any demand letters, threatened to sue the Estate, or assumed any position that was adversarial to the Estate. We never did so because Mr. Weisberg, Mr. Freedman, and Mr. Weitzman had told us repeatedly that they were advocating for our interests, that we did not need our own attorney, that the amount of money offered by the Estate was fair and non-negotiable, and that entering into a compensation agreement with the Estate would allow us to move on with our lives in peace, comfort, and privacy.

6.    On December 22, 2019, Mr. Weisberg came to my father's restaurant in New Jersey. Marie-Nicole, Eddie, Aldo, and I were there, along with our spouses and parents. Frank was not there, as he was living in California at the time. Mr. Weisberg brought a single copy of a document titled "Acquisition and Consulting Agreement" ("Agreement"). This was the first time I had seen this document which was read out loud to us.  A copy of the Agreement is attached as Exhibit 1 to the Declaration of Martin Singer, who is counsel to the Jackson Parties. I signed the Agreement; so did all the other members of my family. When we asked for a copy of the agreement after signing, we were told that only the Estate would hold a copy. We were not represented by independent counsel when we signed the Agreement.

7.    I understand that Frank, Mr. Weisberg, and Kenny Katz signed a Letter of Direction ("Letter") in January or February 2020, which is attached as Exhibit 2 to the Declaration of Mr. Singer. None of us asked the Estate for more compensation than what the Estate had agreed to pay us under the Agreement. I did not assume any position that was adversarial to the Estate when Frank discussed the Letter with the Estate or when he signed the Letter. I did not sign the Letter myself.

8.    Around April 2024, Mr. Weisberg and Mr. Freedman contacted my siblings and me, which was unsolicited. They told us that the Estate wanted to

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.061/3246711.2

3

Case No. 2:26-cv-02129 HDV (AGRx)

DECLARATION OF DOMINIC SAVINI CASCIO

Docusign Envelope ID: 2371E6D9-A280-8825-8396-CFB2424DAD1A

continue annual payments to us under new terms. For the first time, Mr. Freedman told us that we needed an attorney to represent us. He tried to convince us to hire him to negotiate with the Estate and stated that he would request a conflict waiver from the Estate. This was the point when it became clear to my siblings and me that Mr. Freedman was representing the Estate's interests only and was not representing our interests.

9.     So, my siblings and I hired our current attorney, Howard E. King, to represent us as independent counsel.

10.     In June or July 2024, Mr. King told Mr. Singer, who is counsel for the Estate, that my siblings and I intended to challenge the Agreement as void and unconscionable. This was the first time that anyone in my family had sent any kind of legal demand to any of Defendants or assumed any kind of adversarial position to any of the Defendants. Prior to that time, neither I nor, to my knowledge, any member of my family had asserted any legal claim against the Jackson Parties, threatened litigation, or communicated any dispute concerning the Agreement.

11.     The Jackson Parties' Motion and the supporting declaration of Mr. Singer contain a number of falsehoods. The Jackson Parties accuse my siblings and me of engaging in an "extortion scheme." (Mot. at 9:17.) They also claim that "[i]n late-2019, the Cascio Parties threatened to go public with their own purported sexual abuse allegations unless they were each paid significant amounts of money." (*Id.* at 13:5-7.) None of this is true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___5/13/2026___ at ___Greenville___, ___South Carolina___.

Dominic Savini Cascio

Docusign Envelope ID: 92464D41-BF5E-8767-83AE-BD2712FA17BB

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD
JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE and
ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>              Plaintiffs,<br><br>      vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN MR. WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>              Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx)<br><br>**DECLARATION OF ALDO CASCIO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS**<br><br>*Filed Concurrently with Plaintiffs' Opposition to Jackson Parties' Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings; Declarations of Howard E. King, Frank Cascio, Edward Joseph Cascio, Dominic Savini Cascio, and Marie-Nicole Porte; and Plaintiffs' Memorandum of Evidentiary Objections*<br><br>Date:     June 4, 2026<br>Time:     10:00 a.m.<br>Crtrm.:  5B<br><br>Action Commenced:  February 27, 2026 |

6187.061/3246721.2
DECLARATION OF ALDO CASCIO

Case No. 2:26-cv-02129 HDV (AGRx)

I, Aldo Cascio, declare as follows:

1.      I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.  This declaration is submitted in support of Plaintiffs' Opposition to the Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings ("Motion") filed by Defendants the Michael Jackson Company, MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties").

