KING, HOLMES, PATERNO & SORIANO, LLP
HOWARD E. KING, ESQ., STATE BAR NO. 77012
STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
SROTHSCHILD@KHPSLAW.COM
JACKSON S. TRUGMAN, ESQ., STATE BAR NO. 295145
JTRUGMAN@KHPSLAW.COM
HEATHER L. PICKERELL, ESQ., STATE BAR NO. 346211
HPICKERELL@KHPSLAW.COM
1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90067-4506
TELEPHONE: (310) 282-8989
FACSIMILE: (310) 282-8903

Attorneys for Plaintiffs EDWARD JOSEPH CASCIO,
DOMINIC SAVINI CASCIO, MARIE-NICOLE PORTE
and ALDO CASCIO

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| EDWARD JOSEPH CASCIO, an individual; DOMINIC SAVINI CASCIO, an individual; MARIE-NICOLE PORTE, an individual; and ALDO CASCIO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>THE MICHAEL JACKSON COMPANY, a limited liability company; JOHN BRANCA, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; JOHN MCCLAIN, as Co-Administrator of THE ESTATE OF MICHAEL JACKSON, Co-Trustee of the MICHAEL JACKSON FAMILY TRUST, and individually; MJJ PRODUCTIONS, LLC, a limited liability company; MJJ VENTURES, LLC, a limited liability company; HERMAN WEISBERG, an individual; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 2:26-cv-02129 HDV (AGRx)<br><br>**SUPPLEMENTAL DECLARATION OF FRANK CASCIO IN SUPPORT OF PLAINTIFFS' OPPOSITION TO JACKSON PARTIES' MOTION FOR ORDER COMPELLING ARBITRATION AND REQUEST FOR STAY OF ARBITRATION PROCEEDINGS AND PLAINTIFFS' OPPOSITION TO HERMAN WEISBERG'S JOINDER**<br><br>Action Commenced: February 27, 2026 |

6187.061/3254657.1                                1                    Case No. 2:26-cv-02129 HDV (AGRx)
SUPPLEMENTAL DECLARATION OF FRANK CASCIO

**SUPPLEMENTAL DECLARATION OF FRANK CASCIO**

I, FRANK CASCIO, declare as follows:

1.     I have personal knowledge of the facts set forth herein, which are known by me to be true and correct, and if called as a witness, I could and would competently testify thereto. This declaration is submitted in support of Plaintiffs' opposition to the Motion for an Order Compelling Arbitration and Request for Stay of Arbitration Proceedings ("Motion") filed by Defendants, The Michael Jackson Company, MJJ Productions, LLC, MJJ Ventures, LLC, John Branca, and John McClain (together, "Jackson Parties") and Plaintiffs' opposition to the Joinder filed by Herman Weisberg.

2.     Bryan Freedman, who was an attorney for the Estate of Michael Jackson ("Estate"), has submitted a declaration in support of the Jackson Parties' reply brief in support of their Motion. Mr. Freedman's declaration is full of falsehoods about my siblings—Edward Joseph Cascio ("Eddie"), Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio—and me.

3.     Mr. Freedman's declaration omits important context about my family's relationships with him, Mr. Weisberg, and the now-deceased Howard Weitzman. Mr. Freedman represented Eddie and Marie-Nicole's husband, James Porte, as their attorney from 2014 to 2022 in connection with a class action lawsuit concerning posthumous Michael Jackson records ("Records Matter"). It was the Estate who recommended Mr. Freedman to them, and the Estate paid for Mr. Freedman's attorney fees. In that matter, Eddie and James were not adverse to the Estate or any of the Jackson Parties. I had known and maintained a positive personal relationship with Mr. Weitzman and representatives of the Estate for years due to my family's and my relationship with Jackson and the Estate. Because of my family's existing relationship with Mr. Freedman and Mr. Weitzman, I viewed our communications with them as confidential and cooperative—not adversarial.

4.     Contrary to Mr. Freedman's testimony in paragraph 16 of his

declaration, we were never represented by Ken Katz or by any tax attorney. Mr. Katz is our family's neighbor and friend. Mr. Katz has never represented us as an agent or manager. My siblings and I do not have a tax lawyer. We have a tax accountant, John Tapinis. Defendants and Mr. Freedman were always aware that Mr. Tapinis is an accountant and not an attorney. The Estate required Mr. Tapinis to sign a non-disclosure agreement before advising us about the tax implications of the "Acquisition and Consulting Agreement" ("Agreement").

5.    Mr. Freedman's testimony in paragraphs 4 to 9 of his declaration contains misrepresentations about my family's initial contacts with the Estate concerning Jackson's sexual abuse.

