UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES

| | |
|---|---|
| EDWARD JOSEPH CASCIO, et al., Plaintiffs, v. THE MICHAEL JACKSON COMPANY, et al., Defendants. | Case No. CV 26-2129-HDV (CTSx) Los Angeles, California Thursday, June 18, 2026 10:25 A.M. to 11:03 A.M. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE HERNÀN D. VERA
UNITED STATES DISTRICT JUDGE

Appearances: See Page 2

Deputy Clerk: Wendy Hernandez

Court Reporter: Recorded; CourtSmart

Transcription Service: JAMS Certified Transcription
16000 Ventura Boulevard #1010
Encino, California 91436
(661) 609-4528

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES:

For the Plaintiffs:

King Holmes Paterno and Soriano LLP
By: HOWARD E. KING
HEATHER L. PICKERELL
1900 Avenue of the Stars, 25th Floor
Los Angeles, California 90067
(310) 282-8989
hking@khpslaw.com
hpickerell@khpslaw.com

For the Defendants:

Singer Weinstein Wolf and Jonelis LLP
By: MARTIN D. SINGER
ALLISON S. HART
2049 Century Park East, Suite 2400
Los Angeles, California 90067
(310) 556-3501
mdsinger@singerlaw.com
ahart@singerlaw.com

Freedman Firm PC
By: MICHAEL G. FREEDMAN
1801 Century Park East, Suite 450
Los Angeles, California 90067
(310) 285-2210
michael@thefreedmanfirm.com

Robert and Robert PLLC
By: CLIFFORD S. ROBERT
526 RXR Plaza
Uniondale, New York 11556
(516) 832-7000
crobert@robertlaw.com

LOS ANGELES, CALIFORNIA, THURSDAY, JUNE 18, 2026, 10:25 A.M.

THE CLERK: Calling item three, Civil 26-2129, *Cascio, et al. v. The Jackson Company* [sic], *et al.*

Counsel, please state your appearances.

HEATHER L. PICKERELL: Good morning, Your Honor. Heather Pickerell and Howard King on behalf of the plaintiffs.

THE COURT: Good morning.

MARTIN D. SINGER: Good morning, Your Honor. Martin Singer and Allison Hart on behalf of the Jackson defendants.

THE COURT: Good morning.

MICHAEL G. FREEDMAN: Good morning, Your Honor. Michael Freedman and Clifford Robert on behalf of Defendant Herman Weisberg.

THE COURT: Good morning.

CLIFFORD S. ROBERT: Good morning, Your Honor.

THE COURT: All right. Please take a seat, counsel. We're here on, essentially, a motion to compel arbitration. We've had surreplies. We've had additional declarations. We've had joinders. I want to cut through all of that and focus on the issues that are most in dispute. But just for completeness, why don't I invite Mr. Singer or counsel for Mr. Weisberg to present the motion, and I'll jump in with questions as appropriate, but more specifically

focusing on the EFAA and the issue here about when the claim arose or accrued, as well as whether this was a predispute arbitration agreement. Those are the issues that I'm more focused on.

MR. SINGER: Thank you, Your Honor. I appreciate that.

And I think what's significant here is -- what we're dealing with is a settlement agreement which was signed in January of 2020, where more than $16 million was paid and in -- specifically in the agreement itself, it referred to the fact that the plaintiffs were releasing their claims. In fact, they expressly released the claims that are now being sought to litigate again before you.

And also, they also agreed not only that it has to be resolved in arbitration, they -- there's a very broad delegation clause -- appreciate, though, it's -- the issue is whether the EFAA applies. They don't dispute that they signed the agreement. They don't dispute they accepted all the benefits. They don't dispute there's a broad arbitration agreement or that it has a delegation clause. So now the issue is, under the EFAA, it has no application to the facts in this case since all the facts of the alleged sexual assault dispute arose before the parties signed the agreement and they agreed to arbitrate. No one's going to pay $16 million if there is no dispute and no claims, which

occurred here.

THE COURT: Counsel, what should I do, though, about, one, the title of the document? Calling it a "consulting agreement" and not being specific about the claims -- I mean, I think I would agree with you that it seems clear from the point of view of common sense that the parties knew that what was being released were these -- you know, these assault allegations, but it's not exactly what the agreement says. I mean, it's broad, I grant you that, but --

MR. SINGER: Well, the fact that they -- what you label the agreement is irrelevant per se, in my opinion. It's the substance of what's agreed in the agreement.

