UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD JOSEPH CASCIO et al., | Case No. 2:26-cv-02129-HDV-CTS |
| Plaintiffs, | **ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION [22, 30]** |
| v. | |
| THE MICHAEL JACKSON COMPANY et al., | |
| Defendants. | |

1

## I.      INTRODUCTION

This action arises out of a dispute between Plaintiffs Edward Jospeh Cascio, Dominic Savini Cascio, Marie-Nicole Porte, and Aldo Cascio (collectively "Plaintiffs") and Defendants The Michael Jackson Company ("MJC"), John Branca, John McClain, MJJ Productions, LLC, MJJ Ventures, LLC, and Herman Weisberg (collectively "Defendants").  Plaintiffs allege that Michael Jackson ("Jackson") drugged, raped, and sexually assaulted each of the Plaintiffs when they were children and that Defendants were complicit in the abuse.

Before the Court is Defendants' Motion to Compel Arbitration ("Motion") [Dkt. 22]. Defendants assert that the parties entered into a settlement agreement in 2019 with express releases for the claims at issue, and contend that any dispute over the agreement should be sent to arbitration under the specific terms of the parties' contract.  Plaintiffs respond that the parties' arbitration provision in the parties' 2019 agreement is unenforceable pursuant to the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA").  The EFAA amended the Federal Arbitration Act ("FAA") to invalidate and prohibit enforcement of "***predispute*** arbitration agreement[s]" that "relate[] to [a] sexual assault dispute or [a] sexual harassment dispute."  9 U.S.C. § 402(a) (emphasis added).  The EFAA does not apply retroactively to sexual assault disputes occurring before the effective date of the statute in March 2022.  The two issues presented in this Motion are thus: (1) do the claims involve a "sexual assault dispute," and (2) when did the parties' dispute technically arise?

The Court concludes that the claims presented undoubtedly involve a sexual assault dispute as defined in the EFAA.  But the Court nonetheless finds that the parties' interests became adverse—and the parties' dispute therefore arose—in the summer of 2019 when the Plaintiffs disclosed the alleged abuse to the Defendants for the first time and the parties engaged in back-and-forth negotiations over the specific payments to be provided.  Because the arbitration provision was executed *before* the effective date of the statute, and *after* the commencement of the parties' dispute, the EFAA does not apply.  Although the allegations are horrific, the Court is without discretion to do aught but enforce the language of the arbitration clause.

The Motion is granted.

2

## II.  BACKGROUND

Plaintiffs (all now adults) met Jackson when they were children.  Complaint ¶ 23 [Dkt. 1].  Plaintiffs allege that Jackson sexually abused each of them for years, and that the abuse continued into their adolescence.  *Id.*  Each Plaintiff maintains that Jackson raped, molested, or sexually assaulted them on interstate and international trips.  *Id.* ¶¶ 24–27.  Plaintiffs aver that the release of the documentary *Leaving Neverland* in 2019—an account of Jackson's alleged sexual abuse of other children—"deprogrammed" them and forced them to recognize for the first time that Jackson's actions were wrong and "severely damaged them."  *Id.* ¶ 42.  Plaintiffs further contend that, during the alleged sexual assault encounters with Jackson, Defendant John Branca ("Branca"), Defendant John McClain ("McClain"), and other individuals working for The Estate of Michael Jackson (the "Jackson Estate"),[1] were aware of Jackson's sexual abuse of the Plaintiffs.  *Id.* ¶ 38.

In 2019, Plaintiffs were introduced to Defendant Herman Weisberg ("Weisberg"), a private investigator.  *Id.* ¶¶ 16, 43.  Weisberg purportedly promised to assist the Plaintiffs' family with obtaining fair compensation from Jackson's Estate for the alleged sexual abuse they suffered as children.  *Id.* ¶ 43.  Plaintiffs allege that Weisberg convinced Plaintiffs that he was working for them but concealed that his actual job was to "neutralize the threat that *Leaving Neverland* would trigger public disclosures from other Jackson victims, including Plaintiffs."  *Id.* ¶¶ 43, 45.