2.      I am the brother of the other three Plaintiffs—Edward Joseph Cascio, Dominic Savini Cascio, and Marie-Nicole Porte—and non-party Frank Cascio ("my siblings").

3.      In 2019, the documentary *Leaving Neverland*, was released. The documentary, which I watched, is about Michael Jackson's sexual abuse of Wade Robson and James Safechuck when they were children.

4.      Also in 2019, shortly after *Leaving Neverland* aired, three agents of the Estate of Michael Jackson ("Estate") reached out to my siblings and me: an investigator, Herman Weisberg, and two attorneys, Bryan Freedman and Howard Weitzman (who is now deceased). We were informed that the Estate wanted to meet with us privately at Howard Weitzman's office to discuss our relationship with Michael Jackson and the abuse we had suffered. In 2019, the Estate flew us to California, where they met with each of us individually to discuss our relationship with Michael Jackson.  After interviewing each of us in California and flying to New Jersey to interview our parents, they told us that the Estate wanted to compensate us for our trauma. Howard Weitzman told us that we were an extraordinary family with an unbelievably powerful story about our lives with Michael Jackson.

5.      During this period, the interactions between my siblings and me, on the one hand, and the Estate, Mr. Weisberg, Mr. Freedman, and Mr. Weitzman, on the

other hand, were amicable. We trusted them. As far as we were concerned, we were working on the same team.  We never demanded any payment from the Estate—the Estate offered to pay *us* if we remained silent about our relationship with Michael Jackson. We were asked to provide a list of anyone we had talked to about our experiences since *Leaving Neverland*.  We never did so because Mr. Weisberg, Mr. Freedman, and Mr. Weitzman had told us repeatedly that they were advocating for our interests, that we did not need our own attorney, that the amount of money offered by the Estate was fair and non-negotiable, and that entering into a compensation agreement with the Estate would allow us to move on with our lives in peace, comfort, and privacy.

6.     On December 22, 2019, Mr. Weisberg came to my father's restaurant in New Jersey. Marie-Nicole, Eddie, Dominic, and I were there, along with our spouses and parents. Frank was not there, as he was living in California at the time. Mr. Weisberg brought a single copy of a document titled "Acquisition and Consulting Agreement" ("Agreement").  This was the first time I had seen this document which was read out loud to us.  A copy of the Agreement is attached as Exhibit 1 to the Declaration of Martin Singer, who is counsel to the Jackson Parties. I signed the Agreement; so did all the other members of my family. When we asked for a copy of the agreement after signing, we were told that only the Estate would hold a copy. We were not represented by independent counsel when we signed the Agreement.

7.     I understand that Frank, Mr. Weisberg, and Kenny Katz signed a Letter of Direction ("Letter") in January or February 2020, which is attached as Exhibit 2 to the Declaration of Mr. Singer. None of us asked the Estate for more compensation than what the Estate had agreed to pay us under the Agreement. I did not assume any position that was adversarial to the Estate when Frank discussed the Letter with the Estate or when he signed the Letter. I did not sign the Letter myself.

8.     Around April 2024, Mr. Weisberg and Mr. Freedman contacted my

siblings and me, which was unsolicited. They told us that the Estate wanted to continue annual payments to us under new terms. For the first time, Mr. Freedman told us that we needed an attorney to represent us. He tried to convince us to hire him to negotiate with the Estate and stated that he would request a conflict waiver from the Estate. This was the point when it became clear to my siblings and me that Mr. Freedman was representing the Estate's interests only and was not representing our interests.

9.     So, my siblings and I hired our current attorney, Howard E. King, to represent us as independent counsel.

10.     In June or July 2024, Mr. King told Mr. Singer, who is counsel for the Estate, that my siblings and I intended to challenge the Agreement as void and unconscionable. This was the first time that anyone in my family had sent any kind of legal demand to any of Defendants or assumed any kind of adversarial position to any of the Defendants. Prior to that time, neither I nor, to my knowledge, any member of my family had asserted any legal claim against the Jackson Parties, threatened litigation, or communicated any dispute concerning the Agreement.

11.     The Jackson Parties' Motion and the supporting declaration of Mr. Singer contain a number of falsehoods. The Jackson Parties accuse my siblings and me of engaging in an "extortion scheme." (Mot. at 9:17.) They also claim that "[i]n late-2019, the Cascio Parties threatened to go public with their own purported sexual abuse allegations unless they were each paid significant amounts of money." (*Id.* at 13:5-7.) None of this is true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___5/13/2026___ at ___Yucca Valley___, ___California___.