6.    In 2019, Aldo told Mr. Katz that Jackson had abused him and other members of our family. Mr. Katz told me that he knew a private investigator, Mr. Weisberg, who had previously worked for the Estate. Mr. Katz invited me to join Mr. Weisberg and him for lunch.

7.    So, I joined Mr. Weisberg and Mr. Katz for lunch in Los Angeles, California. We discussed Jackson's sexual abuse of my siblings. Mr. Weisberg said that he had already set up a meeting with Mr. Freedman that day at his hotel, the Sunset Marquis. I was taken by total surprise. I had no idea that Mr. Weisberg had already set up a meeting with Mr. Freedman or anyone from the Estate. No one in my family had requested any meeting with the Estate or its representatives. Mr. Weisberg did not tell me that he was presently working for the Estate.

8.    Mr. Freedman showed up at the Sunset Marquis. He was wearing a suit. He told us that Mr. Weisberg had invited him to swim and "hang out" at the hotel. To be clear: Mr. Freedman wore his suit the entire time. He never changed into a swimming suit. Nor did I ask him to. In fact, Mr. Weisberg asked us all to put our phones on the table as a token of trust.

9.    My conversation with Mr. Freedman at the Sunset Marquis was deeply personal and emotional. The sole topic of discussion was the sexual abuse my

family suffered. The meeting was in no way adversarial. I never brought up any legal claim. I never threatened to sue the Estate. I never demanded payment. We never even discussed money or payment during the meeting. I never threatened to go public with my family's experience. I thought our past relationship with the Estate and Mr. Freedman's ongoing representation of Eddie and James made it possible for us to have a frank dialog about the sexual abuse. I was not furious or upset that Mr. Weitzman did not attend the meeting at the Sunset Marquis because I was blindsided by the existence of the meeting and I did not expect to be meeting him or anyone else from the Estate that day.

10. Paragraph 10 of Mr. Freedman's declaration contains falsehoods and mischaracterizations about the interviews that Mr. Weitzman and he conducted of my siblings and me. Mr. Weitzman, Mr. Freedman, and Mr. Weisberg met with each of us in Mr. Weitzman's office. Each of us was alone during the interview. None of us had an attorney present. Mr. Katz was not present. This alone should make clear that Mr. Katz did not represent us. None of us "indicated during those interviews that [we] had alleged sexual abuse claims [we] intended to assert." We told Mr. Freedman and Mr. Weitzman about what Jackson had done to our family. That was it. During our meetings, Mr. Freedman and Mr. Weitzman told us that they had sympathy towards our family and that they wanted to understand our experiences directly.

11. Mr. Freedman testifies in paragraph 10 of his declaration that Mr. Weitzman and he "did not believe the Cascios' alleged claims had merit." That is not what either Mr. Weitzman or Mr. Freedman represented to us. Mr. Weitzman informed me that Jackson had sexually abused others, including another girl. After Mr. Freedman and Mr. Weitzman listened to each of us describe Jackson's sexual abuse during our interviews, they got emotional and consoled us. Mr. Freedman, Mr. Weitzman, and Mr. Weisberg traveled to New Jersey to meet with my parents. My mother cooked for them. Mr. Freedman and Mr. Weitzman spent hours talking,

apologizing for what Jackson did to our family, eating, and drinking wine. Mr. Freedman and Mr. Weitzman were emotional with my parents as well. When Aldo had a mental health crisis in 2019, Mr. Freedman and Mr. Weitzman had Mr. Weisberg pay for Aldo's therapist in New York and for his treatment in Seattle for depression and trauma. Mr. Freedman and Mr. Weitzman would greet me with hugs. Why would Mr. Freedman and Mr. Weitzman do any of this if they did not believe us or if we were adverse to the Estate?

12.    Mr. Freedman's testimony in paragraph 13 about the Estate's offer to pay us $100,000 each is inaccurate. During a conversation, Mr. Weitzman told me that John Branca, the Co-Administrator of the Estate, wanted to offer us $100,000 each but that he would go back to Mr. Branca to ask that the Estate pay us more money. This was a unilateral offer on Mr. Weitzman's part. I did not demand that the Estate pay us more money. I never raised my voice at Mr. Weitzman or Mr. Freedman. I never threatened to "go public" with claims—we never threatened to bring any claims against the Estate.

13.    The Michael Jackson Company never agreed to pay each of us "a significantly greater amount of money in installments payable over a six (6) year period" after "lengthy negotiations" with me, as Mr. Freedman testifies. The Agreement required the Estate to pay each of my siblings and me $690,000 (minus a 6% commission to Mr. Katz and Mr. Weisberg) per year for five years. As I explained in my initial declaration, I asked the Estate to increase the first installment and to reduce the subsequent payments accordingly. The Estate requested that the payments now be spread over six years. Hence, the Estate increased the first payment to $800,000 (minus the 6% commission)—an amount the Estate chose— and spread the remainder of the total amount due under the Agreement across six years. The total amount remained the same. We never asked for more money.