And I think what's important is to look at paragraph 4 of the agreement, which is attached as Document 22-1, attached to Mr. Singer's declaration -- my declaration, and specifically -- this is the key language. It's in the agreement. It says (reading): The parties recognize they have had potential disputes in the past and as part of the agreement and in order to start on a, quote, "clean slate," the parties agree it is in their mutual best interest to fully release each other from any and all claims that they may have against the other relating to any subject matter, known or unknown, from the beginning of time to the date of execution of this agreement.

It is clearly acknowledging they had potential disputes. The Cascio parties do not dispute that they disclosed all their claims of sexual assault or sexual harassment or any claims that they had. They acknowledged there was an original proposal of $100,000 per person which was rejected. Then -- and you have this agreement, and even though it was signed in December 2019 by most of the Cascios, one member did not sign it until January of 2020, and then there was a major amendment to the agreement, which plaintiffs concealed from the Court. When they filed the Complaint, they did not disclose the fact that, after this agreement was entered into to deal with the claims, in fact they negotiated an amendment which provided an additional over a half-million dollars to be paid upfront that was not going to be paid, and that is significant, and it is evident that plaintiffs intentionally did not acknowledge those facts.

Now, in terms of --

THE COURT: Why is that all important? That just dealt with the timing of the first payment.

MR. SINGER: Well, because they claimed there was no agreement being negotiated concerning these claims. We agree, Your Honor, the -- they --

THE COURT: Well, they -- they're not saying there wasn't negotiations. They're saying there wasn't a dispute

because they thought that -- I guess that Mr. Freedman -- Bryan Freedman was acting in their -- you know, on their behalf. So it's a slightly different argument but --

MR. SINGER: But they also claimed there was no negotiation of an agreement. They said it was presented to them; they just signed it. That is not a fact.

But whether Bryan Freedman had a potential conflict is irrelevant to the issues before you. The only issue is was there a -- was there a claim of sexual assault? There's no dispute, every plaintiff has acknowledged they disclosed the claims or they disclosed their -- the allegations of the sexual assault. They then disclosed the fact there was an initial proposal to pay X and then they made a new agreement to pay Y and then again there was an increase. And it is significant because one of their claims is "We were just presented with it. We had no opportunity to sign it." Yet they were able to -- they were able to then have it modified. And it is significant to get an extra half-million dollars upfront.

THE COURT: How did that happen? Was the brother Frank essentially operating as their agent? I mean, how did that --

MR. SINGER: Well, first --

THE COURT: -- come about?

MR. SINGER: Bryan Freedman has disputed in his

declaration, but even if he was acting as their agent, that doesn't dispute whether or not the agreement is governed by the EFAA. They may have a claim against Bryan Freedman. That doesn't mean that all their claims about whether the agreement is enforceable goes before the arbitrator. Plaintiffs are not prohibited from asserting any of their defenses. If they claim, "We didn't have counsel," "We thought we had this lawyer representing us, but he represented the other side," well, yes, and then what happens? You resolve the dispute. The issue is where does it get resolved? And it gets resolved, and there's a broad arbitration provision.

In addition, as the Supreme Court has held, when you have a broad delegation clause, which exists in this agreement, it's the arbitrator who makes that determination. But every claim that they have to the invalidity of the agreement, whether Bryan Freedman acted in an inappropriate manner or whether they were just presented as is -- all of those claims can be resolved before the arbitration.

And it's important to note, Your Honor, as we put in the papers, this is forum shopping. The exact same matter was before a state judge in California in February and just before the agreement -- just before the judge had given a tentative in state court this matter has to go to arbitration, they then filed this action before you -- the

other members of the Cascio family. But this concept of an -- the EFAA doesn't apply -- and let's look at all the cases that they even --

THE COURT: And meanwhile, there -- in addition to the state court action, there's a pending arbitration. I couldn't quite follow where that is.

MR. SINGER: I can explain to you what's going on there, Your Honor.

So the Jacksons filed an arbitration first because there was extortion here -- alleged extortion, that notwithstanding a signed settlement agreement, notwithstanding the fact they waited five years to get every penny that they were owed, which is over $16 million, they made a demand for $213 million. An arbitration was commenced initially against Frank Cascio. While that case is pending, the attorneys for Mr. Cascio --

THE COURT: That was in 2024; right? That -- that's been going on for a while?