In June 2019, Plaintiffs assert that they shared explicit details with Bryan Freedman and the late Howard Weitzman, both attorneys for the Jackson Estate, about the abuse they experienced by Jackson.  *Id.* ¶¶ 49–50.  Plaintiffs were initially offered $100,000 each from the Jackson Estate.  *Id.* ¶ 54.  According to Plaintiffs, Weitzman informed them that this amount was inadequate and promised to try to negotiate a higher amount from Branca.  *Id.* ¶¶ 54–55.  In the months that followed, the Jackson Estate and the Plaintiffs (through their brother, Frank Cascio) negotiated the compensation.  Reply in Support of Motion ("Reply") [Dkt. 35] at 5; Complaint ¶¶ 54, 60; Declaration of Bryan Freedman ("Freedman Decl.") ¶¶ 12–15 [Dkt. 35-2]; Declaration of Martin D. Singer in Support of Motion ("Singer Decl.") ¶ 6, Ex. 1 [Dkt. 22-1].

---

[1] Both Branca and McClain are currently, and throughout this dispute have been, co-administrators of the Jackson Estate and co-trustees of the Michael Jackson Family Trust.  *Id.* ¶¶ 11, 12.

3

On December 22, 2019, Weisberg told the Plaintiffs that the Jackson Estate was "prepared to compensate them fairly" and presented them with an "Acquisition and Consulting Agreement" (the "Agreement"), which was characterized as a "life rights" agreement.  Complaint ¶¶ 56, 58–59. Plaintiffs contend that they were not given a copy of the Agreement, but that a family member read it aloud to them during dinner at the Cascio family restaurant in New Jersey.  *Id.* ¶¶ 56–57, 64.  The Agreement provided that each Plaintiff would be paid five annual payments of "approximately $690,000" as compensation for the alleged sexual abuse.  *Id.* ¶ 60.  At the request of Plaintiffs' brother, the amount of the first payment was increased to $800,000.  Motion at 15; Opposition at 5 (citing Declaration of Frank Cascio ("Frank Decl.") ¶ 7).

The Agreement contains an arbitration clause prohibiting Plaintiffs from filing claims in a court of law.  Complaint ¶ 66; Singer Decl., Ex. 1.  Plaintiffs signed the Agreement, and their signatures were notarized by a notary public that Weisberg purportedly brought to the restaurant that day.[2]  Complaint ¶ 68.  Plaintiffs do not contest that the required payments have all been made.

In April 2024, Plaintiffs allege that Weisberg contacted them again, indicating that Branca would increase their compensation in exchange for continued silence.  *Id.* ¶ 71.  When Plaintiffs demanded compensation "proportional to Jackson's crimes and the harm they caused," Branca and the Jackson Estate purportedly made false and defamatory statements to reporters that were published and circulated to the public.  *Id.* ¶ 75.  According to Defendants, before receiving the final payments under the Agreement in 2024, Plaintiffs and Frank Cascio demanded that they be paid $213 million (later reduced to $44 million), or they would file a public lawsuit alleging various tort claims against MJC and other Defendants.  Motion at 9–10.  On September 17, 2024, MJC initiated an Arbitration against Frank Cascio, asserting claims for civil extortion, anticipatory breach of contract, and declaratory relief.  *Id.* at 16; Singer Decl. ¶ 14.  After counsel for Plaintiffs threatened to file lawsuits for defamation and various other claims against Defendants on October 11, 2024, Singer Decl. ¶ 17, MJC filed a Petition to Compel Arbitration ("Petition") in the Los Angeles Superior Court against

---

[2] The Agreement was signed by Plaintiffs on December 22, 2019, and by Plaintiffs' brother, Frank Cascio, on January 10, 2020, and is thus referred to as the "2020 Agreement."  Singer Decl. Ex. 1.

4

Frank Cascio and Does 1-10.[3]  Motion at 16–17; Singer Decl. ¶25.  On January 14, the Los Angeles Superior Court announced a tentative ruling in favor of MJC and issued a final ruling granting the Petition on March 4, 2026.  Motion at 17; Singer Decl. ¶¶ 26, 29, Exs. 5, 6.

On February 27, 2026, Plaintiffs filed this lawsuit.  The Complaint alleges claims for (1) Sex Trafficking of Children by Force, Fraud, or Coercion in violation of 18 U.S.C. §§ 1591, 2255; (2) Negligence; (3) Negligent Hiring, Supervision, or Retention of Employee; (4) Intentional Infliction of Emotional Distress; (5) Breach of Contract; (6) Fraud; (7) Breach of Fiduciary Duty; (8) Rescission; and (9) Declaratory Judgment.  Defendants now move to compel arbitration based on the arbitration clause in the Agreement pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and the California Arbitration Act, Cal. Civ. Proc. Code § 1281.  Singer Decl., Ex. 1 at ¶ 20.  The Motion is fully briefed.  *See* Opposition [Dkt. 29]; Reply [Dkt. 35].  Weisberg joins in the Motion.  *See* Joinder of Herman Weisberg in Motion to Compel Arbitration ("Joinder") [Dkt. 30].  The Court heard oral arguments and took the matter under submission.  [Dkt. 46].