DocuSigned by:

*Aldo Cascio*

—40C82228FDA847C...

Aldo Cascio

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD
JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE and
ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>                Plaintiffs,<br><br>        vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN MR. WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>                Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx)<br><br>**DECLARATION OF MARIE-NICOLE PORTE IN SUPPORT OF PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS**<br><br>*Filed Concurrently with Plaintiffs' Opposition to Jackson Parties' Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings; Declarations of Howard E. King, Frank Cascio, Edward Joseph Cascio, Dominic Savini Cascio, and Aldo Cascio; and Plaintiffs' Memorandum of Evidentiary Objections*<br><br>Date:    June 4, 2026<br>Time:    10:00 a.m.<br>Crtrm.:  5B<br><br>Action Commenced:  February 27, 2026 |

6187.061/3246714.2

DECLARATION OF MARIE-NICOLE PORTE

Case No. 2:26-cv-02129 HDV (AGRx)

Docusign Envelope ID: 77069B71-6803-8A56-8998-9DB97A24F7BB

I, Marie-Nicole Porte, declare as follows:

1.     I am a party in the above-entitled action.  I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.  This declaration is submitted in support of Plaintiffs' Opposition to the Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings ("Motion") filed by Defendants the Michael Jackson Company, MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties").

2.     I am the sister of the other three Plaintiffs—Edward Joseph Cascio, Dominic Savini Cascio, and Aldo Cascio—and non-party Frank Cascio ("my siblings").

3.     In 2019, the documentary *Leaving Neverland* was released. The documentary, which I watched, is about Michael Jackson's sexual abuse of Wade Robson and James Safechuck when they were children.

4.     Also in 2019, shortly after *Leaving Neverland* aired, three agents of the Estate of Michael Jackson ("Estate") reached out to my siblings and me: an investigator, Herman Weisberg, and two attorneys, Bryan Freedman and Howard Weitzman (who is now deceased). We were informed that the Estate wanted to meet with us privately at Howard Weitzman's office to discuss our relationship with Michael Jackson and the abuse we had suffered. In 2019, the Estate flew us to California, where they met with each of us individually to discuss our relationship with Michael Jackson.  After interviewing each of us in California and flying to New Jersey to interview our parents, they told us that the Estate wanted to compensate us for our trauma. Howard Weitzman told us that we were an extraordinary family with an unbelievably powerful story about our lives with Michael Jackson.

5.     During this period, the interactions between my siblings and me, on the one hand, and the Estate, Mr. Weisberg, Mr. Freedman, and Mr. Weitzman, on the

Docusign Envelope ID: 77069B71-6803-8A56-8998-9DB97A24F7BB

other hand, were amicable. We trusted them. As far as we were concerned, we were working on the same team.  We never demanded any payment from the Estate—the Estate offered to pay *us* if we remained silent about our relationship with Michael Jackson. We were asked to provide a list of anyone we had talked to about our experiences since *Leaving Neverland*.  We never sent any demand letters, threatened to sue the Estate, or assumed any position that was adversarial to the Estate. We never did so because Mr. Weisberg, Mr. Freedman, and Mr. Weitzman had told us repeatedly that they were advocating for our interests, that we did not need our own attorney, that the amount of money offered by the Estate was fair and non-negotiable, and that entering into a compensation agreement with the Estate would allow us to move on with our lives in peace, comfort, and privacy.

6.      On December 22, 2019, Mr. Weisberg came to my father's restaurant in New Jersey. Dominic, Eddie, Aldo, and I were there, along with our spouses and parents. Frank was not there, as he was living in California at the time. Mr. Weisberg brought a single copy of a document titled "Acquisition and Consulting Agreement" ("Agreement"). This was the first time I had seen this document which was read out loud to us.  A copy of the Agreement is attached as Exhibit 1 to the Declaration of Martin Singer, who is counsel to the Jackson Parties. I signed the Agreement; so did all the other members of my family. When we asked for a copy of the agreement after signing, we were told that only the Estate would hold a copy. We were not represented by independent counsel when we signed the Agreement.

7.      I understand that Frank, Mr. Weisberg, and Kenny Katz signed a Letter of Direction ("Letter") in January or February 2020, which is attached as Exhibit 2 to the Declaration of Mr. Singer. None of us asked the Estate for more compensation than what the Estate had agreed to pay us under the Agreement. I did not assume any position that was adversarial to the Estate when Frank discussed the Letter with the Estate or when he signed the Letter. I did not sign the Letter myself.