14.    Shortly before my siblings signed the Agreement in December 2019, Mr. Freedman emailed Mr. Weisberg and Mr. Weitzman on November 28, 2019 that

Docusign Envelope ID: 1AAC56C1-4690-8408-8311-C77E80220D6D

"the Estate is interested in purchasing the Cascio's life rights, intellectual property, memorabilia, and consulting services in exchange for 15 million dollars paid over time. We are working on the preparation of documentation to memorialize this understanding." Mr. Weisberg sent a copy of Mr. Freedman's email to me. The email does not mention resolution of my family's claims or threats against the Estate because we had made no such threats or claims. **Exhibit 1** is a true and correct copy of this email.

15.     Mr. Freedman testifies in paragraph 16 of his declaration that "[at] no time did [he] ever state that the Cascios should not hire an attorney." This is untrue. To the contrary, Mr. Freedman, Mr. Weitzman, and Mr. Weisberg told us that we should not hire an attorney because we did not need one.

16.     Mr. Freedman's testimony in paragraphs 17 and 18 of his declaration about his contacts with my family in 2024 is false. I did not contact Mr. Weisberg. I was not "upset that [my family and I] did not receive enough money under the Agreement." I never "screamed" at Mr. Freedman. I never "said that the money [my siblings and I] received under the Agreement was not enough." Nor did I make "threatening and highly offensive statements concerning [Mr. Freedman's] son."

17.     Here is what actually happened. In March 2024, Mr. Weisberg and Mr. Katz contacted Eddie on behalf of Mr. Freedman. They relayed Mr. Freedman's message that the Estate would be willing to continue paying us. So, I had a phone call with Mr. Freedman and Mr. Weisberg. Mr. Freedman asked me what would constitute just compensation for our family. I asked what he would do if Michael Jackson sexually abused his son, as the singer had done to my siblings. Mr. Freedman responded: "Why would you go there?" Yet, within hours after that conversation, Mr. Weisberg called me and asked if our family wanted Mr. Freedman to represent us as his attorney. We were thrilled to work with Mr. Freedman, as he had represented our whole family's interests in 2019 (or so he led us to believe), he represented Eddie and James in the Records Matter for eight years, and he showed

Docusign Envelope ID: 1AAC56C1-4690-8408-8311-C77E80220D6D

enormous compassion to us after learning of the sexual abuse.

18. So, I had dinner with Mr. Freedman, Mr. Weisberg, and James at a sushi restaurant at the Fairmont Hotel in Santa Monica, California. Mr. Freedman told us that Mr. Branca wanted to make further payments to us. It was Mr. Freedman who said that the Estate had not paid us enough money. He said he was waiting for the Estate to sign a conflict waiver to allow him to represent us. Mr. Freedman called the Agreement "toilet paper" and said that he "had enough on the Estate" that would convince them to do right by us. Because of what Jackson did to us, Mr. Freedman said, the Estate would give our family whatever we wanted. Mr. Freedman said that before he passed away, Mr. Weitzman told Mr. Branca and him that we were an extraordinary family with an unbelievably powerful story to tell about Jackson and our experiences with him. Mr. Freedman also said that Mr. Weitzman had told him and Mr. Branca that he believed that Jackson had sexually abused my siblings. Mr. Freedman mentioned that Marie-Nicole's testimony was particularly powerful because others had witnessed Jackson molesting her. Notably, Mr. Freedman makes no mention of any of this in his declaration. Why would Mr. Freedman offer to represent our family in 2024 if we were adverse to him in 2019 and if he did not believe that Jackson had sexually abused my siblings?

19. After my siblings filed the complaint in this lawsuit in February 2026, the Jackson Parties served an arbitration demand on me, my siblings, and James. Exhibit 1 of the arbitration demand is a document that the Jackson Parties purported to be the Agreement. **Exhibit 2** is a true and correct copy of the document. This document looks very similar to the copy of the Agreement that Martin Singer attached as Exhibit 1 to his initial declaration in support of the Motion. But the documents are not the same. There are substantial differences in the terms between the Agreement and this document. For example, the mandatory arbitration and release provisions exclude claims related to the Records Matter. Also, the payment terms are different to those in the Agreement and excludes the 6% commission to

Mr. Weisberg and Mr. Katz that was present in the Agreement.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _6/2/2026_____, at _Los Angeles_____, _Ca_____.

DocuSigned by:

D5A0D6D3C4AA440...