MR. SINGER: That is going on right now.

In addition, the arbitrator allowed -- once we knew that there was a breach now by the other Cascio family members, because they've done television interviews, they have breached, allegedly, the confidentiality provisions, the arbitrator has agreed that we have the right to amend -- we did have the right to amend our arbitration demand to now

include all the Cascios. So there is a pending arbitration against all the Cascios, Frank Cascio and the plaintiffs in this case, including the husband of one of the defendants -- excuse me -- one of the plaintiffs, James Porte. That case is pending before the arbitrator.

Now, the issue is they want to get out -- we say, "You now have to go forward with the pending arbitration that involves all the parties," and their defense is "Well, the EFAA applies because we didn't have a claim then." That is not the type of cases that exist for the EFAA. What are the type of cases? Somebody worked somewhere, and before any alleged claim occurs, you may have an arbitration agreement signed, and then you make a claim for sexual assault or sexual harassment or any other type of claim, they would say, "Therefore this" -- in fact, I can distinguish those cases that are cited.

There has never been a case cited, nor can there be a case, that you would have the right to assert a claim for sexual assault, reach an agreement, and at the -- after you reach the agreement, and under the agreement you get paid, and it says, "If there's a future dispute, we go to arbitration" -- and not only did they agree to have an arbitration brought, they also agreed under the broad delegation power, which says the arbitrator will determine whether the matter is arbitrable or not. Now, yes, they try

to argue, "Well, the EFAA applies, and therefore the arbitrator shouldn't make that decision"; so then the only issue is -- from the EFAA -- Was there a claim asserted? If there was no claim asserted, do you think a party would pay someone $16 million over five years? Of course there was a claim asserted.

And the actual document -- the fact that they -- by the way, so for paying that kind of money, they also got their life rights, and what's the significant of the life rights? "Life rights" means they cannot now go forward and try to sell a story about what happened to them during their life, which would include the alleged potential claims. So when you call it a "life rights" agreement, yes, life rights agreement says, if a party says that "I have been sexually assaulted," even though you have a release, does that mean that you cannot now come forward and do a movie and --

THE COURT: No, I understand all that. We're getting, I think, off the path here.

MR. SINGER: Yeah, I understand.

THE COURT: So -- but it's not -- the issue is at any point prior to this, did the parties' interests become adverse? They have filed declarations saying in those interviews that Freedman and, I think, Weitzman did, they didn't assert a claim, but I think it does stand to reason, and I would agree with you, that from a common sense

perspective there was an opposition of interests that would lead to an agreement that includes a release, but I'm still struggling with how that is defined. I mean, was there really a dispute or interests that were adverse or not?

MR. SINGER: Well, Your Honor, if I may, I want to focus on the language of the statute and Chapter 4, subparagraph 1, and if you look at the language of this paragraph and then you look at paragraph 4 of the settlement agreement, it clearly falls squarely under the fact that it does not -- that the EFAA does not apply. Paragraph 1 for definitions it says (reading): Predispute arbitration agreement. The term "predispute arbitration agreement" means any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement.

THE COURT: Right.

MR. SINGER: So no five people come forward and say, allegedly, "Michael Jackson sexually assaulted me, Michael Jackson did this to me, Michael Jackson did this to me. He assaulted me. He engaged in this conduct." Now you enter into negotiations of an agreement -- there's -- we -- I'm not going to repeat that, but let's look at the language of the release. The language of the release says (reading): The parties recognize they have had potential disputes in the past -- they had potential disputes in the past -- we're not -- the future -- and as part of the agreement, we'll have a

clean slate, and we give a release.

So it is clear when you look at the language -- having a dispute doesn't mean you have to send a demand letter. Having a dispute doesn't mean that you have to file a lawsuit. What bigger dispute is it -- in fact, the allegations are that the -- the Cascios didn't want to get caught for extortion so, when they asked to meet with Bryan Freedman immediately, this shows you that they recognized the -- while the claim was being made, they requested that Bryan Freedman show up at a hotel in West Hollywood wearing a bathing suit to make sure he's not wearing a mic while they're disclosing their claims. He's saying Michael -- if someone says, "Michael Jackson assaulted me," is that not a claim? Of course it's a claim. "Michael Jackson did A, B, C, or D to me"; yes, that is a claim.