## III.    LEGAL STANDARD

The FAA "governs arbitration agreements in contracts evincing 'a transaction involving commerce.'"  *Zoller v. GCA Advisors, LLC*, 993 F.3d 1198, 1201 (9th Cir. 2021) (quoting 9 U.S.C. § 2).  It "declares 'a liberal federal policy favoring arbitration' and provides that such agreements 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'"  *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) and 9 U.S.C. § 2).  In cases governed by the FAA, courts must treat the "arbitration clause as severable from the contract in which it appears, and thus apply the clause to all disputes within its scope."  *Granite Rock Co. v. International Broth. of Teamsters*, 561 U.S. 287, 298–99 (2010).

The FAA allows "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.  A district court facing such a motion must determine, "(1) whether a valid agreement

---

[3] This proceeding, filed on July 9, 2025, was *The Michael Jackson Company, LLC vs. Frank Cascio, et al.*, LASC Case No. 25SMCP00385.  Singer Decl. ¶ 25.

to arbitrate exists, and if it does, (2) whether the agreement encompasses the dispute at issue." *Revitch v. DIRECTV, LLC*, 977 F.3d 713, 716 (9th Cir. 2020) (quoting *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). "If the answer to both questions is yes, then the FAA requires a court 'to enforce the arbitration agreement in accordance with its terms.'" *Id.* (quoting *Chiron Corp.*, 207 F.3d at 1130). Under the FAA, motions to compel arbitration are evaluated on the summary judgment standard based on Rule 56. *Hansen v. LMB Mortgage Servs.*, 1 F.4th 667, 670 (9th Cir. 2021).

## IV.   DISCUSSION

The arbitration clause in the Agreement addresses the governing law, venue, jurisdiction, and mandatory arbitration. Singer Decl., Ex. 1 at ¶ 20. The portion of the arbitration clause addressing arbitrability provides:

> Any dispute, claim or controversy arising out of or relating to the Agreement or the breach, termination, enforcement, interpretation or validity thereof, including any allegations that either Party has violated any state or federal statutory or common law right, along with the determination of the scope, enforceability, or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Los Angeles County, California, before a retired judge or justice of a California or federal court.

*Id.* The clause further provides that the question of arbitrability must be decided by an arbitrator, stating that "[w]ithout limiting the foregoing, the question of arbitrability is itself a question to be resolved finally by the arbitrator and not by a court." *Id.*

Defendants contend that a valid and enforceable arbitration agreement governs this dispute and that "'any dispute, claim or controversy arising out of or relating to' the Agreement—including disputes over arbitrability itself—must be resolved exclusively in arbitration." Motion at 9 (quoting Agreement). While Plaintiffs maintain that the Agreement is unconscionable on numerous other grounds, they concede that these arguments are beyond the scope of this Motion. *See* Opposition at 4 n.4 (citing Complaint ¶¶ 43–79).

6

The Court concludes that the arbitration language in the parties' Agreement encompasses the Plaintiffs' claims in this action.[4]  Indeed, the Plaintiffs' Complaint admits that the five annual payments were to compensate for the alleged sexual abuse.  Complaint ¶ 60.  While Plaintiffs are fully within their rights to raise questions about unconscionability, those challenges must be presented later before an arbitrator since arbitrability was expressly left to that forum.[5]

### A.    The EFAA

Plaintiffs principally contend that arbitration is precluded under the EFAA, an amendment to the FAA which forecloses enforcement of "predispute arbitration agreements" involving sexual assault and sexual harassment disputes.  The EFAA amended the FAA to invalidate and prohibit enforcement of "predispute arbitration agreement[s] [and] predispute joint-action waiver[s]" for "case[s] . . . filed under Federal, Tribal, or State law" that "relate[] to [a] sexual assault dispute or [a] sexual harassment dispute."  Pub. L. No. 117-90, 136 Stat. 26, 28 (2022), *codified at* 9 U.S.C. §§ 401–402; § 402(a).  The applicability of the EFAA to an arbitration agreement is a threshold question to be determined by the court rather than an arbitrator.  9 U.S.C. § 402(b).