8.      Around April 2024, Mr. Weisberg and Mr. Freedman contacted my

Docusign Envelope ID: 77069B71-6803-8A56-8998-9DB97A24F7BB

siblings and me, which was unsolicited. They told us that the Estate wanted to continue to compensate us for our trauma. For the first time, Mr. Freedman told us that we needed an attorney to represent us. He tried to convince us to hire him to negotiate with the Estate and stated that he would request a conflict waiver from the Estate. At that point, I understood that Mr. Freedman represented the Estate's interests and not ours.

9. So, my siblings and I hired our current attorney, Howard E. King, to represent us as independent counsel.

10. In June or July 2024, Mr. King told Mr. Singer, who is counsel for the Estate, that my siblings and I intended to challenge the Agreement as void and unconscionable. This was the first time that anyone in my family had sent any kind of legal demand to any of Defendants or assumed any kind of adversarial position to any of the Defendants. Prior to that time, neither I nor, to my knowledge, any member of my family had asserted any legal claim against the Jackson Parties, threatened litigation, or communicated any dispute concerning the Agreement.

11. The Jackson Parties' Motion and the supporting declaration of Mr. Singer contain a number of falsehoods. The Jackson Parties accuse my siblings and me of engaging in an "extortion scheme." (Mot. at 9:17.) They also claim that "[i]n late-2019, the Cascio Parties threatened to go public with their own purported sexual abuse allegations unless they were each paid significant amounts of money." (*Id.* at 13:5-7.) None of this is true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___5/13/2026___ at ___Greenville___, ___South Carolina___.

DocuSigned by:

*Marie Nicole Porte*

7404B4A1F16E405...

Marie-Nicole Porte

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.061/3246714.2

4

Case No. 2:26-cv-02129 HDV (AGRx)

DECLARATION OF MARIE-NICOLE PORTE

KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD
JOSEPH CASCIO, DOMINIC SAVINI
CASCIO, MARIE-NICOLE PORTE and
ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN MR. WEISBERG, an individual; and DOES 1 through 20, inclusive, <br><br> Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx) <br><br> **DECLARATION OF FRANK CASCIO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS** <br><br> *Filed Concurrently with Plaintiffs' Opposition to Jackson Parties' Motion for an Order Compelling Arbitration and Re uest for Stay of Arbitration Proceedings  Declarations of Howard E. King, Edward Joseph Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio  and Plaintiffs' Memorandum of Evidentiary Objections* <br><br> Date:    June 4, 2026 <br> Time:    10:00 a.m. <br> Crtrm.:  5B <br><br> Action Commenced:  February 27, 2026 |

6187.061/3239389.4

Case No. 2:26-cv-02129 HDV (AGRx)

DECLARATION OF FRANK CASCIO

I, Frank Cascio, declare as follows:

1.    I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto.  This declaration is submitted in support of Plaintiffs' Opposition to the Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings ("Motion") filed by Defendants The Michael Jackson Company, MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties").

2.    I am the brother of Plaintiffs Edward Joseph Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio ("my siblings").

3.    In 2019, the documentary *Leaving Neverland*, was released. The documentary, which I watched, is about Michael Jackson s sexual abuse of Wade Robson and James Safechuck when they were children.

4.    In 2019, three agents of the Estate of Michael Jackson ("Estate") reached out to my siblings and me: an investigator, Herman Weisberg, and two attorneys, Bryan Freedman and Howard Weitzman (who has since died). They told us that the Estate wanted to pay us compensation for Jackson's sexual abuse. Mr. Weisberg, Mr. Freedman, and Mr. Weitzman arranged for my siblings to travel to California to meet with them.

5.    Also in 2019, shortly after *Leaving Neverland* aired, three agents of the Estate of Michael Jackson ("Estate") reached out to my siblings and me: an investigator, Herman Weisberg, and two attorneys, Bryan Freedman and Howard Weitzman (who is now deceased). We were informed that the Estate wanted to meet with us privately at Howard Weitzman's office to discuss our relationship with Michael Jackson and the abuse we had suffered. In 2019, the Estate flew us to California, where they met with each of us individually to discuss our relationship with Michael Jackson.  After interviewing each of us in California and flying to New Jersey to interview our parents, they told us that the Estate wanted to

KING, HOLMES,
PATERNO &
SORIANO, LLP

6187.061/3239389.4                                    2                    Case No. 2:26-cv-02129 HDV (AGRx)

DECLARATION OF FRANK CASCIO

compensate us for our trauma. Howard Weitzman told us that we were an extraordinary family with an unbelievably powerful story about our lives with Michael Jackson.