Frank Cascio

SUPPLEMENTAL DECLARATION OF FRANK CASCIO

# EXHIBIT 1

**Heather L. Pickerell**

---

| | |
|---|---|
| **From:** | JPK 2014 <jpk2014@outlook.com> |
| **Sent:** | Monday, May 18, 2026 6:43 PM |
| **To:** | Howard King; Jackson Trugman; Heather L. Pickerell; Karen L. Sloane |
| **Subject:** | Fw: Rights Aquisition |

This message contains PRIVILEGED and CONFIDENTIAL information that is intended only for use by the named recipient. If you are not the named recipient, any disclosure, dissemination, or action based on the contents of this message is prohibited. In such case, please notify us and destroy and delete all copies of this transmission. This email shall not be forwarded, whether in electronic form or otherwise, without the express written consent of the sender.

---

**From:** francesco cascio <fdcascio@gmail.com>
**Sent:** Monday, May 18, 2026 7:42 PM
**To:** James Porte <jpk2014@outlook.com>
**Subject:** Fwd: Rights Aquisition


Kind Regards,

Frank

Mobile: 917.816.6400

Begin forwarded message:

> **From:** Herman Weisberg <herman@sageintell.com>
> **Date:** November 28, 2019 at 4:25:08 AM PST
> **To:** Ken Katz <katz.kenneth@gmail.com>, fdcascio@gmail.com
> **Subject: Fwd: Rights Aquisition**
>
>
>
> office 212-267-0028
> cell. 917-207-5285
> Herman@sageintell.com
> www.sageintell.com
>
> Begin forwarded message:
>
>> **From:** Bryan Freedman <bfreedman@ftllp.com>
>> **Date:** November 28, 2019 at 00:35:25 EST
>> **To:** Herman Weisberg <herman@sageintell.com>

1

**Cc:** Howard Weitzman <HWeitzman@kwikalaw.com>
**Subject: Rights Aquisition**


Herman, This will confirm that the estate is interested in purchasing the Cascio's life rights, intellectual property, memorabilia, and consulting services in exchange for 15 million dollars paid over time. If agreeable to the Cascio's, we expect the closing will take place prior to December 31, 2019 and effectuated by and through a written agreement between the parties.


We are working on the preparation of documentation to memorialize this understanding.


Thank you.


Bryan J. Freedman, Esq.
Freedman & Taitelman, LLP
1901 Avenue of the Stars, Suite 500
Los Angeles, California  90067
(310) 201-0005 Phone
(310) 201-0045 Facsimile
 www.ftllp.com

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above.  This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT 2

Confidential

# ACQUISITION AND CONSULTING AGREEMENT

This Agreement (the "Agreement") is made and entered into as of the date this Agreement is fully executed by the Parties (as defined below) (the "Effective Date") by and between The Michael Jackson Company, LLC ("MJC"), on the other hand, and Frank Cascio, Edward Cascio, Valeria Lissette Cascio (née Valeria Lissette Manchego), Dominic Cascio, Jr., Cindy Cascio (née Cindy Betancur), Aldo Cascio, Marie-Nicole Porte, James Porte, Dominic Cascio, Sr., and Connie Cascio (individually and collectively, the "Cascio Parties"), on the other hand. MJC and the Cascio Parties are sometimes referred to collectively herein as the "Parties" and individually as a "Party."

In consideration of the mutual promises and covenants contained in this Agreement, the Parties agree as follows:

1.     Life Story Rights. The Cascio Parties and MJC recognize that the Cascio family had a unique and close relationship to Michael Jackson such that Michael Jackson referred to them as a second family. As a result of this unique and close relationship, the Cascio Parties have unique knowledge about Michael Jackson that is not publicly known and that could be of great value if exploited. As consideration in addition to their other obligations under this Agreement, the Cascio Parties, and each of them, agree to grant to MJC, in perpetuity, the exclusive and irrevocable rights to the life story of each of the Cascio Parties as that life story relates to Michael Jackson in any way, and their interactions and relationships with Michael Jackson, or their knowledge of other Cascio Parties' interactions and relationships with Michael Jackson, from birth to the present (the "Cascio Life Story Rights"). The Cascio Life Story Rights include, but are not in any way limited to, all pictures, videos, audio recordings, or any other audio, visual or audiovisual works of the Cascios with Michael Jackson, Michael Jackson's family (including Michael Jackson's three children), and of the Cascios, along with all stories about the Cascio Parties' interactions with Michael Jackson that are not publicly known at the time of execution of this Agreement. The Cascio Life Story Rights include, but are not in any way limited to, all interactions with Michael Jackson relating to his use of prescription or other drugs, his use of alcohol, his mental and physical health, and any other private matters. The Cascio Parties agree not to disclose anything relating to the Cascio Life Story Rights to any other person or entity without the prior written and signed authorization of MJC, except for specific matters already publicly known by virtue of their public and widespread disclosure, prior to the Effective Date, by the press, by Michael Jackson, or by the Co-Executors of the Estate of Michael Jackson or those acting under their express, actual authority. Without limiting the foregoing, the Cascio Parties agree not to disparage Michael Jackson by portraying him in a negative light to any other person or entity regardless of whether such portrayal is based on matters that the Cascio Parties may believe to be true. The Cascio Parties recognize that the Cascio Life Story Rights are valuable, and their disclosure in violation of this Agreement, would constitute irreparable harm to MJC. For the avoidance of doubt, the Cascio Parties agree not to sell, license, or authorize anyone else to use or exploit the Cascio Life Story Rights and agree to use or exploit the Cascio Life Story Rights to anyone else.