But the issue is was there a dispute? Of course there was a dispute. Why would a party pay 16 million over five years and then have language of this agreement? The -- independent of the fact of this significant negotiation and the language of the declaration is, if you look at the Cascio declarations, they all state that as of 2019 they disclosed allegations of sexual abuse to the representatives of the Estate and they sought compensation. That establishes an adverse legal interest. As I say, you don't have to file a

lawsuit. You don't have to have hostile correspondence. You don't even have to have hostile negotiations or the fact that it was cordial negotiations. Yes, it's cordial; you want to reach a deal.

And in terms of the -- and here's the other two admissions, Your Honor, that you cannot -- in my opinion, should not be ignored by the Court. We have two judicial admissions by counsel, one counsel who's present here, one counsel who was involved previously. In Exhibit 7 --

THE COURT: The King letter, you're saying?

MR. SINGER: Well, here -- here's the issue, Your Honor: There is judicial admissions confirming there was a dispute. Howard King, who -- attorney who filed this proceeding, he wrote a letter on September 23, 2024, that was attached as Exhibit 7 to my declaration. He admits -- he states -- he admits that the Cascio parties revealed in 2019 they had been molested by Michael Jackson for decades.

But here's the bigger admission by their counsel: Mark Geragos admitted in the -- it's attached as Exhibit 8 to my declaration. Mark Geragos states, quote (reading): The agreement was executed solely to resolve all such claims. That is their lawyer -- the Cascios' lawyer. If that's not a judicial admission -- and it was filed in the superior court. Mr. King wrote a letter. Mr. Geragos wrote -- he submitted a document that was filed in the Los Angeles Superior Court.

And nothing happened in 2024. What happened in 2024? The only thing that happened in -- they wanted more money. They didn't now say, "Oh, by the way, we've asserted these claims." No. They say, "You know what? We asserted these claims. We got paid $16 million, but, you know, maybe Jordy Chandler got paid more. We want more money. You know how much more money we want? We want $213 million." That's what happened in 2024. That was not the -- the dispute was whether they breached the agreement and committed extortion.

And the question is -- under the law is, is the dispute definite and concrete, touching the legal relationships of parties having an adverse legal interest? How could you not have a dispute more discrete -- excuse me -- more distinct than someone claiming, "By the way, Michael Jackson, when he was alive, sexually abused me, sexually assaulted me"? How could someone think that was not a dispute or a claim, and then they get compensated for it.

THE COURT: Okay. I understand. I appreciate that. Anything else you'd like to add. I'm going to give you a chance --

MR. SINGER: Well, the only thing is, if it's necessary, which I don't think it's necessary, but it's up to you, Your Honor, I can distinguish their three cases they cited, but all their cases involve the standard predispute arbitration agreement. That's what the -- what the EFAA was

to do and has -- the law has evolved over the last several years. The courts wanted to make it clear that, if you had an arbitration agreement where you worked as an employee or you had an agreement that says, "I'm going to resolve all my disputes in the future," and then you make a claim later "By the way, my boss" or "my coworker sexually assaulted me," the court said, "Okay. Those type of disputes should not go to arbitration." That is not what this dispute is about.

THE COURT: Okay.

MR. SINGER: This dispute is -- everyone -- their lawyers acknowledge there was a dispute. The lawyers acknowledge they were paid money to resolve their claims. Nobody gets paid $16 million over five years if there's no dispute and there's no claims, and the fact that Bryan Freedman allegedly has a conflict, Hey, they could raise that with the arbitrator. That is not -- the issue before you is was there a dispute or not? Of course there was a dispute. And the fact they didn't send a letter is irrelevant.

THE COURT: All right. Counsel, I understand. I need to call on other counsel. Let me call up either Mr. Freedman or Mr. Robert just to -- if -- in case you want to add anything for Mr. Weisberg. Otherwise --

MR. FREEDMAN: Your Honor, we --

THE COURT: I know there's a joinder but --

MR. FREEDMAN: We've joined. If the Court has any

questions about our joinder or the challenge to it, I can address it briefly, but otherwise, we would submit.

THE COURT: Okay. All right.

MR. FREEDMAN: Thank you.

THE COURT: Very good. So now who wants to argue for the plaintiffs?

MS. PICKERELL: Good morning, Your Honor.

THE COURT: Good morning.