Under the EFAA, a "sexual assault dispute" is defined as "a dispute involving a nonconsensual sexual act or sexual contact, as such terms are defined in section 2246 of title 18 or similar applicable Tribal or State law, including when the victim lacks capacity to consent."  § 401(3).  There can be no serious doubt that the Complaint alleges a sexual assault dispute under the EFAA.  Specifically, Plaintiffs aver that Jackson committed "sexual acts" defined by 18 U.S.C. §

---

[4] Defendants are either direct signatories to the Agreement or intended beneficiaries pursuant to the express terms of the contract.  Singer Decl. ¶ 12, Ex. 1 at ¶ 4(a) ("[T]he Cascio Parties . . . hereby fully and forever release and discharge MJC, Michael Jackson, the Estate of Michael J. Jackson, its Co-Executors . . . all companies owned in-whole or in-part by the Estate of Michael Jackson (including but not limited to all companies owned in-whole or in-part by Michael Jackson at the time of his death), personal representatives, and each of their respective heirs, successors, assigns, licensees, subsidiaries, affiliates, affiliated entities, representatives, beneficiaries, spouse, employees, officers, members, managers, attorneys, insurers, sureties and agents ("the Estate Released Parties").").

[5] Plaintiffs raise arguments about potential conflicts of interest by various attorneys whom Plaintiffs allege effectively represented both them and the Jackson Estate.  Opposition at 4, 5; Complaint ¶¶ 48, 72–73.  Those arguments, while serious, must also be presented to the arbitrator.  Singer Decl., Ex. 1 at ¶ 20.

7

2246(2), that Jackson committed rape as defined by California Penal Code Section 261, and that Jackson committed sexual battery under California Penal Code Section 243.3. Opposition at 11–12; Complaint, *see e.g.*, ¶¶ 23–27. The allegations fit squarely within the EFAA definition.

The dispositive issue here is *when* a dispute arose between the parties. The EFAA applies to "any dispute or claim that arises or accrues on or after the date of enactment of this Act," which occurred on March 3, 2022. Pub. L. No. 117-90, § 3, 136 Stat. 26, 28 (2022). Specifically, the Court must determine whether a dispute had arisen at the time the Agreement was made, before the March 3, 2022 effective date of the EFAA. The timing of when a dispute arose is thus determinative of whether the Agreement, and its attendant arbitration clause, governs this dispute.[6]

The parties have different positions on this key issue.

Plaintiffs contend that the dispute between the parties did not arise until 2024, when Plaintiffs' counsel told Martin Singer, an attorney for the Jackson Estate, that they intended to challenge the Agreement as unconscionable and void. Opposition at 15. Plaintiffs maintain that the parties' interests never became adverse until that time. In support of this theory, they point out that Plaintiffs never filed a civil action against the Defendants, never sent a demand letter, and never requested arbitration before the Agreement was executed in 2019. *Id.* at 15–16. Moreover, Plaintiffs assert that because representatives of the Jackson Estate approached Plaintiffs proactively offering compensation for Jackson's alleged sexual abuse, and because this was done in an attempt to "neutralize" any potential threat of public disclosure, there was no dispute in 2019 when the Agreement was signed. *Id.*

In contrast, Defendants maintain that there *was* a dispute in 2019 that led to the signing of the Agreement. Reply at 5–6. According to Defendants, Plaintiffs' brother, Frank Cascio, purportedly demanded in 2019 that the estate pay him and his siblings, or they would "go public" with their abuse allegations. *Id.* (citing Declaration of Bryan Freedman ("Freedman Decl.") ¶¶ 5, 8 [Dkt. 35-2]). Moreover, it is undisputed that negotiations did occur. Plaintiffs were initially offered $100,000 to resolve their sexual assault allegations, but eventually received $3,450,000, paid over a

---

[6] Defendants make a similar argument that the EFAA does not apply here because it only prevents enforcement of "predispute" arbitration clauses. Reply at 4. The analysis is essentially the same.

period of five years. *Id.* at 6; Singer Decl., Ex. 1 at 2, Ex. 2. Defendants assert correctly that this money paid to each of the Plaintiffs under the Agreement "was not a gift," but was "consideration for Plaintiffs' release of their alleged sexual misconduct claims." Reply at 5.