6. During this period, the interactions between my siblings and me, on the one hand, and the Estate, Mr. Weisberg, Mr. Freedman, and Mr. Weitzman, on the other hand, were amicable. We never demanded any payment from the Estate—the Estate offered to pay *us* if we remained silent about our relationship with Michael Jackson. We were asked to provide a list of anyone we had talked to about our experiences since *Leaving Neverland*. We never sent any demand letters, threatened to sue the Estate, or assumed any position that was adversarial to the Estate. We never did so because Mr. Weisberg, Mr. Freedman, and Mr. Weitzman had told us repeatedly that they were advocating for our interests, that we did not need our own attorney, that the amount of money offered by the Estate was fair and non-negotiable, and that entering into a compensation agreement with the Estate would allow us to move on with our lives in peace, comfort, and privacy.

7. In December 2019, my siblings, their spouses, and my parents signed an "Acquisition and Consulting Agreement" ("Agreement") in our family's restaurant in Mr. Weisberg's presence in New Jersey. A copy of the Agreement is attached as Exhibit 1 to the Declaration of Martin Singer, who is counsel for the Jackson Parties. I signed the Agreement separately in Mr. Weitzman's presence in January 2020.

8. The Agreement provides that the Estate would pay each of my siblings and me annual payments of $690,000 minus six percent, which would be paid to Weisberg and his agent, Ken Katz. The annual payments would start on January 1, 2020 and continue for five years.

9. Shortly after I signed the Agreement in January 2020, I asked Mr. Weitzman if the Estate would consider making a higher initial payment and he said they would pay $800,000 for the first annual installment and pay $530,000 for

Docusign Envelope ID: B89D2044-173D-8968-83C9-E65A8990C6EC

the remaining installments to my siblings and me. This was the same total amount that the Estate agreed to pay us under the Agreement. I did <u>not</u> ask for an increase in the amount of compensation under the Agreement. The Estate obliged—no one from the Estate pushed back on my request. So, I signed a Letter of Direction ("Letter") that reflects the new payment schedule. A copy of the Letter is attached as Exhibit 2 to the Declaration of Martin Singer. To be clear: I did not assume any adversarial position to the Estate at this time.

10.    Around April 2024, Mr. Weisberg and Mr. Freedman contacted my siblings and me, which was unsolicited. They told us that the Estate wanted to renew its arrangement with us under new terms. For the first time, Mr. Freedman told us that we should have an attorney represent us. He tried to convince us to hire him to negotiate with the Estate; he told us that he had requested a conflict waiver from the Estate. This was the first time it became clear to my siblings and me that Mr. Freedman was representing the Estate's interests only and was not representing our interests.

11.    So, my siblings and I hired our current attorney, Howard E. King, to represent us as independent counsel.

12.    In June or July 2024, Mr. King told Mr. Singer, who is counsel for the Estate, that my siblings and I intended to challenge the Agreement as void and unconscionable.  This was the first time that anyone in my family had sent any kind of legal demand to any of Defendants or assumed any kind of adversarial position to any of the Defendants. Prior to that time, neither I nor, to my knowledge, any member of my family had asserted any legal claim against the Jackson Parties, threatened litigation, or communicated any dispute concerning the Agreement.

13.    The Jackson Parties' Motion and the supporting declaration of Mr. Singer contain a number of falsehoods. The Jackson Parties accuse my siblings and me of engaging in an "extortion scheme." (Mot. at 9:17.) They also claim that "[i]n late-2019, the Cascio Parties threatened to go public with their own purported

Docusign Envelope ID: B89D2044-473D-8968-83C9-F65A8990C6EC

sexual abuse allegations unless they were each paid significant amounts of money." (*Id.* at 13:5-7.) None of this is true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on __5/14/2026__ at Palm Springs, California.

DocuSigned by:

D5A0D8D3C4AA440...

Frank Cascio

King, Holmes,
Paterno &
Soriano, LLP

6187.061/3239389.4

5

Case No. 2:26-cv-02129 HDV (AGRx)

DECLARATION OF FRANK CASCIO