2.     Consulting Obligations. As consideration in addition to their other obligations, promises, and services that the Cascio Parties agree to undertake incident to the terms and conditions of this Agreement, the Cascio Parties agree to consult with MJC at reasonable times

10386-00001/675087.4                    **Page 1 of 10**

Confidential

upon MJC's request in order to cooperate in efforts to exploit the Cascio Life Story Rights and also to help MJC exploit other unique information the Cascio Parties have about Michael Jackson. The Cascio Parties, and each of them agree to make themselves available, so long as they are given reasonable advance notice, to consult with MJC when MJC needs such consulting services.

3.    Payment. As financial consideration for all of the obligations, promises, and services that the Cascio Parties agree to undertake incident to the terms and conditions of this Agreement, MJC shall cause the following payments to certain of the Cascio Parties as follows (the "Payments").

a.    On January 31, 2020, eight-hundred thousand dollars ($800,000) to Frank Cascio; and on January 1, 2021, and continuing for five additional calendar years ending on January 1, 2025, MJC shall cause to be paid to Frank Cascio the annual sum of Five Hundred and Thirty Thousand Dollars (USD $530,000).

b.    On January 31, 2020, eight-hundred thousand dollars ($800,000) jointly to Edward Cascio and Valeria Lissette Cascio; and on January 1, 2021, and continuing for five additional calendar years ending on January 1, 2025, MJC shall cause to be paid jointly to Edward Cascio and Valeria Lissette Cascio the annual sum of Five Hundred and Thirty Thousand Dollars (USD $530,000).

c.    On January 31, 2020, eight-hundred thousand dollars ($800,000) jointly to Dominic Cascio, Jr. and Cindy Cascio; and on January 1, 2021, and continuing for five additional calendar years every calendar year ending on January 1, 2025, MJC shall cause to be paid jointly to Dominic Cascio, Jr. and Cindy Cascio the annual sum of Five Hundred and Thirty Thousand Dollars (USD $530,000).

d.    On January 31, 2020, eight-hundred thousand dollars ($800,000) to Aldo Cascio; and on January 1, 2021, and continuing for five additional calendar years ending on January 1, 2025, MJC shall cause to be paid to Aldo Cascio the annual sum of Five Hundred and Thirty Thousand Dollars (USD $530,000).

e.    On January 31, 2020, eight-hundred thousand dollars ($800,000) jointly to Marie-Nicole Porte and James Porte; and on January 1, 2021, and continuing for five additional calendar years ending on January 1, 2025, MJC shall cause to be paid jointly Marie-Nicole Porte and James Porte the annual sum of Five Hundred and Thirty Thousand Dollars (USD $530,000).

f.    On January 31, 2020, MJC shall cause to be paid jointly to Dominic Cascio, Sr. and Connie Cascio the sum of Ten Thousand Dollars (USD $10,000).

g.    MJC shall cause the Payments to be paid to the Cascio Parties via wire transfer or check as directed by the Cascio Parties (the "Payment Direction"). The Cascio Parties shall provide MJC with executed W-9 forms prior to payments being made. The Cascio Parties shall notify MJC in writing if there is any change to the Payment Direction.

h.    If the date by which any of the Payments are to be delivered falls on a Saturday, Sunday or legal holiday in the State of California or the United States, then the date

Confidential

said payment shall be delivered shall be the next following day which is not a Saturday, Sunday or legal holiday in the State of California or the United States.