MS. PICKERELL: As you've pointed out, this is a straightforward legal question, and it has a straightforward answer: Was the document that the plaintiffs signed in 2019 a predispute arbitration agreement? The Sixth Circuit, the Third Circuit, and the Eighth Circuit have spoken directly to this issue. The answer under the case law and the plain and ordinary meaning of the EFAA clearly must compel the Court to conclude that the answer is "yes." That should be the end of the Court's analysis, and that alone requires denying the motion to compel arbitration as to the entire case.

What has been missing from the briefing on the defendants' side, and even today in this hearing, is what does the law actually say about when a dispute arises? It's not when a claim is asserted, contrary to what Mr. Singer just connoted. It is not when a claim accrues. It is when a dispute arises. That is very clear in Section 401(1). And what did the Sixth Circuit say in *Memmer*, what did the Third

Circuit say in *Cornelius*, and what did the Eighth Circuit say in *Famuyide*? It is when the parties become formally adverse to each other, when the injured party does one of the following: sends a demand letter, files an administrative charge, requests arbitration, or commences a lawsuit.

THE COURT: But those are examples. They're not the "be all end all" of when interests become adverse. That's why I asked the question and I'm still struggling philosophically -- wish I was back in law school -- as to what that means. Again, as I said, from a common sense perspective, saying that these alleged assaults happened and demanding compensation does appear to put your interests adverse to the Estate.

MS. PICKERELL: Yes, Your Honor. And I completely understand where your common sense intuition comes from given the chronology of the events. It's hard to look at a situation, even as Mr. Singer points out, where an agreement is signed and then a dispute arises after. It's an uncommon situation, but it's the situation here.

And let me use *Famuyide*, actually, the Eighth Circuit case, to illustrate. In that case an employee who worked for Chipotle was sexually assaulted at work. She brought internal complaints to Chipotle, which they ignored. Then she retained an attorney, who sent multiple letters to Chipotle, including one that says, quote (reading),We are

considering pursuing a civil action against Chipotle, and asked Chipotle to respond whether, quote (reading), it is interested in discussing an out-of-court resolution with Ms. Famuyide of her claims.

That is a stronger example of a potential dispute than what is in the present case, and we'll get into what happened here shortly, but the Eighth Circuit said that was not a dispute. It's not a dispute because, according to the Eighth Circuit, these kinds of explanatory letters do not constitute formal adversity. Those kinds of explanatory letters are, quote (reading), communications that result in amicable resolution between the correspondents.

That, Your Honor, is what happened here. We had an amicable resolution between the victims of Michael Jackson's sexual abuse and the Estate, who offered to compensate them for their trauma. They had an amicable resolution facilitated by Mr. Bryan Freedman, an attorney who was actively representing the interests of both sides. He had a good attorney-client relationship with one of the plaintiffs. His fees were being paid by the Estate under a retainer agreement that the plaintiffs signed. They were told they didn't need to hire an attorney. There was no dispute here in the legal sense. All of the evidence that Mr. Freedman has presented in his declaration of swimming suit meanings and TIFFs and slam phone calls, even if taken as true, that's

not a legal dispute, and that's very clear based on the Sixth Circuit, Eighth Circuit, and Third Circuit precedents.

That's ultimately what the Court needs to focus on here and shouldn't be distracted by all of these little details about what may or may not have happened. There is no evidence of any demand letter, any arbitration request, any litigation -- nothing that could constitute formal adversity, and that should resolve the instant matter before the Court.

I do want to take a moment to also emphasize the significance of the text of the agreement. As Your Honor has already pointed out, the agreement is titled as an "Acquisition of Life Rights," and it was structured that way. No one denies that the agreement's release provision does refer to, quote, "potential disputes," but this was not a settlement agreement. It doesn't refer to actual disputes anywhere. It doesn't refer to any of the disputes that existed between the parties for a reason. They intentionally --

THE COURT: But that juxtaposition of the interviews where all the allegations were made and the agreement -- the amount of the agreement, the release -- it would be hard to dispute that that wasn't what was intended, and as Mr. Singer points out, your clients' prior lawyers admitted as much several times that was the purpose of the agreement.

MS. PICKERELL: Yes, Your Honor. There's two points here. Let me take the first point, the piece about whether Mark Geragos made these judicial admissions in the separate proceeding in the superior court. First of all, he was not the plaintiffs' attorney in that proceeding. That proceeding only involved Frank Cascio. He's not a party to that case. The law is clear that statements made in proceedings that are not the one before this Judge, they're not judicial admissions. As a matter of law, it's not a judicial admission. As a matter of practice, it wasn't any kind of admission made on behalf of plaintiffs. The single sentence in this pleading has been kind of plucked out of context and ultimately, again, refers to claims, not to disputes. They are different. The EFAA makes that clear. They're not the same thing. The single sentence of Mark Geragos in an unrelated case involving a party that is not the plaintiffs cannot sink this entire -- the entire position that we've assumed here.