Under the EFAA, when a dispute arises is "a fact-specific inquiry." *Combs v. Netflix, Inc.*, 180 F.4th 1201, 1205 (9th Cir. 2026) (quoting *Memmer v. United Wholesale Mortgage, LLC*, 135 F.4th 398, 409–10 (6th Cir. 2025)). The Ninth Circuit has acknowledged that a "dispute may arise on the date that a lawsuit was filed," but "may arise earlier, too." *Id.* While Plaintiffs are correct that a "sexual assault dispute" does not require the party to plead a sexual assault claim in a court of law, a "dispute" does exist when there is "some aspect of opposition or disagreement" between the parties. *Id.* (quoting *Cornelius v. CVS Pharmacy Inc.*, 133 F.4th 240, 246 (3d Cir. 2025)); *see also* Black's Law Dictionary (11th ed. 2019) (defining "dispute" as a "conflict or controversy").

The Ninth Circuit's recent ruling on this issue in *Combs v. Netflix, Inc.* is instructive. *Id.* The Court in *Combs* explained that, in determining when a dispute arises under the EFAA, "the relevant question is when the parties became adverse to one another." *Id.* (quoting *Memmer*, 135 F.4th at 409). Parties become adverse when one sends a "demand letter, files an administrative charge, requests arbitration . . . or, some other event occurs." *Memmer*, 135 F.4th at 409. It went on to note that "a dispute arises when one party asserts a right, claim, or demand, and the other side expresses disagreement or takes an adversarial posture." *Combs*, 180 F.4th at 1205 (quoting *Kader v. S. Cal, Med. Ctr., Inc.*, 99 Cal. App. 5th 214, 223 (2024)). But a dispute does not arise merely "whenever the underlying challenged conduct occurred" because that would equate the key timing with "whenever a 'claim' accrues." *Id.*

Applying this framework, the Court concludes that a "dispute" between the parties arose when the Plaintiffs first disclosed the alleged abuse to the Jackson Estate and entered into a series of negotiations over the Agreement. It is beyond cavil that Defendants disagreed with the accuracy of these claims and did not wish these allegations to become public. Motion at 13; Singer Decl. ¶ 4; Freedman Decl. ¶ 10. And it is likewise undisputed that the Plaintiffs negotiated for and received compensation under the Agreement for the nondisclosure of this information and the release of claims. Complaint ¶¶ 54, 60; Singer Decl. ¶ 6, Ex. 1 at 2–4; Reply at 5; Freedman Decl. ¶¶ 11–15.

9

At that point, during the summer of 2019, the parties' interests were undoubtedly adverse to each other. *See, e.g., Memmer*, 135 F.4th at 409 (A dispute arises between parties under the EFAA when they become "adverse" to each other.). It belies common sense to argue otherwise. Indeed, the purpose of the Agreement was to resolve Plaintiffs' claims against Defendants, which it did by compensating them in exchange for their silence.

Based on the record presented, the Court finds that a "sexual assault dispute" arose between parties in 2019 when the Agreement was negotiated and executed. The EFAA by its terms cannot apply to a dispute that arose before the effective date of the statute.[7]

## V. CONCLUSION

For the foregoing reasons, the Motion is granted.[8] Proceedings in this Court are stayed pending the completion of arbitration.

Dated: August 12, 2026

_____
Hernán D. Vera
United States District Judge

---

[7] Alternatively, Defendants contend that the EFAA prohibition does not apply because the Agreement is not a "predispute arbitration agreement." Reply at 4. The Court agrees. A "predispute arbitration agreement" is defined by the EFAA as "any agreement to arbitrate a dispute that had not yet arisen at the time of the making of the agreement." 9 U.S.C. § 401(1). Because the Court finds that the dispute arose prior to the execution of the Agreement, the EFAA cannot be invoked to void the arbitration clause.

[8] The Court finds that the arbitration agreement applies to Defendant Weisberg. Although Weisberg was not a signatory to the Agreement, he did sign the January 28, 2020 Letter of Direction ("Letter") pertaining to the Agreement and incorporating the Agreement by reference. Singer Decl., Ex. 2 at 1–2. Plaintiffs' brother, Frank Cascio, signed the Letter on behalf of himself and the Plaintiffs. *Id.* The Letter states that Weisberg and his agent will receive 3% of all payments made to Plaintiffs under the Agreement, and specifies that the binding arbitration clause of the Agreement "is incorporated herein by this reference and made a part of this Letter." *Id.* at 1–2. The Letter further states that "any potential dispute arising out of or relating to this Letter also arises out of and relates to the Agreement and must be arbitrated pursuant to . . . the Agreement." *Id.*