4.      Releases. The Parties recognize that they have had actual and potential disputes in the past and, as part of this Agreement and in order to start on a "clean slate," the Parties agree it is in their mutual best interests to fully release each other from any and all claims that they may have against the other relating to any subject matter, known or unknown, from the beginning of time until the date of execution of this Agreement. Accordingly, the Parties hereby exchange the following releases:

a.      Except with respect to the obligations created by or arising out of this Agreement, the Cascio Parties, on behalf of themselves, and any of their companies, and each of the Cascio Parties' respective heirs, successors, assigns, licensees, subsidiaries, affiliates, representatives, beneficiaries, spouse, agents, employees, officers, members, managers and attorneys ("the Cascio Releasing Parties"), hereby fully and forever release and discharge MJC, Michael Jackson, the Estate of Michael J. Jackson, its Co-Executors, its individual beneficiaries (Michael Jackson's three children and Michael Jackson's mother), all companies owned in-whole or in-part by the Estate of Michael Jackson (including but not limited to all companies owned in-whole or in-part by Michael Jackson at the time of his death), personal representatives, and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers, members, managers, attorneys, insurers, sureties and agents ("the Estate Released Parties"), from any and all claims, causes of action, damages and any other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date that this Agreement is fully executed by the Parties, relating in any way to their individual and collective association with, interactions with, knowledge of, or experiences through Michael J. Jackson.

b.      Except with respect to the obligations created by or arising out of this Agreement, MJC and the Estate of Michael J. Jackson, on behalf of themselves, and any of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, representatives, beneficiaries, spouse, agents, employees, officers, members, managers and attorneys ("the MJC Releasing Parties"), hereby fully and forever release and discharge the Cascio Parties, and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers, members, managers, attorneys, insurers, sureties and agents ("the Cascio Released Parties"), from any and all claims, causes of action, damages and any other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date that this Agreement is fully executed by the Parties, relating in any way to their individual and collective association with, interactions with, knowledge of, or experiences through Michael J. Jackson.

c.      Excluded from this Release are any claims and causes of action on behalf of or against either the Estate Released Parties and the Cascio Released Parties relating to the tracks *Breaking News*, *Monster*, *Keep Your Head Up*, and the other tracks the Estate of Michael Jackson acquired from certain of the Cascio Parties or entities under their control ("the Cascio Tracks"). The Cascio Tracks are the subject of litigation in Los Angeles Superior Court, Case

Confidential

No. BC 548468. This exclusion from the Releases shall be narrowly construed to apply *only* to claims and causes of action directly relating to the Cascio Tracks and shall not be construed to extend to any other claims, causes of action, damages and other obligation of any kind and nature, at law, in equity, or otherwise, known or unknown, suspected or unsuspected, disclosed or undisclosed, arising from the beginning of time until the date of this Agreement.

d.      Nothing herein shall be construed to release any claims for breach of this Agreement. Nothing herein shall be construed as an admission of liability by any Party, and each Party expressly acknowledges and agrees that the other Party hereto has not admitted, and by execution or performance of this Agreement does not admit, any liability or obligation to the other Party, except for the obligations created by this Agreement.

5.      Waiver of Civil Code Section 1542 and Similar Laws. The Parties acknowledge that they may hereafter discover facts different from, or in addition to, those now known or believed to be true relating to the Action. Notwithstanding the existence of any such different or additional facts, the Parties hereby agree that this Agreement shall remain in full force and effect. The Parties hereby waive any and all rights which they have or may have under the provisions of Section 1542 of the California Civil Code as now worded and as thereafter amended, along with any other similar principles of law in other jurisdictions. Section 1542 of the California Civil Code reads as follows:

> SECTION 1542. A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

The Parties hereby waive and relinquish any right and benefit which either Party or any other party may have under Section 1542 to the extent that such party may lawfully do so in connection with the subject matter hereof.

6.      Confidentiality and Non-Disparagement.

a.      Each Party shall forever maintain the confidentiality of and shall not disclose this Agreement or anything relating thereto, including but not limited to the Agreement's existence, terms, subject matter, etc., along with the Cascio Life Story Rights, information relating to the Cascio Life Story Rights, other than information relating thereto that is already publicly known at the time of execution of this Agreement (the "Confidential Information") to any third-party except insofar as disclosure is necessary to be made to the Party's respective accountants and attorneys (who will similarly keep the terms and conditions of this Agreement confidential and shall sign appropriate non-disclosure agreements). Should any Party be served with legal process that may be interpreted to require disclosure of this Agreement, that Party shall advise the other Parties immediately upon receipt of such process and in advance of any such disclosure in order to allow any of the other Parties to bring an appropriate motion for a protective order or other motion or action. Any action to enforce this

10386-00001/675087.4                          Page **4** of **10**

Confidential

Agreement must be brought pursuant to Paragraph 20 below. Nothing herein shall be construed to prevent disclosure required by law.

b.       The Parties agree to refrain from making any statement or taking any action, directly or indirectly, orally or in writing, that may defame, disparage, embarrass, or in any way harm or impair the reputation, goodwill, business interests or financial interests of any of the other Parties, including the Cascio Releasing Parties and the Estate Released Parties, except as required by law or in connection with a legal or administrative proceeding.