As for what happened during these interviews, again, it is Bryan Freedman's position that each plaintiff came up and explained, "This is the claim I'm going to bring against the Estate." That's not what happened. Each of the plaintiffs have attested that that was not the case.

And it bears noting that, again -- that Bryan Freedman put in his declaration a client confidential

communication he had with one of the plaintiffs. That alone should lead the Judge to conclude that the declaration is self-serving. It's vague, it's conclusory as to Freedman's interactions with the plaintiffs themselves, and it also bears noting at this point that it creates no evidentiary basis for Mr. Weisberg, at least, to say that he had any dispute with the plaintiffs in 2019. In fact, to this point, we have heard no evidence and no argument from Mr. Weisberg's counsel about why he has any contractual right to enforce the arbitration agreement as a nonsignatory. We've heard nothing from them.

Mr. Freedman's declaration cannot be the basis on which Your Honor grants the motion to compel arbitration. If it does, Your Honor really does need to hear his live testimony to test his credibility, but the bottom line is that his declaration stands for one thing alone: He has beef with Frank Cascio. That's not a dispute with the plaintiffs, it's only maybe a dispute between the Michael Jackson Company and Frank Cascio, it's not a dispute with the rest of the Jackson defendants, and it's certainly not a dispute with Herman Weisberg.

I do want to take one final piece before -- I want to present one final piece to your -- to Your Honor about the timing of when the sexual assaults happened. Mr. Singer has repeated the argument that because Michael Jackson sexually

assaulted plaintiffs as children long before the agreement was entered into that means that the dispute could not have arisen in a matter that would help us here. That's not the case, Your Honor, and in fact, one of the cases that the defendants --

THE COURT: Well, I think the argument there is that's when the claim accrued, not -- the language uses "arise or accrue," and they're in a disjunctive. So I thought that that argument goes to the accrual.

MS. PICKERELL: That's right, Your Honor. Right? Their issue is whether the dispute accrued -- sorry -- the dispute arose at a certain point or when the claim accrued, and in fact one of the cases that they've cited explains the difference. This is *Kader v. Southern California Medical Center Inc.* This is a California Court of Appeals case from 2024, 99 Cal.App.5th two-twenty-fourteen. In that case the conduct constituting sexual harassment occurred before the agreement was signed, and the California Court of Appeal still said even though the claim accrued before the agreement was signed, the dispute did not arise until after. And this was in fact a case where the victim complained internally about the sexual abuse that was happening. Their own case demonstrates that the fact pattern here, despite it defying common sense, the dispute still did not arise until after the agreement was signed. That is possible and the California

Court of Appeals has acknowledged that.

Same with *Johnson*, a case that we cited in our briefs, a Southern District of New York case, 657 F.Supp.3rd 535. One of the acts of sexual harassment occurred before the agreement was signed, and yet arbitration was barred as to the entire case.

I know Your Honor is having a lot of difficulty wrapping your mind around the existence of the release provision; so I do want to emphasize something here. If this were a different case, I would agree with you, that a release provision could counsel the Court to conclude that this is evidence that there was a dispute. But this is a one-of-one case. This is not an ordinary employment dispute. This is not an ordinary employment agreement. Those are the cases that typically fall under the EFAA's purview.

This was a case where the plaintiffs -- again, represented by Bryan Freedman -- were, under amicable circumstances, encouraged to sign an agreement that they did not read, that was read out to them that they signed. We now have two documents that the defendants portend is the agreement. We don't even know if the document they signed had a release provision. That is an outstanding factual issue that needs to be resolved. We don't know if the document they signed had any release provision. The release provision in the two different documents are differently

worded. That's suspicious.

THE COURT: But you started you started your presentation saying this is all legal. Now you're back to saying we need an evidentiary hearing.