7.       <u>Representations And Warranties</u>. The Cascio Parties, and each of them, hereby represent and warrant that they have not defamed, disparaged, embarrassed, or in any way harmed or impaired the reputation, goodwill, business interests or financial interests of Michael Jackson, his Estate, his companies (including MJC) and/or that they have not shared the Confidential Information except to individuals and/or entities the Cascio Parties have previously expressly advised MJC and its representatives. Each of the Cascio Parties shall provide MJC with a written list of persons or entities that they have disclosed Confidential Information at the time of execution of this Agreement or within seven days thereafter and each of the Cascio Parties shall sign his or her respective list (or a joint list by more than one person). It is understood by the Parties that these representations and warranties are essential to this Agreement, and if they are breached and/or turn out to be false in any material way, MJC shall have the right to cancel all future Payments and seek the return of all Payments made to the Cascio Parties, along with interest at the legal rate against the Cascio Parties.

8.       <u>Cross-Default; A Breach by One Is a Breach by All</u>.

a.       If any of the Cascio Parties: (i) discloses information relating to the Cascio Life Story Rights (except for information publicly known at the time of execution of this Agreement) to any person other than MJC and the Estate Released Parties as set out in Paragraph 1 without the express written consent of MJC or the Estate Released Parties; or (ii) breaches or causes the breach of the Confidentiality or Non-Disparagement provisions in Paragraph 6, then any outstanding obligation of MJC to make the Payments shall be void, and MJC shall be entitled to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below. Each Party understands the significance of the Confidential Information remaining confidential, and that this Paragraph is a material term of this Agreement. The Cascio Parties hereby agree that if any of the Confidential Information becomes public, then MJC shall have no further financial obligation to any of the Cascio Parties, including but not limited to the Payments, and that MJC shall no longer be bound by this Paragraph 20. Without limiting the foregoing, the Cascio Parties understand that a breach by one of them is a breach by all of them and a breach by one of them shall relieve MJC of any obligation to make further Payments and shall entitle MJC to to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below.

b.       If any of the Cascio Parties' Representations and Warranties, as set out above in Paragraph 7, turn out to be false then any outstanding obligation of MJC to make the Payments shall be void, and MJC shall be entitled to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a

Confidential

proceeding set forth in Paragraph 20 below. Without limiting the foregoing, the Cascio Parties understand that a breach by one of them is a breach by all of them and a breach by one of them shall relieve MJC of any obligation to make further Payments and shall entitle MJC to to recover any Payments already made by MJC to the Cascio Parties (with interest at the legal rate), including but not limited to in a proceeding set forth in Paragraph 20 below.

9. <u>Indemnification</u>. The Cascio Parties, jointly and severally, hereby agree to indemnify and hold harmless MJC from and against any and all claims, demands, causes of action, costs, expenses, losses, damages, judgments, and reasonable outside attorneys' fees ("Claims") arising out of or resulting in any way from any breach by any of the Cascio Parties of the representations and warranties set forth in Paragraph 7 above.

10. <u>No Fiduciary Relationship</u>. The Parties agree that this Agreement does not create any sort of joint venture or fiduciary relationship between the Cascio Parties and MJC.

11. <u>Representation By Counsel</u>. All Parties expressly acknowledge that they either have been represented by counsel of their choosing or have had the opportunity to consult with independent counsel in connection with this Agreement. Accordingly, any principle requiring that ambiguities in a writing be construed against its drafter shall have no application to this Agreement.

12. <u>Authority to Bind</u>. The undersigned signors for each of the Parties represent and warrant that they are duly authorized to execute this Agreement on behalf of their respective Parties and have full authority to act for their respective Parties in making all promises, representations, releases, and covenants set forth in this Agreement.

13. <u>No Waiver</u>. No waiver of any breach of a covenant, condition or promise of this Agreement shall be deemed to be a waiver of any other or subsequent breach of a covenant, condition or promise, whether of like or different nature.

14. <u>Integration</u>. This Agreement expresses the entire agreement of the Parties hereto. No recitals, promises, agreements, representations or warranties of any kind whatsoever have been made or have been relied upon by any Party hereto, except as specifically set forth in this Agreement. All prior discussions and negotiations regarding the subject matter of this Agreement have been and are merged and integrated into, and are superseded by, this Agreement.

15. <u>Written Modifications Only</u>. This Agreement may not be modified in any way whatsoever, except in a writing signed by all Parties.

16. <u>Construction of Agreement</u>. This Agreement shall be construed as a whole according to its fair meaning. The headings used in this Agreement are for reference only and shall not affect the construction of the Agreement.