MS. PICKERELL: No, Your Honor. I should clarify. It is all legal, and Your Court does not actually need to host an evidentiary hearing to resolve this issue. Again, the analysis is clear: Was there a dispute? No demand letter. No formal adversity. That is simple. But if Your Court -- if Your Honor is going to credit the defendants' version of events, credit Bryan Freedman's version of events, credit the text of the agreement, and point to the text of the agreement to rule in favor of the defendants, that would not be proper because there are outstanding factual disputes as to his testimony and outstanding factual disputes as to whether or not there even was a release provision in the document they signed. So I would just ask Your Honor not to resolve the motion on those grounds, but you can resolve it on purely legal grounds, a straightforward legal analysis.

THE COURT: Okay. All right. Understood. Thank you, Counsel.

MS. PICKERELL: Thank you, Your Honor.

THE COURT: Brief rebuttal?

MR. SINGER: Thank you very much, Your Honor. I'll

be very (inaudible). If not, I know you'll cut me off. But I apologize for (indecipherable) that comment.

But just so it's clear -- I just want to make it clear for -- with respect to Mr. Weisberg, he is a signatory to the arbitration provision. He is a signatory to the letter of direction, which is a modification. He specifically signed it. All parties agreed, including the Cascios -- and by the way, Frank Cascio, who they claim they don't represent, signed the letter of direction not only on his behalf but on behalf of all the Cascio family members. So there's no dispute that Mr. Weisberg is also subject to the same issue here.

And I think it's important to point out: What is this case about? This case is not about a sexual assault. This case is about them trying to get out of an agreement to get more money. What are their claims? Rescission, avoidance of the releases, a declaration regarding enforceability, damages for alleged breach of the agreement, fraud in connection with the agreement, and the fiduciary duty claims. That's what their claims are in this case, Your Honor. It's not that a sexual assault occurred afterwards. It's the fact that they signed an agreement, got paid money over five years, "You know what? We want more money." That's what this dispute is about. This dispute is not covered by the EFAA. There was clearly a dispute there.

And what's important to focus on is, yes, you can look at it's a life rights agreement, and I explained to you why you would want a life rights agreement, because you want to have it broader than just a release to make sure they cannot sell their life stories and say, "This is what happened to us." This agreement contains very strict confidentiality provisions. You would not have these strict confidentiality provisions but for the fact that you want to make sure that whatever claims existed, whatever the issues were, can never come forward, and that is in fact the claims that are being made by my client in the arbitration: "We paid you $16 million for you to be confidential. You didn't. You've done television interviews." You wouldn't have strict confidentiality provisions in this type of an agreement.

And lastly, I just want to focus on this one case *Famuyide v. Chipotle* -- apologize for my accent -- *Chipotle Mexican Grill*, the Eighth Circuit case. That case actually helps us. There's nothing in that case that disputes the type of facts we have here because in the *Famuyide* case was a dispute arise -- it says (reading): when one side asserts a claim or demand and the other side responds adversely. Someone says, "I'm sexually assaulted." How do you respond adversely? "Okay. I'm going to pay you $16 million." It clearly fits within that.

And what I need -- what, I think, we need to just look at: This was a dispute, and their lawyers acknowledged it. And it's just a creative argument to say, "We want more money." That's what this case is about. And because the contract has a strong delegation authority, it is the arbitrator who determines whether the matter goes to arbitration, recognizing, Your Honor, you have to determine from the first instant whether EFAA does apply, and it is clear there is not one case throughout the country that has ever determined that when someone got paid significant money and then because you -- you could not assert more of a dispute or a claim that someone sexually assaulted you when you were a minor. That, to me, is -- there is no bigger type of dispute you can assert.

But in any event, there is not one case that they cite, nor can they cite, that deals with the fact where someone disclosed some tort occurred, some injury occurred to the alleged plaintiff; and then they got paid a lot of money; and it says, if there's a future dispute, you go to arbitration; the arbitrator determines "Oh, the EFAA applies." There is no such case, Your Honor. This would be -- you would be -- if you made a decision in their favor, you would be basically turning the EFAA on its head, where anyone who settles a claim could say, "Oh, I want more money because that agreement is invalid. Well, now I have a new dispute, and

therefore, because it involves sexual assault, I have the right now not to go to arbitration but go to court." That is exactly what is happening here, Your Honor.

THE COURT: Okay. All right. Thank you to both sides for the excellent briefing, and the matter will be deemed submitted.

MR. SINGER: Thank you so much.

MS. PICKERELL: Thank you, Your Honor.

(Proceedings adjourned at 11:03 a.m.)

///

///

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Julie Messa
Julie Messa, CET**D-403
Transcriber

July 18, 2026
Date