17. <u>Jointly Drafted</u>. This Agreement shall be deemed negotiated and drafted jointly by the Parties hereto, and shall not be strictly construed for or against any of the Parties hereto, and none of the Parties shall be deemed to be the sole drafter.

Confidential

18.    Severability. The Parties agree that in the event that any provision of this Agreement should be held by a court of competent jurisdiction to be void, voidable, illegal or unenforceable in any respect, the remaining provisions shall still remain in full force and effect.

19.    Governing Law, Mandatory Arbitration, Venue, And Jurisdiction. This Agreement shall be governed and interpreted under the laws of the State of California without reference to choice of law rules. Any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof, and any other further disputes between the Parties relating to any subject matter other than the Cascio Tracks, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Los Angeles County, California, before a retired judge or justice of a California or Federal court. Without limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court. Any such arbitration shall be filed with and administered by JAMS or Signature Resolution, at the claimant's choice, pursuant to their then current general arbitration rules. With respect to any procedural, substantive or other conflicts between the California Arbitration Act and the Federal Arbitration Act, the Federal Arbitration Act shall govern. If neither JAMS nor Signature Resolution (or successor entities) shall exist at the time of a demand for arbitration, the arbitration shall be filed with and administered by ADR Services pursuant to its applicable arbitration rules at the time of filing. If ADR Services does not exist at the time of the demand for arbitration, the arbitration shall be filed with AAA or any other arbitration service. The filing of an action in a public court relating to this Agreement shall constitute a breach of this Agreement, and the confidentiality provisions thereof, and shall entitle the non-breaching Party to all damages, including attorneys' fees expended in compelling arbitration, resulting therefrom. Each Party irrevocably submits to the exclusive jurisdiction and exclusive venue of the state and federal courts located in the County of Los Angeles, State of California for any necessary court proceedings, such as petitions to confirm or vacate an arbitral award.

20.    Attorneys' Fees. The Parties agree that they shall bear their own costs, expenses and attorneys' fees relating to the negotiation of this Agreement. In any subsequent legal proceeding between the Parties that may arise out of or relate to this Agreement, the prevailing party shall be entitled to recover its costs, expenses, and reasonable attorneys' fees.

21.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the Parties, along with their respective successors and assigns.

22.    Communications. All written communications that are required or otherwise may be given under this Agreement shall be deemed delivered and given upon personal delivery, facsimile transmittal or e-mail transmission thereof to the people and addresses shown below:

As to the Cascio Parties, address to:
Frank Cascio
Tel: (917) 816-6400
Email: fdcascio@gmail.com

As to MJC, address to:
Howard Weitzman
Kinsella Weitzman et al.
808 Wilshire Blvd, Third Floor
Santa Monica, CA 90401
Tel: (310) 566-9800
Email: hweitzman@kwikalaw.com

10386-00001/675087.4                    Page 7 of 10

Confidential

From time to time, either Party may substitute a different representative than the representatives or attorneys listed above to receive any notice, request, instruction, or document to be provided under this Agreement. The Party shall advise the other Party in writing of a change in that Party's representative.

      23.    <u>Counterparts</u>. This Agreement may be executed by way of one or more counterparts, each of which shall be deemed an original, but all of which together constitute one agreement among the parties hereto. Each of the Parties hereto agrees that a fax or email transmission of a signature on this document shall constitute a valid execution of this document, and shall be sufficient to formally bind, at the time of transmission, the party whose signature was transmitted by fax or email.

      IN WITNESS WHEREOF, the Parties have approved and executed this Agreement on the dates set forth opposite his, her or its respective signatures.

      EXECUTED by the Parties as follows:

<u>By the Michael Jackson Company</u>

_____      Dated: _____

By _____, an Authorized Signatory

<u>By Frank Cascio</u>

_____      Dated: _____
Frank Cascio

<u>By Edward Cascio</u>

_____      Dated: _____
Edward Cascio

Confidential

By Valeria Lissette Cascio

_____          Dated: _____
Valeria Lissette Cascio

By Dominic Cascio, Jr.

_____          Dated: _____
Dominic Cascio, Jr.

By Cindy Cascio

_____          Dated: _____
Cindy Cascio

By Aldo Cascio

_____          Dated: _____
Aldo Cascio

By Marie-Nicole Porte

_____          Dated: _____
Marie-Nicole Porte

10386-00001/675087.4                  Page **9** of **10**

Confidential

By James Porte

_____          Dated: _____
James Porte


By Dominic Cascio, Sr.

_____          Dated: _____
Dominic Cascio, Sr.


By Connie Cascio

_____          Dated: _____
Connie Cascio